UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION VIII

UNITED STATES DEPARTMENT OF THE ARMY

UNITED STATES DEPARTMENT OF THE INTERIOR
ROCKY MOUNTAIN REGION

AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| ROCKY MOUNTAIN ARSENAL, ) | FEDERAL FACILITY |
| COLORADO ) | AGREEMENT PURSUANT TO |
| ) | CERCLA SECTION 120 |
| UNITED STATES DEPARTMENT ) | |
| OF THE ARMY ) | |
| ) | |
| SHELL OIL COMPANY ) | Docket No. CERCLA VIII-89-13 |

Federal Facility Agreement )
Pursuant to Section 120 of )
the Comprehensive Environmental )
Response, Compensation and )
Liability Act of 1980, as amended )
by the Superfund Amendments and )
Reauthorization Act of 1986, )
42 U.S.C. §§ 9601-9675 )
)

---

## FEDERAL FACILITY AGREEMENT

---

**B8900038**
Exhibit B
Page 1 of 128

# TABLE OF CONTENTS

Page

I.      JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    EFFECTIVE DATE, PUBLIC COMMENT AND EFFECT
        ON PRIOR AND OTHER AGREEMENTS . . . . . . . . . . . . . . . . 6
        (i)    Effective Date of Agreement . . . . . . . . . . . . . . . . . . . 6
        (ii)   Public Review of Agreement . . . . . . . . . . . . . . . . . . 7
        (iii)  Interpretation with Respect to Other Agreements . . . . . . . . . 7
        (iv)   Relation to Future Consent Decree . . . . . . . . . . . . . . . . 7

IV.     THE SITE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.     CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . 11

VII.    DETERMINATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VIII.   ROLE OF DOI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IX.     ROLE OF ATSDR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

X.      ROLE OF THE STATE . . . . . . . . . . . . . . . . . . . . . . . . . . 15

XI.     LEAD AGENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

XII.    OPERABLE UNITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

XIII.   ROLE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

XIV.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

XV.     RMA COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XVI.    RMA COUNCIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

XVII.   STEERING AND POLICY COMMITTEE ("SAPC") . . . . . . . . . . . 28

XVIII.  FINAL REVIEW COMMITTEE ("FRC") . . . . . . . . . . . . . . . . 28

- i -

Page

XIX.     TECHNICAL REVIEW COMMITTEE ("TRC") . . . . . . . . . . . . . . 29

XX.      ADOPTION OF TECHNICAL PROGRAM PLAN . . . . . . . . . . . . . 30

         (i)     Purpose of Technical Program Plan . . . . . . . . . . . . . . . . . . 30

         (ii)    Development of Drafts of Technical
                 Program Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

         (iii)   Approval of Technical Program Plan . . . . . . . . . . . . . . . . 32

         (iv)    Subsequent Extensions of Deadlines . . . . . . . . . . . . . . . . 33

         (v)     Amendment of the Technical Program Plan . . . . . . . . . . . . 33

XXI.     EXCHANGE AND PRESERVATION OF INFORMATION . . . . . . 33

XXII.    ASSESSMENT AND IMPLEMENTATION OF
         INTERIM RESPONSE ACTIONS . . . . . . . . . . . . . . . . . . . . . . . 37

XXIII.   EMERGENCY ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

XXIV.    REMEDIAL INVESTIGATION/FEASIBILITY STUDIES . . . . . . . 45

         (i)     Responsibilities for On-Post Operable Unit . . . . . . . . . . . . 45

         (ii)    Responsibilities for Off-Post Operable Unit . . . . . . . . . . . 46

         (iii)   Product Managers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

         (iv)    Interaction of Lead Agency and Lead Party . . . . . . . . . . . . 46

         (v)     Designation of New Products and Subproducts . . . . . . . . . . 46

         (vi)    Effect of New Product or Subproduct
                 Designation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

         (vii)   Revision of On-Going RI Products or
                 Subproducts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

         (viii)  Preparation of New Technical Plans . . . . . . . . . . . . . . . . . . 47

                 (a)     Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

- ii -

Page

(b)     Initial Effort to Reach Consensus on the Scope of Work for New Technical Plans . . . . . . . . . 48

(c)     Draft Technical Plans for New Products and Subproducts . . . . . . . . . . . . . . . . . . . . . . . . . . 48

(d)     Review and Comment on Draft Technical Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

(e)     Draft Final Plans and Response to Comments . . . . . . . . . . . . . . . . . . . . . . . . . . 49

(f)     Availability of Dispute Resolution . . . . . . . . . . . . . . . 49

(g)     Finalization of New Technical Plans . . . . . . . . . . . . . . 49

(ix)     On-Going Technical Plans . . . . . . . . . . . . . . . . . . . . . . . . 50

(x)     Draft and Final Reports for Products and Subproducts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

(a)     Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

(b)     Product and Subproduct Reports for On-Post Operable Unit . . . . . . . . . . . . . . . . . . . . . . . 51

(c)     Product and Subproduct Reports for Off-Post Operable Unit . . . . . . . . . . . . . . . . . . . . . . . 53

(d)     Meetings of the RMA Committee on the Development of Products and Subproducts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

(e)     Identification and Determination of Potential ARARs . . . . . . . . . . . . . . . . . . . . . . . . . . 53

(f)     Review and Comment on Draft Product and Subproduct Reports . . . . . . . . . . . . . . . . . . . . . 55

(g)     Availability of Dispute Resolution for Draft Final Product Reports . . . . . . . . . . . . . . . . 56

(h)     Finalization of Product Reports . . . . . . . . . . . . . . . . . 56

(i)     Subsequent Modifications of Product Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

(j)     Other Deliverables . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

- iii -

Page

(k)    Remedial Investigation/Feasibility Study
Reports ................................. 58

XXV.    RECORDS OF DECISIONS ("RODs") .................... 59

(i)    Contents of Each ROD .......................... 59

(ii)    Draft RODs ................................. 59

(iii)    Review and Comment on Draft RODs ............. 59

(iv)    Draft Final RODs ............................. 60

(v)    Availability of Dispute Resolution .................... 60

(vi)    Finalization of RODs .......................... 60

(vii)    Publication and Judicial Review of RODs .............. 61

(viii)    Modification of RODs ......................... 62

XXVI.    DEADLINES AND SCHEDULES AND EXTENSIONS THEREOF  62

(i)    Prior Procedure ............................. 62

(ii)    Development of Deadlines ...................... 62

(iii)    RI/FS Deadlines for the On-Post
Operable Unit ............................. 62

(iv)    RI/FS Deadlines for the Off-Post
Operable Unit ............................. 63

(v)    Extension of IRA, RI/FS, Supplemental Response
Action, Design and Implementation Deadlines ......... 63

(vi)    Schedules and Extensions Thereof .................... 65

XXVII.    FORCE MAJEURE ............................. 65

XXVIII.    ENFORCEABILITY ............................ 66

XXIX.    STIPULATED CIVIL PENALTIES ..................... 67

XXX.    DISPUTE RESOLUTION ......................... 68

XXXI.    CONTENTS OF ADMINISTRATIVE RECORD FOR EACH
RI/FS ROD, CUSTODIAN AND JARDFC ............. 72

(i)    Contents of Administrative Record for
On-Post ROD ............................. 72

(a)    Pre-Plan RI/FS Activity ...................... 72

(b)    Other Documents Governing the RI/FS Process ..... 72

- iv -

Page

(c)      NPL Listings ................................ 72
(d)      The RI/FS Plan ........................... 73
(e)      IRAs ..................................... 73
(f)      Products, Subproducts and Other Deliverables ...... 73
(g)      RI/FS Report for Each ROD ............... 74
(h)      SAPC or FRC Activities ................... 74
(i)      RMA Committee Activities ................. 74
(j)      RMA Council Activities .................... 75
(k)      JARDFC Activities ....................... 75
(l)      TRC Activities ........................... 75
(m)      Local Governments' Involvement ............ 75
(n)      Interagency Agreements .................... 75
(o)      Executive Orders ......................... 75
(p)      Deadlines ............................... 75
(q)      ROD ................................... 75
(r)      Other Documents ........................ 76
(s)      Index ................................... 76

(ii)     Contents of Administrative Records for
         RODs for Other Operable Units and IRAs ........... 76

(iii)    Supplementation of Administrative Record for
         On-Post ROD .................................. 76

(iv)     Custodian of Administrative Records .............. 77

(v)      Joint Administrative Record and Document
         Facility Committee ............................. 77

(vi)     Challenges to Administrative Record .............. 77

(vii)    Joint Administrative Record and
         Document Facility ("JARDF") .................. 78

XXXII.   COMMUNITY RELATIONS ........................ 78
XXXIII.  ASSESSMENT AND SELECTION OF SUPPLEMENTAL
         RESPONSE ACTIONS .............................. 78

- v -

                                                                                      Page

XXXIV.  DESIGN AND IMPLEMENTATION OF FINAL AND
        SUPPLEMENTAL RESPONSE ACTIONS . . . . . . . . . . . . . . . . . 80

        (i)     Response Actions Covered by the Section . . . . . . . . . . . . . . 80

        (ii)    Design and Implementation Deadlines . . . . . . . . . . . . . . . . . 80

        (iii)   Role of the RMA Committee and the RMA Council . . . . . . 80

        (iv)    Shell's Right to Participate as Lead Party  . . . . . . . . . . . . . 82

        (v)     Design of Response Actions . . . . . . . . . . . . . . . . . . . . . . . . 82

        (vi)    Implementation of Response Actions . . . . . . . . . . . . . . . . . 83

        (vii)   Right to Judicial Review . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        (viii)  Extensions of Deadlines . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        (ix)    EPA Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

XXXV.   OPERATION AND MAINTENANCE OF RESPONSE ACTION
        STRUCTURES AND MONITORING OF RESPONSE ACTIONS . 85

XXXVI.  PERIODIC REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

XXXVII. NOTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

XXXVIII. SPECIAL EXEMPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XXXIX.  JUDICIAL REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XL.     FUNDING  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

XLI.    ATSDR HEALTH ASSESSMENT OR HEALTH EFFECTS STUDY 92

XLII.   NATURAL RESOURCE DAMAGE ASSESSMENT . . . . . . . . . . . 93

XLIII.  SHELL PARTICIPATION IN RESPONSE ACTIONS . . . . . . . . . . 95

XLIV.   RESTRICTIONS ON OWNERSHIP, USE AND TRANSFER . . . . . 97

XLV.    AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100


EXHIBIT A   THE ARSENAL

EXHIBIT B   THE SITE

EXHIBIT C   AGREEMENT BY THE STATE TO BE BOUND BY DISPUTE
            RESOLUTION

- vi -

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION VIII

UNITED STATES DEPARTMENT OF THE ARMY

UNITED STATES DEPARTMENT OF THE INTERIOR
ROCKY MOUNTAIN REGION

AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| ROCKY MOUNTAIN ARSENAL, COLORADO | ) ) ) | FEDERAL FACILITY AGREEMENT PURSUANT TO CERCLA SECTION 120 |
| UNITED STATES DEPARTMENT OF THE ARMY | ) ) ) | |
| SHELL OIL COMPANY | ) | Docket No. CERCLA VIII-89-13 |
| Federal Facility Agreement Pursuant to Section 120 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601-9675 | ) ) ) ) ) ) ) ) ) | |

---

## FEDERAL FACILITY AGREEMENT

---

Based on the information available to the Organizations on the effective date of this Agreement and without trial or adjudication of any issues of fact or law, the Organizations agree as follows:

## I. JURISDICTION

Each Organization is entering into this Agreement pursuant to the following authorities:

(i)  EPA enters into those portions of this Agreement that relate to the RI/FS pursuant to Sections 104(b), 120(e)(1), 120(e)(6), 120(f) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b), 9620(e)(1), 9620(e)(6), 9620(f) and 9622(d)(3), and Executive Order 12580;

(ii)     EPA enters into those portions of this Agreement that relate to IRAs, Final Response Actions and Supplemental Response Actions pursuant to Sections 120(e)(2), 120(e)(6), 120(f) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9620(e)(2), 9620(e)(6), 9620(f) and 9622(d)(3), and Executive Order 12580;

(iii)    The Army enters into those portions of this Agreement that relate to the RI/FS pursuant to Sections 104(b), 120(e)(1), 120(e)(6), 120(f) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b), 9620(e)(1), 9620(e)(6), 9620(f) and 9622(d)(3), Executive Order 12580, the National Environmental Policy Act, 42 U.S.C. § 4321, and the Defense Environmental Restoration Program, 10 U.S.C. § 2701, et seq.

(iv)    The Army enters into those portions of this Agreement that relate to IRAs, Final Response Actions and Supplemental Response Actions pursuant to Sections 104(b)(2), 120(e)(2), 120(e)(6), 120(f) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b)(2), 9620(e)(2), 9620(e)(6), 9620(f) and 9622(d)(3), and Executive Order 12580.

(v)     The Army enters into those portions of this Agreement that relate to the Natural Resource Damage Assessment pursuant to Section 107(f), 42 U.S.C. § 9607(f).

(vi)    DOI enters into those portions of the Agreement that relate to its responsibilities in the RI/FS pursuant to Sections 104(b)(2) and 120(e)(1) of CERCLA, 42 U.S.C. §§ 9604(b)(2) and 9620(e)(1), Executive Order 12580, the Endangered Species Act, 16 U.S.C. § 1531 et seq., the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq. and the Eagle Protection Act, 16 U.S.C. § 668;

(vii)   DOI enters into those portions of the Agreement that relate to the Natural Resource Damage Assessment pursuant to Sections 107(f) and 122(j)(2) of CERCLA, 42 U.S.C. §§ 9607(f) and 9622(j)(2).

(viii)  ATSDR enters into those portions of the Agreement that relate to its responsibilities in the RI/FS pursuant to Section 104(i)(6) and 120(e)(1) of CERCLA, 42 U.S.C. §§ 9604(i)(6) and 9620(e)(1), and Executive Order 12580.

(ix)    Shell enters into those portions of this Agreement that relate to the RI/FS pursuant to Sections 104(b), 104(i)(6), 120(e)(1), 120(e)(6) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b), 9604(i)(6), 9620(e)(1), 9620(e)(6) and 9622(d)(3).

(x)     Shell enters into those portions of this Agreement that relate to IRAs, Final Response Actions and Supplemental Response Actions pursuant to Sections 104(b)(2), 120(e)(2), 120(e)(6) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b)(2), 9620(e)(2), 9620(e)(6) and 9622(d)(3).

- 2 -

(xi)     Shell enters into those portions of this Agreement that relate to the Natural Resource Damage Assessment pursuant to Section 107(f) of CERCLA, 42 U.S.C. § 9607(f).

(xii)    If the State becomes a Signatory, it enters into those portions of this Agreement that relate to the RI/FS pursuant to Sections 120(f) and 121(f) of CERCLA, 42 U.S.C § § 9620(f) and 9621(f).

(xiii)   If the State becomes a Signatory, it enters into those portions of this Agreement that relate to IRAs, Final Response Actions and Supplemental Response Actions pursuant to Sections 120(f) and 121(f) of CERCLA, 42 U.S.C. § § 9620(f) and 9621(f).

(xiv)    If the State becomes a Signatory, it enters into those portions of this Agreement that relate to the Natural Resource Damage Assessment pursuant to Section 107(f) of CERCLA, 42 U.S.C. § 9607(f).

II.   **PURPOSE**

2.1     This Agreement is intended to establish a procedure by which the Organizations will cooperate in the assessment, selection and implementation of Response Actions resulting from the release or threat of release of hazardous substances, pollutants or contaminants at or from the Arsenal.  Prior to the effective date of this Agreement, the Army's, EPA's, DOI's, ATSDR's and Shell's participation in the RI/FS and the IRAs were governed by the February 1, 1988, and June 7, 1988, proposed consent decrees.  On the effective date of this Agreement, the Army's, EPA's, DOI's ATSDR's and Shell's participation shall be in accordance with this Agreement.

2.2     The general purposes of this Agreement are to:

(a)     Ensure that the environmental impacts at the Site associated with past activities at the Arsenal are thoroughly investigated and appropriate remedial action taken as necessary to protect the public health and the environment.

(b)     Establish a procedural framework and schedule for developing, implementing and monitoring appropriate Response Actions at the Site in accordance with CERCLA and the NCP and any pertinent guidance issued by ATSDR, EPA, DOD or DOI which is not inconsistent with CERCLA and the NCP.

(c)     Facilitate cooperation, exchange of information and participation of the Organizations in such actions.

- 3 -

2.3     Specifically, the purposes of this Agreement are to:

(a)     Provide for IRAs which are appropriate for the Site prior to the implementation of final remedial action(s) for the Site. This process is designed to promote cooperation among the Organizations in identifying IRA alternatives prior to selection of final IRAs.

(b)     Establish requirements for performance of a RI to determine fully the nature and extent of the threat to the public health or the environment caused by the release or threatened release of hazardous substances, pollutants or contaminants at or from the Arsenal and to establish requirements for the performance of a FS for the Site and to identify, evaluate and select alternatives for the appropriate remedial action(s) to prevent, mitigate or abate the release or threatened release of hazardous substances, pollutants or contaminants at or from the Arsenal in accordance with CERCLA.

(c)     Identify the nature, objective and time for Response Actions to be taken at the Site. Response Actions at the Site shall attain that degree of cleanup of hazardous substances, pollutants or contaminants mandated by CERCLA.

(d)     Implement the selected interim and final remedial action(s) in accordance with CERCLA and satisfy the requirements of Section 120(e) of CERCLA, 42 U.S.C. § 9620(e), for an interagency agreement between EPA and the Army.

(e)     Assure compliance, through this Agreement with all federal and State laws pertinent to the CERCLA cleanup of the Site. Assure compliance through this Agreement, with the Resource Conservation and Recovery Act of 1976, as amended, and other federal and State hazardous waste laws and regulations for the matters covered herein. It is the intent of the EPA, DOI and ATSDR that the Army's compliance with the terms and conditions of this Agreement and the Settlement Agreement shall constitute compliance with the Army's obligations under CERCLA, all other environmental laws applicable through CERCLA and the NCP with respect to the assessment and selection of Final Response Actions. It is the intent of the United States that Shell's compliance with the terms and conditions of this Agreement and the Settlement Agreement shall constitute compliance with Shell's obligations under CERCLA, all other environmental laws applicable through CERCLA and the NCP with respect to the assessment and selection of Final Response Actions.

(f)     Coordinate Response Actions at the Site with the mission and support activities at the Arsenal.

(g)     Expedite the cleanup process for the Arsenal to the extent consistent with protection of human health and the environment.

- 4 -

(h)     Provide a process for the performance of ATSDR's Health Assessment or Heath Effects Study.

(i)     Provide for the performance of the Natural Resource Damage Assessment for the Site.

2.4     An important purpose of this Agreement is to ensure Shell's full participation in recognition of the unique factual circumstances that gave rise to this Agreement and of the important role that Shell has in the cleanup of the Site. Thus, the United States has entered into this Agreement based on this determination of EPA, in consultation with the Army, that certain aspects of the RI/FS or IRAs will be done properly at the Site by Shell within the Deadlines and in a manner consistent with the NCP. To ensure that Shell will meet the Deadlines and will perform RI/FS and IRA activity in a manner consistent with the NCP, the Organizations agree that Shell's obligations under this Agreement shall be enforceable directly against Shell to the same extent as under an administrative order entered pursuant to Sections 104(b), 120(e)(6), 122(a) and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9604(b), 9620(e)(6), 9622(a) and 9622(d)(3). If it is subsequently determined that Shell shall perform any Final Response Action or Supplemental Response Action at the Site, such a determination shall be set forth in a Consent Decree between the United States and Shell that is entered by the Court.

2.5     Another important purpose of this Agreement is to ensure the performance of EPA's responsibilities at this Site and under this Agreement in accordance with Section 120 of CERCLA, 42 U.S.C. § 9620. To assist in the performance of this EPA responsibility, the Army and Shell agree to pay EPA Costs as defined in the Settlement Agreement payable and pursuant to Section XII of the Settlement Agreement.

2.6     It is the goal of the Organizations that, following certification of completion of the Final Response Action for the On-Post Operable Unit, significant portions of the Arsenal will be available for open space for public benefit (including, but not limited to, wildlife habitat(s) and park(s)) consistent with the terms of this Agreement. Portions of the Arsenal will be made available for such use at the earliest practicable date consistent with any necessary Response Actions.

2.7     The Organizations intend that Response Actions at the Arsenal will be sufficient to assure that groundwater and surface water flowing beyond the Arsenal boundaries will be of a quality that is protective of human health and the environment and that Response Actions will be sufficient to prevent the vertical and horizontal migration of on-post contaminated groundwater and surface water so that off-post surface water and groundwater may be used in areas outside of the Arsenal boundaries.

2.8     The Organizations intend by this Agreement to provide for substantial and meaningful involvement of the State in the initiation, development and selection of

- 5 -

Response Actions to be undertaken under this Agreement, and to establish a public participation process that allows local government representatives and interested members of the public to have a meaningful opportunity to participate in the planning and selection of remedial actions, including but not limited to the review of all applicable data as they become available and the development of studies, reports and action plans.

2.9    It is the hope of the United States and Shell that this Agreement will ultimately be incorporated, along with terms from the Settlement Agreement, into a Consent Decree.  Paragraphs 3.9-3.12 indicate how this Agreement would relate to such a Consent Decree.  It is the intent of the United States and Shell that upon entry of a Consent Decree incorporating this Agreement, all of the terms of this Agreement shall become part of the Consent Decree, and shall be fully enforceable pursuant to the terms of that Decree.

2.10    It is the intent of the United States and Shell that this Agreement take effect as soon as possible, notwithstanding the absence of a Consent Decree. Accordingly, paragraph 3.1 provides that this Agreement shall become effective upon execution by the Army, EPA, DOI, ATSDR and Shell.  Unless and until this Agreement is incorporated into a Consent Decree that has been entered by the Court, it shall be enforceable.

2.11    Pursuant to Sections 120(f) and 121(f) of CERCLA, 42 U.S.C. §§ 9620(f) and 9621(f), the State shall have an opportunity to participate in the assessment and selection of Response Actions undertaken pursuant to CERCLA.  Accordingly, this Agreement provides that the State shall be afforded such an opportunity for all major phases of the assessment and selection of Response Actions for the Site.

2.12    The United States and Shell recognize the importance of encouraging the State to become a Signatory to this Agreement so as to promote an orderly and efficient process for the State's participation in the selection of Response Actions for the Site. Accordingly, the State will be given an opportunity to sign this Agreement regardless of whether there is a settlement of the Arsenal-related litigation brought by the State against the Army and Shell.

## III.    EFFECTIVE DATE, PUBLIC COMMENT AND EFFECT ON PRIOR AND OTHER AGREEMENTS

### (i)    Effective Date of Agreement

3.1    Upon this Agreement being executed by the Army, EPA, DOI, ATSDR and Shell, it shall become effective, binding and enforceable, as of February 17, 1989. This document shall become binding on the State as provided in paragraphs 10.1 and 10.2.

- 6 -

3.2     When this Agreement becomes effective, it shall replace and supersede in its entirety the document attached as Exhibit E to the Consent Decree lodged with the Court on February 1, 1988, and Exhibit E to the modified Consent Decree filed with the Court on June 7, 1988, in United States v. Shell Oil Co., Civil Action No. 83-C-2379.

3.3     Prior to the effective date of this Agreement, the document referred to as the RI/FS Process Document (attached as Exhibit E to the consent decree lodged with the Court on February 1, 1988, and the modified consent decree filed with the Court on June 7, 1988, in United States v. Shell Oil Co., Civil Action No. 83-C-2379), and both such proposed consent decrees governed the performance of the RI/FS and IRAs for the Site.

3.4     In view of the changes in CERCLA and the NCP that have taken effect since February 1986, and EPA's and DOD's recent guidance on CERCLA, the Army, EPA and Shell, through their respective executions of this Agreement, do substitute by majority vote this Agreement for any still operative provisions of the December 6, 1982, Memorandum of Agreement.

(ii)     Public Review of Agreement

3.5     On or about February 21, 1989, the United States shall publish notice in at least one major Denver newspaper of general circulation that this Agreement is available for a 30-day period of public review and comment.

[PARAGRAPHS 3.6 AND 3.7 ARE RESERVED]

(iii)     Interpretation with Respect to Other Agreements

3.8     This Agreement shall be construed in harmony with the Settlement Agreement to resolve any ambiguities herein so that, to the maximum extent possible, these documents are interpreted to be consistent.

(iv)     Relation to a Future Consent Decree

3.9     It is the hope of the United States and Shell  that this Agreement (along with the Settlement Agreement) will be incorporated into, and specifically be made a part of, a Consent Decree that is entered as part of the settlement of United States v. Shell Oil Co., Civil Action No. 83-C-2329.

- 7 -

3.10    Prior to the incorporation of this Agreement into a Consent Decree, it may be amended pursuant to Section XLV.  Upon incorporation of this Agreement into a Consent Decree, it may be amended only pursuant to the process by which the Consent Decree may be modified, as set forth in such decree.

3.11    If this Agreement is incorporated into a Consent Decree entered by the Court, in the event of a conflict between this Agreement and the Consent Decree, the terms and conditions of the Consent Decree shall govern.  It is the intent of the Signatories that any ambiguities in this Agreement are to be interpreted so as to be consistent with the terms and conditions of any Consent Decree in which this Agreement may be incorporated.

3.12    This Agreement shall be binding on the Signatories irrespective of whether it is incorporated into a Consent Decree.

IV.    THE SITE

4.1 The Site for purposes of this Agreement includes:

(a)    The land outlined on the plat attached hereto as Exhibit B, consisting of the Arsenal and the Off-Post Area; and

(b)    Such area in close proximity to the land described in 4.1(a) as is necessary for purposes of all Response Actions to remediate the release of hazardous substances, pollutants or contaminants at or from the Arsenal.

V.    STATEMENT OF FACTS

5.1    For purposes of this Agreement, the following constitute a summary of the facts upon which the Agreement is based.  None of the following statements shall be considered admissions nor are they binding on any Organization other than for the purposes of this Agreement.

5.2    The Arsenal is a federal enclave and a former chemical warfare agent and pesticide manufacturing facility located outside of Denver, Colorado.

5.3    Property for the facility was purchased by the U.S. Government in 1942 and the Arsenal was constructed with the designated mission of producing chemical munitions for the Armed Forces.  Chemicals manufactured by the Army at the Arsenal have included both blister and nerve agents, incendiary chemicals, and intermediary chemical compounds for the primary products.  The Army also blended hydrazine, a rocket fuel, for the Air Force and conducted a variety of demilitarization operations at the Arsenal.

- 8 -

5.4     In 1947, certain portions of the Arsenal were leased to the Colorado Fuel and Iron Corporation (CF&I) and Julius Hyman & Company (Hyman) for chemical manufacturing. At the Arsenal, CF&I manufactured chlorinated benzenes and DDT and Hyman produced several pesticides. Shell Oil Company became a successor to the interests of Hyman in May 1952 and subsequentially leased a portion of the manufacturing facilities in the Arsenal South Plants Area for pesticide production.

5.5     As a result of operations by the Army and Shell at the Arsenal, hazardous substances were spilled, leaked or released into the environment.

5.6     To contain the spread of contamination from the Arsenal, the Army implemented a Contamination Control Program.

5.7     This program was revised in December 1982, with the adoption of the Memorandum of Agreement by the Army, EPA, Shell and the State, to include steps for remediation of contamination at the Arsenal.

5.8     The Army constructed the North Boundary System in 1978 and 1981 to treat and to control the migration of groundwater contamination off-post beyond the north boundary of the Arsenal.

5.9     In 1981, Shell constructed the Irondale Boundary System to treat and to control the migration of groundwater contamination off-post to the Irondale area.

5.10    The Army constructed the Northwest Boundary System in 1983 to treat and to control the migration of groundwater contamination off-post beyond the northwest boundary of the Arsenal.

5.11    In December 1983, the United States filed <u>United States v. Shell Oil Co.</u>, Civil Action No. 83-C-2379 (D.Colo.) pursuant to CERCLA, for response costs and natural resource damages at the Arsenal. Also, in December 1983, the State filed <u>Colorado v. United States and Shell</u>, Civil Action No. 83-C-2386 (D.Colo.), pursuant to CERCLA, for response costs and natural resource damages at the Arsenal.

5.12    In October 1984, the Army commenced its RI/FS with respect to on-post and off-post contamination associated with the Arsenal. Until mid-1987, this activity took the form of the Army conducting various RI/FS tasks in accordance with CERCLA and the NCP, and then preparing various draft reports that were forwarded to EPA, Shell and the State for review and comment.

5.13    On November 18, 1985, the United States, Shell and the State stipulated in <u>United States v. Shell Oil Co.</u> that:

(a)     "Shell is a person who by contract, agreement or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by Shell, by

- 9 -

another party or entity at a facility owned or operated by another party or entity and containing such hazardous substances, from which there is a release, or a threatened release which caused the incurrence of response costs, of a hazardous substance."

      (b)   "The United States is the owner of a facility from which there is a release or a threatened release which caused the incurrence of response costs, of a hazardous substance."

5.14   On August 21, 1987, EPA listed most of the Arsenal, except for the Basin F fenced area, on the NPL, 52 Fed. Reg. 27641 (July 22, 1987). Basin F also has been proposed for listing on the NPL, 52 Fed. Reg. 27646 (July 22, 1987).

5.15   In January 1988, the Army commenced work, pursuant to CERCLA, on its Basin F IRA. Since that time, response activity by the Army or Shell has been commenced in the following IRAs: Fugitive Dust, Asbestos Removal, Closure of Abandoned Wells, North Boundary System--Trenching Improvements, Hydrazine Facility, Building 1727 Sump, Basin F Groundwater, Basin A Neck Groundwater and North Boundary System--System Improvements.

5.16   In February 1988, the United States lodged a proposed consent decree in United States v. Shell Oil Co. and commenced a public comment period on the proposed decree.

5.17   In March 1988, the Technical Program Plan for cleanup of the Arsenal, pursuant to CERCLA, was adopted by the Organizations. Through the adoption of the Technical Program Plan, the Organizations:

      (a)   Set goals for the issuance of the Army's preferred remedial action for the Off-Post Operable Unit and On-Post Operable Unit;

      (b)   Identified the Products or Subproducts to proceed without substantial modification, those that are sufficiently completed as of this date, and those that require such substantial modification as to be designated New Products or Subproducts.

      (c)   Identified any new Products or Subproducts to be added to the RI/FS for the On-Post and Off-Post Operable Units;

      (d)   Identified any new Products or Subproducts that require ARAR determinations;

      (e)   Identified Other Deliverables to the extent known;

      (f)   Established Deadlines for the completion of IRA Decision Documents;

- 10 -

    (g)     Identified RI/FS Deadlines;

    (h)     Identified Schedules; and

    (i)     Identified and resolved any previously identified or new issues which solely relate to the general conduct of the RI/FS.

5.18   On June 7, 1988, the United States and Shell moved for entry of a modified consent decree in <u>United States v. Shell Oil Co.</u>  To date, the Court has not acted on that motion.

5.19   In November 1988, the Army announced that the Arsenal no longer was an active military installation and that the sole mission of the Army at the Arsenal is the cleanup of the Site pursuant to CERCLA.

5.20   In the absence the of entry of the consent decree, the Army, EPA, DOI, ATSDR and Shell executed this Agreement in order to preserve the utility of the work plans and schedules already adopted for the investigation and remediation of the contamination at the Arsenal, and to preserve the related arrangements for the recovery of Response Costs and Natural Resource Damages.

## VI.   CONCLUSIONS OF LAW

6.1   For purposes of this Agreement, the following constitute the conclusions of law upon which this Agreement is based.  None of the following conclusions shall be considered admissions nor are they binding on any Organization other than for the purposes of this Agreement.

6.2   Based on the preceding Statement of Facts, the Signatories make the following conclusions of law for purposes of this Agreement:

    (a)     The Army is a "person" within the meaning of CERCLA Section 101(21), 42 U.S.C. § 9601(21);

    (b)     The Army is the "owner or operator" of the Arsenal for purposes of CERCLA Section 101(20), 42 U.S.C. § 9601(20);

    (c)     Shell is a "person" within the meaning of CERCLA Section 101(21), 42 U.S.C. § 9601(21);

    (d)     The Arsenal constitutes a "facility" within the meaning of CERCLA Section 101(9), 42 U.S.C. § 9601(9);

- 11 -

(e)   From 1944 to the present, "hazardous substances," as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), were deposited, stored, disposed of, placed, located or released at the Site;

(f)   There has been a "release" and there continues to be or threatens to be a "release" of hazardous substances into the environment, within the meaning of CERCLA Sections 101(22), 104 and 107, 42 U.S.C. §§ 9601(22), 9604 and 9607, at the Site;

(g)   The Army is the operator of the Arsenal facility from which there was a release or a threatened release which caused the incurrence of costs for removal or remedial action costs for any health assessment or health effects study and damages for loss of natural resources, within the meaning of CERCLA Section 107(a)(1), 42 U.S.C. § 9607(a)(1);

(h)   Shell is a person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by Shell at the Arsenal facility from which there was a release or a threatened release which caused the incurrence of costs for removal or remedial action, costs for any health assessment or health effects study and damages for loss of natural resources, within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3);

(i)   The Arsenal is a "federal facility" within the meaning of CERCLA Section 120, 42 U.S.C. § 9620;

(j)   The Arsenal is a facility which is substantially on the NPL with the balance proposed for listing on the NPL;

(k)   The Site is subject to the cleanup standards in Section 121 of CERCLA, 42 U.S.C. § 9621 and the provisions of the NCP.

## VII.   DETERMINATIONS

7.1   For purposes of this Agreement, the following constitute the determinations upon which this Agreement is based.  None of the following determinations shall be considered admissions nor are they binding on any Organization other than for the purposes of this Agreement.

7.2   Based on the preceding statement of facts and conclusions of law, the United States has determined and Shell does not contest for purposes of this Agreement that:

(a)   The Site is subject to the requirements of CERCLA.

- 12 -

(b)     The Army is a responsible party with respect to at least one release at the Site, and Shell is a responsible party with respect to at one release at the Site.

(c)     The actions to be taken pursuant to this Agreement are reasonable and necessary to protect the public health and the environment.

(d)     It is appropriate and desirable for EPA, DOI and ATSDR to enter into this Agreement with the Army and Shell to establish the process for the remediation of hazardous substances at the Site and the performance of any related health assessment or health effects study.

(e)     It is appropriate and desirable for DOI to enter into this Agreement with the Army and Shell for the performance of a Natural Resource Damage Assessment for the Site.

## VIII.   ROLE OF DOI

8.1     DOI shall continue to advise and assist the Lead Agency and Lead Party with respect to Products, Subproducts or Other Deliverables relating to the biota portion of the RI/FS and the IRAs for the On-Post and Off-Post Operable Units.  DOI shall also provide similar advice and assistance to the Lead Agency or Lead Party for other Operable Units.

8.2     DOI shall receive from the Lead Agency or Lead Party:

(a)     Timely advance notice of each meeting concerning biota Products, Subproducts or Other Deliverables and IRAs;

(b)     A copy of each document transmitted by the Lead Agency or Lead Party to the Organizations concerning biota Products, Subproducts or Other Deliverables and IRAs;

(c)     An opportunity to participate in each meeting concerning biota Products, Subproducts or Other Deliverables and IRAs; and

(d)     An opportunity to comment in writing on any biota portion of an IRA document or a draft Technical Plan, Product or Subproduct report, Other Deliverable or ROD, and to review such comments submitted by the Organizations;

(e)     Timely notice of all proposals or actions involving natural resources under DOI Trusteeship.

- 13 -

8.3     DOI shall provide copies of its written comments concerning the biota portion of the RI/FS for each Operable Unit to the Organizations.

8.4     In the event of a dispute concerning the biota portion of an IRA or RI/FS, a representative of DOI may attend and participate (but shall not have a vote) in any relevant meeting of the RMA Committee or the RMA Council. A dispute concerning any of these matters may be raised to Dispute Resolution by any Organization or DOI. If DOI invokes Dispute Resolution, DOI shall make a timely submission in writing of its views on the matter in dispute to the RMA Council, SAPC or FRC. A representative of DOI may attend and participate (but shall not have a vote) in any Dispute Resolution meeting of SAPC or FRC.

8.5     Paragraphs 8.1-8.4 shall not control DOI's participation in a Natural Resource Damage Assessment for the Site. DOI's participation in the Natural Resource Damage Assessment for the Site shall be governed by Section XLII.

## IX.   ROLE OF ATSDR

9.1     When appropriate, ATSDR shall advise and assist the Lead Agency for an Operable Unit in the development of EA-related Products, Subproducts and Other Deliverables and particularly in connection with the exposure assessment, toxicity assessment and risk characterization portion of the EA and the IRAs.

9.2     ATSDR shall receive from the Lead Agency or Lead Party:

(a)     Timely advance notice of each meeting concerning an EA or IRA;

(b)     A copy of each document transmitted by the Lead Agency or Lead Party to the Organizations concerning an EA or IRA;

(c)     An opportunity to participate in each EA or IRA meeting; and

(d)     An opportunity to comment in writing on an IRA or any EA portion of a draft Technical Plan, Product or Subproduct report, Other Deliverable or ROD, and to review such comments submitted by the Organizations.

9.3     ASTDR shall provide copies of its written comments concerning an IRA or the EA for each Operable Unit to the Organizations.

9.4     In the event of a dispute concerning any relevant aspect of an IRA or EA, ATSDR shall be afforded an opportunity, at its election, to submit in writing its views on the matter in dispute to the RMA Committee or the RMA Council. ATSDR may, at its option, attend and participate in any relevant meeting of the RMA Committee or the RMA Council. If a dispute concerning any of these matters is raised pursuant to Dispute Resolution, ATSDR shall be afforded an opportunity to update its earlier

- 14 -

statement of its views through an additional written submission to the RMA Council, SAPC or FRC.

9.5    Paragraphs 9.1-9.4 shall not control ATSDR's Health Assessment or any Health Effects Study.  ATSDR's Health Assessment or Health Effects Study shall be governed by Section XLI.

## X.  ROLE OF THE STATE

10.1    Prior to the effective date of this Agreement, the State's participation in the RI/FS and the IRAs was subject to the February 1, 1988, and June 7, 1988, proposed consent decrees (and the related exhibits).  On the effective date of this Agreement, the State's participation is expected to be consistent with this Agreement. Regardless of whether the State becomes a Signatory, the State shall have the rights of an Organization under this Agreement subject to the following conditions:

(a)    The State may attend meetings of the RMA Council, the SAPC and the FRC only after it has agreed in writing to be bound by the provisions of paragraph 30.10 and to treat as highly confidential, and not to publish, divulge, disclose or make known in any manner or to any extent not authorized or required by law, any Confidential Information received by, or made available to it in connection with any activities performed pursuant to this Agreement; and

(b)    The State may invoke Dispute Resolution only after it has agreed to be bound by the Dispute Resolution process, as evidenced by its execution of the agreement attached hereto as Exhibit C.  The form attached as Exhibit C shall be replaced by an executed copy of that agreement, once it has been executed by all parties thereto.

10.2    This Agreement shall become binding and effective upon the State at the time it becomes a Signatory.

## XI.  LEAD AGENCIES

11.1    For purposes of this Agreement, the Army is the Lead Agency for the On-Post Operable Unit and the Off-Post Operable Unit.

11.2    For purposes of this Agreement, the Army or EPA may be the Lead Agency for any other designated Operable Unit as provided in Executive Order 12580 or any amendments or modifications thereof.

## XII.  OPERABLE UNITS

12.1    It is the present intent of the Signatories that there shall be:

- 15 -

(a)      The On-Post Operable Unit; and

(b)      The Off-Post Operable Unit.

Nothing in this Agreement shall preclude the designation of one or more additional Operable Units upon unanimous agreement of the Organizations. At the request of any Organization, the question of whether a new Operable Unit will be designated shall be subject to Dispute Resolution. In Dispute Resolution on the issue of whether the designation of a new Operable Unit is appropriate, such designation shall not be considered appropriate if it will prevent or substantially delay the design or implementation of an IRA, the On-post Operable Unit or the Off-Post Operable Unit.

12.2   The selection of the Final Response Action for each Operable Unit shall be:

(a)      Preceded by RI/FS;

(b)      Set forth in a ROD, which may include more than one technology as part of the selected remedy;

(c)      In accordance with CERCLA and in a manner not inconsistent with the NCP and any pertinent guidance issued by ATSDR, EPA, DOD or DOI which is not inconsistent with CERCLA and the NCP;

(d)      Supported by the relevant Administrative Record; and

(e)      Consistent with the terms of the Settlement Agreement or any Consent Decree in which this document may be incorporated.

## XIII. ROLE OF COUNSEL

13.1   References in this Agreement to actions being taken in consultation with counsel, or to counsel attending certain meetings, shall not be deemed to preclude consultation with counsel, or counsel attendance at meetings, with respect to any other action taken pursuant to this Agreement.

## XIV. DEFINITIONS

14.1   As used in this Agreement, certain terms shall have the meanings specified in paragraph 14.4. To the extent that these definitions are inconsistent with the definitions which appear in any Consent Decree incorporating this Agreement, the definitions in paragraph 14.4 shall control for purposes of this Agreement unless expressly stated otherwise in such Consent Decree.

- 16 -

14.2   The meaning of any term used in this Agreement which is not defined in paragraph 14.4, but which is defined in Section 101 of CERCLA, 42 U.S.C. § 9601, shall be as defined in CERCLA.

14.3   The term "day" as used in this Agreement shall mean "calendar day."

14.4   The following terms used in this Agreement are defined as follows:

(1)   "Administrative Record" means the documents designated pursuant to paragraph 31.1 or 31.2.

(2)   "Agreement" or "Federal Facility Agreement" means this document, the executed "Federal Facility Agreement for the Rocky Mountain Arsenal," effective February 17, 1989, including all exhibits thereto (and any amendments or modifications thereof or supplements thereto.)

(3)   "ARAR" means a standard, requirement, criterioh or limitation as defined in CERCLA Section 121(d)(2), 42 U.S.C. § 9621(d)(2).

(4)   "Army" means the United States Department of the Army and any successors or assigns, and any agency, command, office or other subdivision thereof; and includes the officers, members, employees and agents of the Army when acting within the scope of their authority.

(5)   "Army-Only Response Costs" means all Response Costs for the Response Actions listed as Army-Only Response Actions on Exhibit C to the Settlement Agreement.

(6)   "Arsenal" means all United States property known as the Rocky Mountain Arsenal and which is described more particularly in Exhibit A to this Agreement.

(7)   "ATSDR" means the United States Agency for Toxic Substances and Disease Registry and any successors or assigns, and any Region, Office or subdivision thereof; and includes the officers, employees and agents of ATSDR when acting within the scope of their authority.

(8)   "Basin F MOU" means the "Memorandum of Understanding between the Department of the Army and Shell Oil Company with respect to the Basin F Interim Action," executed by Shell and the Army on September 26 and 27, 1986, respectively (and any amendments or modifications thereof or supplements thereto).

(9)   "CAR" means a contamination assessment report which is part of a RI/FS.

- 17 -

(10)   "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986.

(11)   "Conceptual Design Document" means a document prepared after completion of approximately 30 percent of the design and engineering work for a discrete portion of a Final or Supplemental Response Action and which sets out the plans for completion of such design and engineering work, with reference to appropriate drawings, specifications, data and documentation.

(12)   "Confidential Information" means all records, reports, or information designated in accordance with Section 104(e)(7)(C) of CERCLA, 42 U.S.C. § 9604(e)(7)(C), or marked or stamped by an Organization or a contractor with the legend "Confidential Information" that concerns or relates to the trade secrets, processes, operations, style of work, or apparatus; or to the confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; and all other records, reports, or information that an Organization or a contractor is required by law or contract to maintain confidential.

(13)   "Consent Decree" means any agreement approved and entered by the Court which wholly or partially resolves litigation concerning the Arsenal and which incorporates this Agreement and specifically makes this Agreement a part thereof.

(14)   "Coordinator" means the Army employee designated to serve on the RMA Committee pursuant to paragraph 15.1.

(15)   "Court" means the United States District Court for the District of Colorado.

(16)   "Custodian" means the person designated by the Army pursuant to paragraph 31.4.

(17)   "Deadlines" means IRA Deadlines, RI/FS Deadlines, Supplemental Response Action Deadlines, Design Deadlines and Implementation Deadlines.

(18)   "Design Deadline" means any timetable or deadline for completion of a scope of work or a final design document for an Operable Unit, as set forth in the ROD for such Operable Unit.

(19)   "Design Scope of Work" means a document that outlines the work plan for, and major elements of, the design and engineering work to be conducted for a discrete portion of a Final or a Supplemental Response Action. Such a document may provide the basis for, and be incorporated in, a contractual agreement between a design contractor and the Lead Agency or Lead Party responsible for such work.

- 18 -

(20)   "Dispute Resolution" means the process for resolving disputes that is set forth in Section XXX of this Agreement.

(21)   "DOD" means the United States Department of Defense and any successors or assigns, and any office or subdivision thereof; and includes the officers, employees and agents of DOD when acting within the scope of their authority.

(22)   "DOI" means the United States Department of the Interior and any successors or assigns, and any Region, office or subdivision thereof (including but not limited to the United States Fish and Wildlife Service); and includes the officers, employees and agents of DOI when acting within the scope of their authority.

(23)   "DOI Trusteeship" means natural resources under the management and protection of DOI, including, but not limited to, species designated as threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., and migratory birds.

(24)   "EA" means the endangerment assessment portion of a RI/FS and includes:

(i)   Contaminant identification (i.e., site characterization and selection of target contaminants and identification of environmental transport and fate mechanisms) for such contaminants;

(ii)   Exposure assessment (i.e., identification of exposure pathways and extent of exposure of human and environmental populations at actual or potential risk);

(iii) Toxicity assessment (i.e., evaluation of the toxicological properties of target contaminants); and

(iv)   Risk characterization (i.e., determination of the likelihood and extent of any harm).

(25)   "Emergency Action" means an action conducted by the Army pursuant to Section XXIII of this Agreement.

(26)   "EPA" means the United States Environmental Protection Agency and any successors or assigns, and any Region, Office or subdivision thereof; and includes the officers, employees and agents of EPA when acting within the scope of their authority.

- 19 -

(27)   "EPA Certification" means the certification by EPA of completion of a Final Response Action or Supplemental Response Action pursuant to paragraphs 34.23-34.24.

(28)   "Final Design Document" means a document prepared after completion of at least 95 percent of the design and engineering work for a discrete portion of a Final or Supplemental Response Action and that includes the final drawings and specifications and the final design analysis and cost estimate for the implementation of that portion of the Remedial Action.

(29)   "Finalization," with respect to a ROD, means the process by which the ROD is submitted to the Court, together with a certified Administrative Record in support of the ROD, and all changes, if any, required as a result of judicial review are made.  The process of Finalization is complete when either the time for judicial review has passed or judicial review has been completed.

(30)   "Final Response Action" means any remedial action for an Operable Unit as set forth in the ROD for such Operable Unit.

(31)   "Financial Manual" means the document developed by Shell and the Army to govern the payment, reimbursement and auditing of their respective response costs claims.

(32)   "Force Majeure" means any event arising from causes beyond the control of an Organization which causes a delay in or prevents the performance of any obligation under this Agreement.  "Force Majeure" includes but is not limited to:  acts of God; fire; war; insurrection; civil disturbance; explosion, unanticipated breakage or accident to machinery, equipment or lines of pipe, despite diligent maintenance; adverse weather conditions which could not be reasonably anticipated; unusual delay in transportation; earthquake; restraint by court order or order of public authority; inability to obtain, at reasonable cost and after exercise of reasonable diligence, any necessary authorizations, approvals, permits or licenses as a result of the action or inaction of any governmental agency or authority other than the Army; delays caused by compliance with applicable statutes or regulations governing contracting, procurement or acquisition procedures, despite the exercise of reasonable diligence; and insufficient availability of appropriated funds, if the Army shall have made timely request for such funds as part of the budgetary process.  "Force Majeure" also includes any strike or labor dispute, whether or not within the control of the Organization affected thereby, but shall not include increased costs or expenses of Response Actions, whether or not anticipated at the time such Response Actions were initiated.

(33)   "FRC" means the Final Review Committee, which shall consist of the following members:  the Assistant Secretary of the Army (Installations and Logistics)(or other official of comparable authority and responsibility); the Administrator

- 20 -

of EPA (or other official of comparable authority and responsibility); the Governor of Colorado; and the President of Shell.

(34)  "FS" means a feasibility study, as defined in the NCP, which is performed as part of an Operable Unit.

(35)  "Health Assessment" means an evaluation by ATSDR of data and information on the release of hazardous substances at or from the Site in order to: assess any current or future impact on public health; develop health advisories or other recommendations; and identify studies of actions needed to evaluate, and mitigate or prevent, human health effects.

(36)  "Health Effects Study" means research, investigation, or study performed by ATSDR to evaluate the health effects of hazardous substances released at or from the Site.  This terms includes, but is not limited to, epidemiological studies, exposure and disease registries, and health surveillance programs.

(37)  "Implementation Deadline" means any date for initiating or completing physical activity on the Site with respect to a Response Action addressed in a Final Decision Document.

(38)  "IRA" means an interim response action which has been determined by the Organizations to be necessary and appropriate for the Site.

(39)  "IRA Decision Document" means the document issued by the Army which reflects the objectives and rationale for an IRA.

(40)  "IRA Deadline" means any date for issuance of a draft IRA Decision Document, as reflected in the Technical Program Plan, or any timetable or deadline for completion of an IRA, as reflected in the appropriate IRA Decision Document or IRA Implementation Document.

(41)  "JARDF" means the Joint Administrative Record and Document Facility described in paragraph 31.8.

(42)  "JARDFC" means the Joint Administrative Record and Document Facility Committee described in paragraphs 31.5.

(43)  "Lead Agency" means the Federal agency that is a Signatory and has primary authority and responsibility under CERCLA, the NCP and Executive Order 12580 for coordinating an Operable Unit.

- 21 -

(44)   "Lead Party" means the Organization that is designated with responsibility, in accordance with paragraphs 24.1, 24.3 and 24.4, to develop one or more Products, Subproducts, or Other Deliverables or perform one or more IRAs (or portions thereof).

(45)   "Natural Resource Damages" means the amount of money to which the United States is entitled as compensation for injury to, destruction of, or loss of natural resources resulting from a release of hazardous substances at or from the Arsenal determined in accordance with Section XLII.

(46)   "Natural Resource Damage Assessment" means the assessment of Natural Resource Damages pursuant to the Natural Resource Damage Assessment Plan.

(47)   "Natural Resource Damage Assessment Plan" means a plan for the assessment of Natural Resource Damages developed in accordance with the requirements and procedures of any applicable regulations promulgated by DOI pursuant to Section 301(c) of CERCLA, 42 U.S.C. § 9651(c), and the requirements and procedures of Section XLII.

(48)   "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan as set forth in 50 Fed. Reg. 47912 (1985), effective February 18, 1986, and all amendments thereto which are not inconsistent with CERCLA and which are effective and applicable to any activity undertaken pursuant to this Agreement.

(49)   "New Product or Subproduct" means a Product or Subproduct so designated in accordance with paragraphs 24.7 and 24.8.

(50)   "NPL" means the National Priorities List, as defined by CERCLA and the NCP.

(51)   "Off-Post Area" means that portion of the Site that is within the area bounded by 80th Avenue, the South Platte River, Second Creek and the northerly and northwesterly boundaries of the Arsenal, together with the surface waters of Barr Lake and the surface waters of the O'Brian Canal and the Burlington Ditch from their confluence with Second Creek to Barr Lake. The Off-Post Area is the shaded area shown on Exhibit B.

(52)   "Off-Post Operable Unit" means the remedial action for the Site necessary to respond to hazardous substances, pollutants or contaminants within (a) the Off-Post Area, but in any event, only the area where hazardous substances, pollutants or contaminants from the Arsenal are found, and which is subject to remedial action by the Army as Lead Agency, in accordance with Executive Order 12580 and any amendments or modifications thereto, and the NCP; and (b) such area immediately adjacent thereto as is necessary for purposes of carrying out all Response Actions resulting from the

- 22 -

release or threat of release of hazardous substances, pollutants or contaminants at or from the Arsenal.

(53)   "Off-Post ROD" means the ROD for the Off-Post Operable Unit.

(54)   "On-Going" or "On-Going Subproduct" means a Product or Subproduct for the On-Post and Off-Post Operable Units listed in paragraphs 24.30, 24.32 and 24.34.

(55)   "On-Post Operable Unit" means the remedial action for the Site necessary to respond to contamination within the Arsenal.

(56)   "On-Post ROD" means the ROD for the On-Post Operable Unit.

(57)   "Operable Unit" means a discrete portion of the remedial action for the Site, as determined pursuant to paragraph 12.1.

(58)   "Organization" means the Army, EPA, Shell or, subject to paragraph 10.1, the State; "Organizations" means the Army, EPA, Shell and, subject to paragraph 10.1, the State.

(59)   "Other Deliverable" means any document, other than a Product or Subproduct report, which presents the results of any studies or reports prepared as part of a RI/FS.  Examples of "Other Deliverables" include Phase 2 CAR Data Addenda, Modeling Reports, Shell's Biota Report(s), Pilot Treatability Test Plans, Shell's Sewers Report(s), Reports concerning the presence of Bald Eagles at the Arsenal, Boundary Systems Evaluation Report, PPLV Methodology, Toxicity Assessment, Composite Well Program Report, Shell's Hydrological and Geological Reports, the Soil Gas Study and Partition Coefficient Studies.

(60)   "Proposal for Other Deliverable" means a concise document that outlines the work plan for, and major elements of, an Other Deliverable not reflected in the Technical Program Plan.

(61)   "Product" means one of the primary aspects of an Operable Unit for which a Product report is prepared.  The term includes an On-Going or New Product.

(62)   "Product Manager" means the employee of the Lead Agency or Lead Party who is designated in accordance with paragraph 24.5, to have day-to-day responsibility for the development of a Product and the development of any related Subproduct or Technical Plan.

(63)   "QA'd/QC'd" means quality assured/quality controlled.

- 23 -

(64)   "Report of Assessment" means a report of the assessment of Natural Resource Damages, consisting of the preassessment screen determination, the Natural Resource Damage Assessment Plan, and all documentation supporting the determination required in the injury determination phase, the qualification phase and the damage determination phase, all in accordance with the requirements and procedures of any applicable regulations promulgated by DOI pursuant to Section 301(c) of CERCLA, 42 U.S.C. § 9651(c), and the requirements and procedures of Section XLII.

(65)   "Representative" or "Committee Representative" means a representative of an Organization on the RMA Committee.

(66)   "Response" or "Response Action" has the same meaning as "Respond" or "Response" as defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

(67)   "Response Action Structure" means any building, equipment, or improvement constructed or placed at the Site in connection with a Response Action.

(68)   "RI" means a remedial investigation, as defined in the NCP, which is performed for an Operable Unit.

(69)   "RI/FS" means the remedial investigation/ feasibility study, as defined in the NCP, which is performed for an Operable Unit.

(70)   "RI/FS Deadlines" means the dates which are identified pursuant to paragraphs 20.2(g), 26.6 and 26.7 and are appended hereto, and are enforceable pursuant to paragraphs 28.1-28.5.

(71)   "RI/FS Report" means a document prepared pursuant to paragraph 24.62.

(72)   "RMA Committee" or "Committee" means the entity established pursuant to paragraphs 15.1 and 15.2.

(73)   "RMA Council" or "Council" means the management body established pursuant to paragraphs 16.1-16.3.

(74)   "ROD" means the Record of Decision for an Operable Unit.  The term does not include an IRA Decision Document.

(75)   "SAPC" means the Steering and Policy Committee which shall consist of the following members:  the Army Deputy for Environment, Safety and Occupational Health (or other official of comparable authority and responsibility); the Regional Administrator of EPA, Region 8 (or other official of comparable authority and

- 24 -

responsibility); the Director of the Colorado Department of Health (or other official of comparable authority and responsibility); and a Vice President of Shell.

(76)   "SAR" means a Study Area Report, i.e., a report which summarizes the data in the CARs on a geographic or contamination flow basis.

(77)   "Schedule" means any time limit, other than a RI/FS Deadline, established pursuant to this Agreement or the Technical Program Plan which governs the conduct of portions of a RI/FS.

(78)   "Settlement Agreement" means the executed "Settlement Agreement between the United States and Shell Oil Company concerning the Rocky Mountain Arsenal," effective February 17, 1989, including all exhibits thereto (and any amendments or modifications thereof and supplements thereto.)

(79)   "Shell" means Shell Oil Company and any successors or assigns, and any office or subdivision thereof; and includes the subsidiaries of Shell and the officers, employees and agents of Shell when acting within the scope of their authority.

(80)   "Signatory" means any Organization that executes this Agreement.

(81)   "Site" has the meaning set forth in paragraph 4.1.

(82)   "State" means the government of Colorado and any successors or assigns, and any department, division, agency, office or other subdivision thereof, and includes the officers, employees and agents of the State when acting within the scope of their authority.

(83)   "Subproduct" means a secondary aspect of an Operable Unit for which a Subproduct report is prepared and which is used in preparation of a Product. The term includes On-Going and New Subproducts.

(84)   "Supplemental Response Action" means a Response Action for the Site selected after finalization of the On-Post ROD. The term does not include either an Emergency Action, or a modification of a ROD in accordance with paragraph 25.16.

(85)   "Supplemental Response Action Plan" means the plan that shall govern development of a RI/FS and ROD for a Supplemental Response Action, as provided in Section XXXIII.

(86)   "Supplemental Response Action Deadline" means any timetable or deadline for completion of a RI/FS for a Supplemental Response Action or for selection of a ROD for a Supplemental Response Action, as developed pursuant to paragraph 33.4.

- 25 -

(87)   "Technical Plan" means a reasonably detailed plan for the development of a Product or Subproduct.

(88)   "Technical Program Plan" or "Plan" means the document that sets forth RI/FS Deadlines, deadlines for completion of IRA Decision Documents, Schedules, and other provisions prepared and adopted in accordance with Section XX.

(89)   "TRC" means the Technical Review Committee described in paragraphs 19.1-19.6.

(90)   "United States" means the Federal government, any department, agency, Region, office or subdivision thereof (including but not limited to the Army, ATSDR, DOD, EPA and DOI); and includes the officers, employees and agents of the United States when acting within the scope of their authority.

## XV.   RMA COMMITTEE

15.1   Upon completion of the Technical Program Plan, the Army designated an employee to serve on the RMA Committee as the Coordinator for the On-Post and Off-Post Operable Units.  The Coordinator shall be responsible on a daily basis for assuring the Army's implementation of the RI/FS, the IRAs, Final Response Actions, Emergency Actions and Supplemental Response Actions for the On-Post and Off-Post Operable Units in accordance with the terms of this Agreement, the Technical Program Plan, and the Settlement Agreement.

15.2   Upon the completion of the Technical Program Plan, the other Organizations each designated an employee to serve on the RMA Committee as its Committee Representative.  Each Representative shall be responsible on a daily basis for ensuring his or her entity's fulfillment of its responsibilities regarding a RI/FS, the IRAs, Final Response Actions, Supplemental Response Actions and Emergency Actions in accordance with the terms of this Agreement, the Technical Program Plan and the Settlement Agreement.  The RMA Committee shall consist of the Coordinator and the Committee Representatives.  A representative of DOI may attend and participate in any meeting of the Committee (but shall not vote).

15.3   The Organizations shall transmit all written communications between each other after the effective date of this Agreement with respect to a RI/FS, the IRAs, Final Response Actions, Supplemental Response Actions and Emergency Actions or related matters concerning the Arsenal, through the Coordinator and Committee Representatives, except for policy matters raised directly with SAPC, communications between attorneys or documents excluded by paragraph 21.1(a).

15.4   The RMA Committee shall meet informally approximately once each month.  Although the Lead Agency and the Lead Party have ultimate responsibility for meeting their respective Deadlines, the RMA Committee shall endeavor to assist in this

- 26 -

effort by scheduling meetings to address Products, Subproducts or Other Deliverables, setting and reviewing completion dates for Technical Plans, Other Deliverables, and reports for Products and Subproducts, overseeing the performance of all environmental monitoring at the Site overseeing the performance of the RI/FS, the IRAs, Final Response Actions, Supplemental Response Actions or other Response Actions, reviewing the progress of the Technical Program Plan and the status of Technical Plans, Products, Subproducts, and Other Deliverables, attempting to resolve disputes informally, making necessary and appropriate adjustments to Schedules, advising the RMA Council whenever a Deadline cannot be attained and recommending, where warranted, that a Deadline be extended in accordance with paragraphs 26.8-26.18.

15.5    The RMA Committee may create such subcommittees as it approves by majority vote of the Organizations.

15.6    Special meetings of the RMA Committee shall be held upon majority agreement of the Organizations.

XVI.   RMA COUNCIL

16.1    Within seven days of the completion of the Technical Program Plan, the Organizations each designated an employee to serve as a member of the RMA Council for the On-Post and Off-Post Operable Units.

16.2    The designee of the Army shall serve as the chairman of the RMA Council for the On-Post and Off-Post Operable Units.

16.3    The Coordinator and Committee Representatives may also serve as members or alternate members of the RMA Council and may attend and participate in any meeting of the RMA Council. Counsel for the Organizations may, subject to paragraph 13.1, also attend and participate in RMA Council meetings. A representative of DOI may attend and participate in meetings of the Council (but shall not vote).

16.4    The chairman shall schedule regular meetings of the RMA Council approximately every three months, shall transmit a proposed agenda at least 20 days in advance of such meeting and shall transmit a final agenda at least 10 days in advance of such meeting which shall incorporate any additional matter that a member requests be included. Regular meetings shall be for the purpose of reviewing and commenting on the progress under the Technical Program Plan and on the status of all Technical Plans, Product and Subproduct reports, and Other Deliverables, and overseeing the performance of the RI/FS, the IRAs, Final Response Actions, Supplemental Response Actions or other Response Actions. The RMA Council shall attempt to resolve differences between the Organizations and shall address any other matter which a member timely seeks to have placed on the agenda.

- 27 -

16.5    Special meetings of the RMA Council shall be held at the request of any Organization.  As much notice for special meetings as is feasible under the circumstances shall be provided by the chairman.

## XVII.  STEERING AND POLICY COMMITTEE ("SAPC")

17.1    On the completion of the Technical Program Plan, the Organizations each designated an employee to serve as a member of the SAPC for the On-Post and Off-Post Operable Units.  The SAPC shall consist of the following members:  for the United States, the Army Deputy for Environment, Safety and Occupational Health (or other official of comparable authority and responsibility) and the Regional Administrator of EPA Region 8 (or other official of comparable authority and responsibility); for the State, the Director of the Colorado Department of Health (or other official of comparable authority and responsibility); and for Shell, a Vice President of Shell.  A representative of DOI may attend and participate (but shall not vote).

17.2    The function of the SAPC shall be (a) to decide significant policy issues as they relate to assessment, selection, design and implementation of Response Actions at or associated with the Site and (b) to resolve disputes relating to assessment, selection, design, and implementation of Response Actions at or associated with the Site when such disputes have not been resolved at the RMA Council level and which have been elevated to the SAPC for resolution.

17.3    Unless otherwise agreed by all members of the SAPC, the SAPC shall meet approximately quarterly at a time and location to be determined by the SAPC.  At the quarterly meetings, the SAPC shall address any policy issues or other matters placed on the agenda.  In addition to its regular quarterly meetings, the SAPC may hold special meetings as necessary to resolve disputes or address policy issues or other matters.  If a special meeting of the SAPC occurs near the time of a regularly scheduled quarterly meeting, the SAPC may agree to cancel or postpone the quarterly meeting, as appropriate.

17.4    The EPA member of the SAPC, or his or her designated representative, shall chair all meetings of the SAPC.  EPA shall prepare an agenda pursuant to the recommendation of the RMA Council and distribute the agenda prior to each SAPC meeting.  EPA shall include on the agenda any policy issues or other matters raised by the other SAPC members.

17.5    During SAPC meetings, Shell, the State and the United States may each be accompanied by legal and technical advisors.  A SAPC member who cannot attend a meeting may designate an alternate representative, who shall be fully authorized to make commitments and take positions on behalf of the Organization he or she represents.

- 28 -

## XVIII.  FINAL REVIEW COMMITTEE ("FRC")

18.1    On the completion of the Technical Program Plan, the Organizations each designated an employee to serve as a member of the FRC for the On-Post and Off-Post Operable Units.  The FRC shall consist of the following members:  for the United States, the Assistant Secretary of the Army (Installations and Logistics) (or other official of comparable authority and responsibility) and the Administrator of EPA (or other official of comparable authority and responsibility) who shall chair meetings of the FRC; for the State, the Governor of Colorado; and for Shell, the President of Shell.  A representative of DOI may attend and participate in meetings of the FRC (but shall not vote).

18.2    FRC meetings shall occur only as needed to resolve disputes or policy issues.  The Organizations may each bring legal and technical advisors of their choosing to FRC meetings unless otherwise agreed by Shell, the State and the United States.  A FRC member who cannot attend a meeting may designate an alternate representative, who shall be fully authorized to make commitments and take positions on behalf of the Organization he or she represents.

## XIX.  TECHNICAL REVIEW COMMITTEE ("TRC")

19.1    Within 21 days of the completion of the Technical Program Plan, the Army, in consultation with the other Organizations, designated, pursuant to 10 U.S.C. § 2705(c) and paragraph 19.6 the following to serve as members of the TRC:

(a)    The chairman of the RMA Council, who shall serve as the Army's representative;

(b)    A representative of EPA (as designated by EPA);

(c)    A representative of the State (as designated by the State);

(d)    A representative of Adams County;

(e)    A representative of the City and County of Denver;

(f)    A representative of Commerce City;

(g)    A representative of the South Adams County Water and Sanitation District;

(h)    A representative of the Tri-County Health Authority; and

- 29 -

(i)     Three public representatives who shall represent a cross section of civic, educational and other such groups from the local community.

19.2     The chairman of the RMA Council shall serve as the chairman of all TRC meetings. A representative of each of Colorado's United States Senators and Members of the United States House of Representatives, Shell, and counsel for the United States, Army, EPA, DOI, Shell and the State, may each attend and participate in any TRC meeting as ex-officio members of the TRC.

19.3     The purpose of the TRC is to afford a forum for cooperation between the Army and concerned local officials and citizens and provide a meaningful opportunity for the members of TRC to become informed and to express their opinion about significant aspects of the RI/FS.

19.4     The chairman shall schedule regular meetings of the TRC approximately every three months. Regular meetings of the TRC shall be for the purpose of reviewing progress under the RI/FS Plan and discussing other matters of interest to the TRC.

19.5     Special meetings of the TRC shall be held at the request of the Army or EPA.

19.6     To avoid unnecessary delay and administrative procedures, the Organizations intend that the appointment of the TRC and the performance of its activities need not comply with the Federal Advisory Committee Act, 5 U.S.C. App., 86 Stat. 770, and the Federal Advisory Committee Management Regulations, 41 C.F.R. §§ 101-6.1001--101-6.1035.

19.7     The Custodian shall distribute to the TRC every three months information concerning the supplementation of the Administrative Records which occurred during that period.

## XX.   ADOPTION OF TECHNICAL PROGRAM PLAN

### (i) Purpose of Technical Program Plan

20.1     The Organizations have developed a Technical Program Plan to govern the completion of the RI/FS for the On-Post and Off-Post Operable Units.

20.2     The Technical Program Plan:

(a)     Has goals for the issuance of the Army's preferred remedial action for the Off-Post Operable Unit and for the issuance of the Army's preferred remedial action for the On-Post Operable Unit;

- 30 -

(b)    Identifies, without specifics, the Products and Subproducts listed in paragraphs 24.30, 24.32 and 24.34 which (1) shall proceed without substantial modification, (2) are sufficiently completed as of the date of the Technical Program Plan or (3) require such substantial modification as to be designated New Products or Subproducts in accordance with paragraphs 24.7-24.8;

(c)    Identifies any New Products or Subproducts not identified in paragraphs 24.30, 24.32 and 24.34 which shall be added to the RI/FS for the On-Post and Off-Post Operable Unit;

(d)    Identifies any New Products or Subproducts that require ARAR determinations;

(e)    Identifies Other Deliverables, to the extent they are known;

(f)    Establishes Deadlines for the completion of IRA Decision Documents;

(g)    Identifies RI/FS Deadlines for the milestones listed in paragraph 26.7;

(h)    Identifies Schedules; and

(i)    Avoids addressing specific issues which can be better resolved in the context of the specific Technical Plans, Products, Subproducts, Other Deliverables, RI/FS Reports and RODs.

20.3    The Technical Program Plan also addresses and resolves previously identified and new issues which solely relate to the general conduct of a RI/FS that were clearly raised by an Organization during the course of drafting or commenting on the draft Technical Program Plan.

(ii)    Development of Drafts of Technical Program Plan

20.4    Representatives of the Organizations and their respective counsel conferred with each others' counsel in an effort to develop a draft Technical Program Plan by consensus to the maximum extent practicable.

20.5    After conferring with the Organizations, the Army prepared a draft Technical Program Plan.

20.6    On or about December 4, 1987, the Army transmitted the draft Technical Program Plan to the other Organizations for review and comment.

- 31 -

20.7   Within 50 days of receiving the draft Technical Program Plan, the other Organizations transmitted their written comments on the draft to the Army, and Shell identified the Products, Subproducts and Other Deliverables for which Shell proposed to be Lead Party.

20.8   Within 30 days of the close of the 50-day period specified in paragraph 20.7, the Army transmitted to SAPC (and to the other Organizations):

(a)   A draft final Technical Program Plan;

(b)   Copies of the written comments of the other Organizations;

(c)   The Army's response to timely written comments received from the other Organizations; and

(d)   The Army's response to Shell's proposals to be Lead Party.

(iii)   <u>Approval of Technical Program Plan</u>

20.9   Within approximately 15 days after receipt of the draft final Technical Program Plan with the comments and responses, SAPC met to decide the unresolved issues, to reconcile any inconsistencies and to direct the finalization of the Technical Program Plan in accordance with its decisions. During the week prior to the SAPC meeting, the Organizations met and attempted to reconcile as many differences as possible concerning the Technical Program Plan. All unresolved issues were placed on the agenda for the SAPC meeting. In reviewing the draft final Technical Program Plan and in deciding the unresolved issues, SAPC considered the impact of each of its decisions on the goals set forth in paragraph 20.2(a).

20.10   To the extent that an Organization did not object to the draft final Technical Program Plan during the course of the SAPC review, it is deemed to have approved the Technical Program Plan.

20.11   If within 20 days of its initial meeting SAPC could not have decided a dispute concerning the Technical Program Plan, any of the Organizations could have elevated the issue to the FRC by notifying the other Organizations in writing of such intent within 5 days of the close of SAPC's 20-day review period. FRC would have had 20 days thereafter to resolve the dispute. The decision of FRC with respect to such dispute would have been reflected in the final Technical Program Plan.

20.12   The Army had 15 days to revise the draft final Technical Program Plan to make it consistent with the decision of SAPC (or FRC, if FRC resolved a dispute concerning the Plan). After revising the Technical Program Plan, the Army transmitted a copy of the Technical Program Plan to SAPC, which approved the Technical Program

- 32 -

Plan upon its determination that the Technical Program Plan is consistent with the decision of SAPC (or FRC, if FRC had resolved a dispute concerning the Plan).

20.13 Following SAPC or FRC approval of the Technical Program Plan, copies of the Plan were issued by the Army to the other Organizations. The RI/FS Deadlines established by and appended to the Plan thereafter shall apply to the RI/FS for the On-Post and Off-Post Operable Units.

    (iv) <u>Subsequent Extensions of Deadlines</u>

20.14 If subsequent to the approval of the Technical Program Plan, an Organization determines that an extension of an RI/FS Deadline is warranted for any reason, it may request such an extension in accordance with paragraphs 26.17-26.18. All extensions of RI/FS Deadlines shall be appended to the Plan and shall thereafter apply to the appropriate RI/FS.

20.15 The Technical Program Plan shall be amended to include a current list of all use restrictions applicable for the Arsenal. The Army shall submit such restrictions, and any revisions thereof, to the SAPC for review and approval.

    (v)     <u>Amendment of the Technical Program Plan</u>

20.16 Within 90 days of the adoption of this Agreement, an Organization may seek to amend the Technical Program Plan as necessary to incorporate changes or requirements that result from the adoption of this Agreement or the Settlement Agreement. An Organization may seek such an amendment by submitting a concise written request to the RMA Council.

20.17 In the event that unanimous agreement is not reached by the RMA Council on the need for an amendment of the Plan, pursuant to paragraph 20.16, any Organization may invoke Dispute Resolution to determine if such amendment shall occur.

20.18 The proponent of a proposed amendment of the Plan shall prepare the text of the proposed amendment.

## XXI. <u>EXCHANGE AND PRESERVATION OF INFORMATION</u>

21.1 Prior to the effective date of this Agreement, Exhibit E to the February 1, 1988, and June 7, 1988, proposed consent decrees governed the exchange and preservation of information by the Signatories. On the effective date of this Agreement, this Section shall control the exchange and preservation of information by the Signatories. On this Agreement becoming binding on a Signatory, the Signatory shall:

- 33 -

(a)   Provide on request, subject to the provisions of subparagraph 21.1(e)(1) and (2), the other Signatories access, for purposes of review and copying, and without the need to make any formal request under the Freedom of Information Act or similar state law, to all technical information or sampling or test data previously obtained or generated by that Signatory or its agents relating to the RI/FS or contamination at the Site, except for:

(i)   Privileged attorney-client communications and attorney work product;

(ii)   Communications between two or more of the Signatories, which retain their privileged or work product status because of their occurrence in the context of the joint or cooperative conduct of litigation;

(iii)   Communications which are subject to the deliberative process privilege among or between personnel of the Army, EPA or the State and their respective managements, and communications of a similar nature between Shell personnel and Shell management;

(iv)   Post-contract award communications between the Army, EPA or Shell and their respective contractors concerning the performance of work by such contractors (but not contract change orders, modifications, amendments or similar communications); however, factual or technical information which is found only in such communications shall be promptly provided to SAPC, at SAPC's request, by the appropriate Signatory where these may prove relevant to a matter submitted to Dispute Resolution;

(v)   Pre-award communications or information received from or exchanged with prospective bidders potential government contractors or any other person submitting bids or proposals to the Army or EPA to the extent that these are confidential as provided by the applicable statutes or regulations governing Federal contracting, procurement or acquisition procedures;

(vi)   Pre-award communications or information received from or exchanged with prospective bidders, potential Shell contractors or any other person submitting bids or proposals to Shell, except to the extent that disclosure is required by law.

(vii)   Communications between the Army or EPA with the staff, members or committees of Congress, subject however, to the right of any Organization to obtain information which is otherwise available by law;

(viii)   Documents generated for purposes of settlement negotiations; and

- 34 -

(ix)    Documents prohibited from disclosure in accordance with Protective Orders Nos. 1, 2, 3, and 4 in United States v. Shell Oil Co., Civil Action No. 83-C-2379 (consolidated with No. 83-C-2386)(D. Colo.), or pursuant to the terms of the Settlement Agreement.

(b)    Hold all Confidential Informational delivered pursuant to subparagraph 21.1(a) subject to subparagraphs 21.1(b)(1)-(3); for purposes of this provision, "Confidential Information" means all records, reports, or information designated in accordance with Section 104(e)(7)(C) of CERCLA, 42 U.S.C. § 9604(e)(7)(C), or marked or stamped by an Organization or a Contractor with the legend "Confidential Information" that concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; and all other records, reports, or information that an Organization or Contractor is required by law or contract to maintain confidential.

(i)    Signatories shall treat as highly confidential, and not publish, divulge, disclose, or make known in any manner or to any extent not authorized or required by law, any Confidential Information received by, or made available to, them pursuant to this Agreement.  If the State is not a Signatory, no other Organization shall be required to provide any Confidential Information to the State hereunder until the State enters into a confidentiality agreement with the Organizations by which the State agrees to maintain the confidentiality of such Confidential Information on the terms set forth in this subparagraph 21.1(b).

(ii)    Nothing herein shall prevent an Organization from using Confidential Information of the others in connection with Dispute Resolution or judicial review; provided that the Organization gives the others at least 10 days prior written notice of its intent to use the Confidential Information for such purpose and takes all reasonable steps to limit to the maximum extent practicable the disclosure of such Confidential Information.

(iii)    The provisions of this subparagraph 21.1(b) shall not limit (A) any rights any Organization may otherwise have under the Consent Decree or applicable law to obtain or use any Confidential Information, or (B) any remedies any Organization may have under applicable law or contract for disclosure or use by the others of any Confidential Information.

(c)    Provide the others on a regular basis with at least seven days advance notice (by location and general description of the type of activity) of all sampling and other field activity to occur in an identified geographic area in connection with a RI/FS;

(d)    Provide the others, on request and to the maximum extent practicable, with "splits" of all samples taken in connection with a RI/FS;

- 35 -

(e)   For all sampling and test data collected in connection with a RI/FS, transmit to the others automatically:

(i)   QA'd/QC'd data for such sampling or test results within 30 days of the completion of the quality assurance/quality control process; or

(ii)   The "raw" sampling or testing data, if no QA'd/QC'd data are transmitted to the others within 150 days of the date when the sample was taken or the test occurred, except where there is a showing of good cause and agreement by all of the Signatories that additional time shall be afforded for the transmittal of the "QA'd/QC'd" data; and

(f)   Preserve for at lease five years from the issuance of the final ROD, irrespective of any document retention policy to the contrary, all documents or information not excluded by subparagraph 21.1(a) concerning:

(i)   Any RI/FS for an Operable Unit;

(ii)   Contamination at the Arsenal or released from the Arsenal;

(iii)   Any IRA or Final Response Action.

21.2   The documents described in subparagraph 21.1(f) shall be preserved at the JARDF. The expense of operating the JARDF shall be accounted for by the Army and Shell in accordance with the Financial Manual. After the conclusion of the 5-year period, Custodian shall notify the Signatories at least 60 days in advance of when it intends to destroy such documents. If any Signatory requests that the Custodian retain the documents for a longer period, the documents shall be retained for such additional time as all Signatories may agree or the Court may order.

21.3   The disclosure of all or any of a discrete portion of an otherwise privileged document described in subparagraph 21.1(a), or the entirety of such document(s), shall not constitute a subject matter waiver or a waiver of an otherwise valid privilege claim for the undisclosed portion of that document or for any undisclosed documents of that type.

21.4   Nothing in paragraph 21.1 shall be construed to deny any person access to a document the disclosure of which would be required pursuant to the Freedom of Information Act, 5 U.S.C. § 552, or the applicable provisions of Colorado Revised Statutes, "Public Records," Colo. Rev. Stat. §§ 24-72-201 - 24-72-205.

- 36 -

XXII.  ASSESSMENT AND IMPLEMENTATION OF INTERIM
       RESPONSE ACTIONS (IRAs)

22.1    Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees governed the assessment and implementation of IRAs.  On the effective date of this Agreement, this Section shall control the assessment and implementation of IRAs.  The Organizations agree that the IRAs listed below are necessary and appropriate:

(a)    Groundwater Intercept and Treatment System North of the Arsenal: This action consists of the construction of one or more pump and treat systems off-post of the Arsenal following assessment and selection, as part of the IRA.

(b)    Improvement of the North Boundary System and Evaluation of all Existing Boundary Systems:  This action consists of (i) assessment of the need for improvements (such as expansion) to the North Boundary System and assessment, selection, and implementation of any necessary improvements to the system, (ii) assessment of the other two boundary systems (Irondale and Northwest) on the Arsenal and assessment, selection and implementation of any appropriate improvements to these systems as necessary, and (iii) implementation of the groundwater recharge trenches to increase the rate of reinjection of treated groundwater in connection with the North Boundary.

(c)    Groundwater Intercept and Treatment System North of Basin F: This action consists of assessment and selection of a groundwater intercept and treatment system north of Basin F and implementation of such a system as necessary.

(d)    Closure of Abandoned Wells on the Arsenal:  This action consists of sampling, plugging, and closing of wells on the Arsenal that are not currently part of the on-going groundwater monitoring program or that are not suitable for inclusion in the future monitoring program.  The plugging and closure shall be performed in accordance with the criteria developed in July 1987 by the United States, the State and Shell.

(e)    Groundwater Intercept and Treatment System in the Basin A Neck Area: This action consists of design and construction of an alluvial groundwater intercept and treatment system in the Basin A Neck area on the Arsenal.

(f)    Basin F Liquids, Sludges, and Soils Remediation:  This action, which is on-going and will continue, consists of remediation of contaminated liquids, sludges, and soils from and under Basin F.  Once liquids are removed to temporary storage tanks (constructed by Shell pursuant to the Basin F MOU), the soils and sludges remaining in the basin and those down to a specified depth beneath the basin liner will be solidified as necessary and transported to a temporary holding area, where they will be properly stored prior to treatment or disposal.  Treatment or disposal of soils and

- 37 -

sludges shall be undertaken either as a subsequent phase of this IRA or as part of the Final Response Action for the On-Post Operable Unit.

(g)    Building 1727 Sump Liquid:  This action consists of remediating contaminated liquid in the Building 1727 sump to mitigate any remaining threat of release of liquids from this sump.

(h)    Closure of the Hydrazine Facility:  This action consists of (i) treatment and disposal of pretreated liquids in tanks used for storage of waste products from the blending of rocket fuels and (ii) dismantling and disposal of all remaining above-ground structures associated with the hydrazine facility.

(i)    Fugitive Dust Control:  This action consists of selection and implementation of a dust suppressant program as expeditiously as possible.

(j)    Sewer Remediation:  This action consists of remediation of certain priority portions of the sanitary sewer to minimize this potential pathway of contaminant flow.  The priority list of sewer system segments for this action will focus first upon those segments located below the groundwater table.

(k)    Asbestos Removal:  This action consists of the United States' on-going survey of friable (i.e., flaking) asbestos on the Arsenal and the prompt removal and disposal of it, if the survey indicates a potential for human exposure.

(l)    Remediation of Other Contamination Sources:  This action consists of assessment and, as necessary, the selection and implementation of an IRA for the Section 36 Trenches, the Section 36 Lime Pits, the M-1 Settling Basins, the Motorpool Area, the Railroad Holding Track in the Rail Classification Yard and, when appropriate, the placement of any material excavated from such locations in a properly constructed temporary storage area or areas on the Arsenal.  If any Organization identifies any additional source area for inclusion in this IRA, the Organization may submit to the others a written report identifying the source area proposed for inclusion and setting forth the factual, technical, and scientific basis for the proposal.  Within 30 days after submission of the report, the Army shall determine whether the source area should be included in this IRA and notify Shell, EPA and the State of its determination.  If Shell or EPA disagrees with the Army's determination, Shell or EPA may invoke Dispute Resolution.

(m)    Pretreatment of CERCLA Liquid Waste:  This action consists of development and implementation of a program to treat wastewater resulting from the assessment and implementation of Response Actions for the Site (e.g., treatment of wastewater) from the Arsenal laboratory and treatment of decontamination water prior to their discharge into the Arsenal sanitary sewer, or development of other appropriate measures for the disposal or reuse of such water.

- 38 -

22.2    The process set forth in paragraph 22.3 shall govern design and implementation of the Basin F Liquids, Sludges and Soils Remediation identified in paragraph 22.1(f).  The process set forth in paragraph 22.4 shall govern implementation of the IRAs identified in subparagraphs 22.1(b)(iii) and 21.1(d).  The process set forth in paragraph 22.5 shall govern implementation of the IRAs identified in subparagraphs 22.1(i) and 22.1(k).  The process set forth in paragraphs 22.5-22.14 shall govern assessment, design and implementation of the IRAs identified in subparagraphs 22.1(a), 22.1(b)(i) and (ii) 22.1(c), 22.1(e), 22.1(g), 22.1(h), 22.1(j), 22.1(l) and 22.1(m).

22.3    Because of the nature and status of the IRA for Basin F, as identified in paragraph 22.1(f), the design and implementation of that IRA shall be as follows:

(a)    This IRA shall attain ARARs to the maximum extent practicable.  The Army shall provide to EPA, DOI, Shell and the State a draft ARAR selection document, which they may review and comment on within 7 days after receiving the document.

(b)    After EPA, DOI, Shell and the State have an opportunity to comment on the draft ARAR selection document, the Army shall prepare a proposed decision document for the final design of the IRA.  This design decision document shall be presented in draft to EPA, DOI, Shell, and the State and the public with a 30-day review and comment period.

(c)    After close of the 30-day comment period, the Army shall prepare a proposed final design decision document, which any Organization (or DOI, subject to paragraph 30.2) may raise to Dispute Resolution.  The Army shall thereafter finalize the decision document consistent with the results of Dispute Resolution, if invoked.  Any Organization (or DOI, subject to paragraph 30.2) may again invoke Dispute Resolution if it disagrees that the final decision document is consistent with the results of Dispute Resolution, if invoked.

(d)    The final design decision document shall include IRA Deadlines for implementation of this IRA (if not set forth in the Technical Program Plan) and shall be supported by a publicly available administrative record, which shall include, but not be limited to, significant facts and studies supporting the initial decision to conduct this IRA, all comments received concerning the final design of the action and the Army's response to those comments.

(e)    If any Organization or DOI believes that this IRA is not being properly implemented, it may so advise the others and shall recommend how the action should be properly implemented.  The Organizations shall attempt to reach unanimous agreement regarding such recommendation.  Any Organization (or DOI, subject to paragraph 30.2) may submit the matter to Dispute Resolution to resolve the disagreement.

- 39 -

(f)    Shell has the right to participate in the implementation of this IRA pursuant to the conditions and provisions of this paragraph.

(g)    This IRA is also subject to paragraph 22.5.

(h)    If the Army determines that the Basin F liquids need to be removed from temporary storage prior to implementation of the Final Response Action for the On-post Operable Unit to avoid exceeding the service life of the tanks, it shall so notify the other Organizations and DOI in writing. Such notification shall fully explain the basis of the Army's determination. The Army shall then prepare a proposed plan for the treatment and disposal (and temporary storage, if appropriate) of the Basin F liquids, and shall provide a draft of the plan to the other Organizations and DOI for a 30-day period of review and comment. After considering the comments received, the Army shall issue a final plan. Any Organization (or DOI, subject to paragraph 30.2) may invoke Dispute Resolution with respect to the final plan not later than seven days of receipt of the plan from the Army. Shell or the State may, upon completion of Dispute Resolution, seek judicial review of the decision of the Administrator of EPA. If Dispute Resolution is invoked, the final plan shall not be implemented by the Army until the conclusion of Dispute Resolution or judicial review. The final plan shall fully reflect the results of Dispute Resolution or judicial review.

22.4    Because of the nature and status of the assessment of the feasibility of the groundwater recharge trenches, as described in paragraph 22.1(b)(iii), and the closure of abandoned wells on the Arsenal, as described in paragraph 22.1(d), these IRAs shall be subject to all the requirements set forth in paragraphs 22.5-22.14, with the following exceptions:

(a)    The requirements of paragraph 22.6 shall not apply to the IRA described in paragraph 22.1(b)(iii); however, that IRA shall be subject to notice and comment when the draft IRA Decision Document is issued in accordance with paragraph 22.9.

(b)    The requirement in paragraph 22.6 that the assessment be subject to notice and comment shall not apply to the IRA described in paragraph 22.1(d); however, that IRA shall be subject to notice and comment when the draft IRA Decision Document is issued in accordance with paragraph 22.9.

(c)    The requirement in paragraph 22.9 that the public be advised of these IRAs at a public meeting shall not apply.

22.5    All IRAs identified in paragraph 22.1 shall, to the maximum extent practicable, be consistent with and contribute to the efficient performance of Final Response Actions. If an IRA will not fully address the threat posed by a release and further response is required, the Army shall ensure an orderly transition from IRAs to

- 40 -

Final Response Actions. Every effort shall be made to avoid duplication between IRAs and Final Response Actions. At the time of implementation of Final Response Actions, IRAs will either end or be incorporated as part of the Final Response Actions.

22.6    The Lead Party shall prepare an assessment of each IRA subject to this paragraph. The goal of the assessment shall be to evaluate appropriate alternatives and to select the most cost-effective alternative for attaining the objective of the IRA. The evaluation of alternatives may be based upon, but not limited to, such factors as protection of human health and the environment, mitigation of the threat to human health and the reasonableness of cost, and timeliness. Any studies or assessments that have been initiated or completed as of the effective date of this Agreement may be used, if appropriate, to satisfy the requirements of this paragraph. Each such assessment shall be submitted in draft to the other Organizations and DOI for review and comment. The other Organizations and DOI may submit comments to the Lead Party within 30 days after receipt of the draft assessment. Within 30 days after close of the comment period, the Lead Party shall transmit a final assessment to the other Organizations and DOI.

22.7    IRAs shall, to the maximum extent practicable, attain ARARs. The Organizations and DOI shall have the opportunity to participate, at the RMA Committee level, in the identification and selection of ARARs that may be applicable to IRAs. The Army shall initially present its proposed decision on the draft assessment issued in accordance with paragraph 22.6. If the Army is not the Lead Party for an IRA assessment, the Army shall provide its proposed ARAR determination to the Lead Party prior to or promptly after the Lead Party begins preparation of the draft assessment. The Lead Party shall assure to the maximum extent possible that the draft assessment is consistent with and based upon the Army's proposed ARAR determination. If EPA, DOI (subject to paragraph 30.2), Shell or the State disagrees with the Army's selection of ARARs, such disagreement shall be subject to Dispute Resolution, as provided in paragraph 22.10, or pursuant to such other process as the United States, Shell and the State may agree in writing.

22.8    The Army shall issue a proposed IRA Decision Document for every IRA subject to this paragraph promptly after issuance of the final assessment for that IRA, in accordance with paragraph 22.6. The proposed IRA Decision Document shall be a concise document that (a) indicates the objective of the IRA; (b) discusses alternatives, if any, that were considered; (c) provides the rationale for the alternative selected; (d) presents the Army's final ARAR decision; (e) summarizes the significant comments received regarding the IRA and the Army's responses to those comments; and (f) establishes an IRA Deadline for completion of the IRA, if appropriate. If the Army is not Lead Party for an IRA, the Army shall consult with the Lead Party prior to issuing the proposed IRA Decision Document.

22.9    Each proposed IRA Decision Document shall be subject to a 30-day public comment period (or such shorter comment period depending on the exigencies of the

- 41 -

situation), during which the other Organizations, DOI and any other person may comment on the proposed IRA Decision Document. The Army shall prepare a response to all significant comments received in written and oral presentations during the comment period. Time permitting, the Army shall hold at least one public meeting during the public comment period to inform the community in the vicinity of the Arsenal of the IRAs subject to this paragraph. The Army may address more than one IRA at a public meeting. The Army shall widely publicize in the Denver metropolitan area the time and place of these public meetings. Each IRA Decision Document required for an IRA subject to this paragraph shall be supported by a publicly available record. This record shall incorporate significant facts, documents and decisions concerning the IRA, as well as all public comments received and the Army's response to significant public comments. Promptly after close of the comment period, the Army shall transmit to the other Organizations and DOI a draft final IRA Decision Document. The draft final IRA Decision Document shall address the issues noted in paragraph 22.8, shall summarize the comments received on the proposed IRA Decision Document, and shall include the Army's responses to those comments.

22.10  Within 20 days after issuance of a draft final IRA Decision Document for any IRA subject to this paragraph, an Organization (or DOI, subject to paragraph 30.2) may invoke Dispute Resolution to resolve disputes concerning the IRA proposed in the draft final IRA Decision Document, including any dispute with respect to the Army's ARAR decision. Shell or the State may seek judicial review in accordance with paragraph 39.2 of the decision that results from Dispute Resolution. The determination that the IRAs listed in paragraph 22.1 are necessary and appropriate shall not be subject to Dispute Resolution or judicial review.

22.11  After close of the period for invoking Dispute Resolution, if Dispute Resolution is not invoked, or after completion of Dispute Resolution, if invoked, the Army shall issue a final IRA Decision Document to the other Organizations and DOI. Only preliminary design work for an IRA for which an IRA Decision Document is required may be conducted prior to issuance of the final IRA Decision Document for that IRA. The public shall be notified of the availability of the final IRA Decision Document and the record supporting it.

22.12  Shell shall have the right to participate in the assessment, design and implementation of IRAs pursuant to the conditions and provisions of this Agreement.

22.13  Following completion of all design work specified in an IRA Decision Document, the Lead Party shall issue an IRA Implementation Document that shall include the final drawings and specifications and the final design analysis and cost estimate for implementation of that IRA and shall also include IRA Deadlines for implementation of the IRA.

22.14  The Lead Party responsible for designing or implementing an IRA shall keep the other Organizations and DOI apprised of the progress of those activities.

- 42 -

Documents relating to the design and implementation of the IRA shall be submitted in draft to the other Organizations and DOI for review and comment. If any Organization or DOI believes that any IRA is being designed or implemented in a way that will not meet the objectives for the IRA set forth in the final IRA Decision Document or IRA Implementation Document or is otherwise not being properly implemented, it may so advise the others and shall recommend how the IRA should be properly designed or implemented. Any Organization (or DOI, subject to paragraph 30.2) may invoke Dispute Resolution to resolve the disagreement.

22.15   IRA Deadlines may be extended for good cause in accordance with the provisions of paragraphs 26.17-16.28.

22.16   At any time prior to the issuance of the On-Post or the Off-Post Operable Unit ROD, as appropriate, any Organization may submit a concise written statement to the RMA Committee which requests consideration by the Organizations of the need for additional action or modification of any IRA because of information that was not available, or conditions that were unknown, at the time that the IRA Decision Document was finalized. The statement shall be accompanied by a supporting technical study and, if deemed appropriate by the proponent of the additional action or modification, a legal memorandum. In the event that a unanimous agreement is not reached by the RMA Committee on the need for additional action or modification, the additional action or modification may be raised by any Organization for Dispute Resolution. The RMA Council, SAPC or FRC shall require the additional action or modification only upon a showing that the requested additional action or modification would be of significant assistance, prior to the issuance of the On-Post or the Off-Post Operable Unit ROD, as appropriate, in assuring protection of human health and the environment.

## XXIII.  EMERGENCY ACTIONS

23.1   Notwithstanding any other provision of this Agreement, the Army retains the right to conduct such Emergency Actions as may be necessary to alleviate immediate threats to human health or the environment from the release or threat of release of hazardous substances, pollutants or contaminants at or from the Arsenal. Such actions may be conducted at any time, either before or after the issuance of a ROD. Notwithstanding any other provision of this Agreement or the Settlement Agreement, Shell shall not be liable for the cost of any Emergency Action taken solely in response to a release or threat of release of a pollutant or contaminant.

23.2   The Army shall provide the other Organizations and DOI with oral notice as soon as possible after the Army determines that an Emergency Action is necessary. If the exigencies of the circumstances permit, the Army shall consult the other Organizations and DOI before undertaking the Emergency Action. In addition, within three days of initiating such an Emergency Action the Army shall provide written notice to the other Organizations and DOI explaining why such Emergency Action is or was

- 43 -

necessary. Promptly thereafter the Army shall provide the other Organizations and DOI with the written bases (factual, technical, and scientific) for such Emergency Action and any available documents supporting such action. Upon completion of an Emergency Action, the Army shall notify the other Organizations and DOI in writing that the Emergency Action has been implemented. Such notice shall state whether, and to what extent, the Emergency Action varied from the description of the action in the written notice provided pursuant to the third sentence of this paragraph.

23.3 If, following receipt of an Emergency Action notice and the supporting documentation referred to in paragraph 23.2, Shell concludes that the action need not have been conducted as an Emergency Action, it may so notify the other Organizations in writing. Such notice must be provided within 30 days of the receipt of the Emergency Action notice and supporting documentation and shall fully explain the basis of Shell's conclusion that the action was not necessary to alleviate an immediate threat to human health or the environment from the release or threat of release of a hazardous substance, pollutant or contaminant. If the Army disagrees with Shell's conclusion, Shell may submit the issue to a special meeting of the SAPC, the Army, EPA and Shell members of which shall make the final decision with respect to the disagreement.

23.4 If Shell concludes that any portion of an Emergency Action was not conducted in accordance with the NCP or was conducted solely in response to a release or threat of release of a pollutant or contaminant, Shell may so notify the other Organizations in writing. Such notice must be provided within 30 days after Shell has been notified, pursuant to paragraph 23.2, that an Emergency Action conducted by the Army has been implemented and shall fully explain the basis of Shell's conclusion. If the Army disagrees with Shell's conclusion, Shell may submit the issue to a special meeting of the SAPC, the Army, EPA and Shell members of which shall make the final decision with respect to the disagreement.

23.5 If the Army agrees, or it is determined by the Army, EPA and Shell members of the SAPC or the Regional Administrator of the EPA (if the Army, EPA, and Shell members fail to reach unanimity) that an action was not properly conducted as an Emergency Action or was conducted solely in response to a release or threat of release of a pollutant or contaminant, the costs of such action shall be an Army-Only Response Costs. If the Army agrees, or the decision reached by the Army, EPA and Shell members of the SAPC or the Regional Administrator of the EPA (if the Army, EPA and Shell members fail to reach unanimity) is that an Emergency Action was not implemented in whole or in part in accordance with the NCP, the costs of that portion of the action so determined to be inconsistent with the NCP shall be an Army-Only Response Cost.

23.6 In no event shall Shell's notification to the Army pursuant to paragraphs 23.3 or 23.4 above prevent the Army from implementing the Emergency Action that is the subject of the notice.

- 44 -

23.7    Time permitting, at the request of the Army, Shell may conduct, or may participate in conducting, all or any portion of an Emergency Action to the extent, and pursuant to such terms as may be mutually agreeable to the Army and Shell. As soon as practicable after Shell agrees to participate in an Emergency Action, Shell and the Army shall enter into a written agreement that sets forth the terms and conditions of Shell's participation. Thereafter, Shell's participation shall be in accordance with that agreement.

## XXIV.   REMEDIAL INVESTIGATION/FEASIBILITY STUDIES

### (i)   Responsibilities for On-Post Operable Unit

24.1    Prior to the effective date of this Agreement, Exhibit E to the February 1, 1988, and June 7, 1988, proposed consent decrees governed the RI/FS for the On-Post Operable Unit. On the effective date of this Agreement, this Section shall control the RI/FS for the On-Post Operable Unit. Shell's participation as Lead Party in the RI/FS for the On-Post Operable Unit shall be in accordance with the terms of the Settlement Agreement and the following:

(a)     If, following completion of the Technical Program Plan, a New Product or Subproduct proposed by an Organization is included in the RI/FS in accordance with paragraph 24.7, or an Other Deliverable proposed by an Organization is determined to be necessary in accordance with paragraph 24.59, Shell shall be afforded a reasonable period of time to request in writing that it be designated Lead Party for such New Product or Subproduct or Other Deliverable. The Army shall determine whether it is more appropriate for Shell than the Army to be Lead Party for the New Product, Subproduct or Other Deliverable and shall notify Shell in writing of the Army's determination within 15 days of receipt of Shell's request.

(b)     If, pursuant to paragraphs 20.8(d) or 24.1(a), the Army denies Shell's request to be Lead Party for any Product, Subproduct or Other Deliverable, Shell may request, within seven days of the receipt of such denial, by written notice to the SAPC, a meeting between the Army's SAPC member and Shell's SAPC member to review the denial. Promptly after receipt of such notice, the two members shall meet and discuss Shell's request to be Lead Party. Following such meeting, the decision of the Army's SAPC member shall confirm or reverse the denial. Such decision shall be final and not subject to judicial review or Dispute Resolution.

(c)     Once it has been determined that it is more appropriate for Shell to be Lead Party for the New Product, Subproduct or Other Deliverable, the Army and Shell shall, pursuant to the Memorandum of Understanding attached as Exhibit G to the Settlement Agreement, develop and sign a scope of work by which the work for the New Product, Subproduct or Other Deliverable shall be done.

- 45 -

24.2    In addition to the Lead Party responsibilities listed in the previous paragraph, Shell may provide technical assistance or technical support to the Army with respect to any aspect of the On-Post Operable Unit.

24.3    The Army shall develop, as Lead Party, all Products, Subproducts, Technical Plans and Other Deliverables for the On-Post Operable Unit not developed by Shell pursuant to paragraphs 24.1 and 24.2.

(ii)    <u>Responsibilities for Off-Post Operable Unit</u>

24.4    The Army shall develop, as Lead Party, all Products, Subproducts and Other Deliverables for the Off-Post Operable Unit. Shell may provide technical assistance or technical support or, at the request of the Army, prepare a Technical Plan for a Product, Subproduct or Other Deliverable being developed by the Army for the Off-Post Operable Unit. Prior to the effective date of this Agreement, Exhibit E to the February 1, 1988, and June 7, 1988, proposed consent decrees governed the RI/FS for the Off-Post Operable Unit. On the effective date of this Agreement, this Section shall control the RI/FS for the Off-Post Operable Unit.

(iii)    <u>Product Managers</u>

24.5    For each Product identified for an Operable Unit, the Lead Party shall designate a Product Manager. The Product Manager shall also be responsible for overseeing all Subproducts associated with that Product.

(iv)    <u>Interaction of Lead Agency and Lead Party</u>

24.6    If the Lead Party for a Product or Subproduct is other than the Lead Agency, the Lead Party shall keep the Lead Agency apprised of its progress so that the Lead Agency may monitor the Lead Party's progress. The Lead Party shall consult with the Lead Agency before taking any significant action with respect to such Product or Subproduct. The Lead Agency shall be responsible for all ARAR determinations for a Product or Subproduct.

(v)    <u>Designation of New Products and Subproducts</u>

24.7    For purposes of this Agreement, New Products and Subproducts shall include: (1) any Products or Subproducts not listed in paragraphs 24.30, 24.32 and 24.34 which are determined necessary for an Operable Unit; and (2) any Products or Subproducts listed in paragraphs 24.30, 24.32 and 24.34 which are determined to require such substantial modification as to require the preparation of new Technical Plans.

24.8    There shall be no New Products or Subproducts for the RI for the On-Post Operable Unit. Subject to the previous sentence, any Organization may propose a New Product or Subproduct for an Operable Unit (other than for the On-Post RI) at any

- 46 -

time after completion of the Technical Program Plan. Any such proposal during the development of the Plan may be subject to Dispute Resolution only in the context of Dispute Resolution on the Plan. After completion of the Plan, such a proposal may be made at any time at the RMA Committee level. Upon unanimous agreement of the Organizations, the proposed New Product or Subproduct shall be included in the applicable RI/FS. Any Organization may invoke Dispute Resolution with respect to a proposal for a New Product or Subproduct made after completion of the Technical Program Plan.

### (vi) Effect of New Product or Subproduct Designation

24.9   New Technical Plans shall be required for all New Products and Subproducts designated pursuant to paragraphs 24.7 and 24.8. Technical Plans for such New Products or Subproducts shall be prepared pursuant to paragraphs 24.11 and 24.28. Technical Plans for New Products or Subproducts shall be the only Technical Plans subject to Dispute Resolution.

### (vii) Revision of On-Going RI Products or Subproducts

24.10   After completion of the Technical Program Plan, any Organization may seek to revise any Product or Subproduct for the RI for the On-Post Operable Unit, including seeking any additional field work, pilot studies, computer modeling or other supporting technical work if the requested revision is determined necessary as a result of information that was not available, or conditions that were unknown, at the time the Technical Program Plan was completed. Such Organization shall submit a concise written statement to the RMA Committee which specifies the nature of the requested revision and how the requested revision arises from previously unavailable information or unknown conditions. The statement shall be accompanied by a supporting technical study and, if appropriate, a legal memorandum. In the event that unanimous agreement is not reached by the RMA Committee on the need for the requested revision, the revision may be raised to Dispute Resolution by any Organization. The RMA Council, SAPC and FRC shall require the revision of the Product or Subproduct only upon a showing that the requested revision could be of significant assistance in evaluating impacts on the public health or the environment, or is otherwise necessary to assure the protection of human health or the environment.

### (viii) Preparation of New Technical Plans

#### (a) Applicability

24.11   The following paragraphs 24.12-24.28 shall govern the preparation of Technical Plans for New Products or Subproducts designated pursuant to paragraphs 24.7-24.8.

- 47 -

(b)  Initial Effort to Reach Consensus on the Scope of Work for New Technical Plans

24.12  Promptly after a Product Manager is designated for a New Product, he or she shall meet with the RMA Committee and attempt to reach unanimous agreement (to the maximum extent practicable) on the development, refinement and specification of the scope of work for the new Technical Plan for that Product. Counsel for the United States, Army, Shell and the State may attend and participate in such meetings.

(c)  Draft Technical Plans for New Products and Subproducts

24.13  Any Organization that is the proponent of a New Product or Subproduct which becomes part of a RI/FS in accordance with paragraphs 24.7-24.8 shall prepare the draft Technical Plan for that Product of Subproduct, provided, however, that if EPA is the proponent, it shall prepare the statement of work for the new Technical Plan and the Army shall prepare the Technical Plan.

24.14  A draft Technical Plan shall provide, to the extent practicable, objectives for the Technical Plan and adequate detail as to how these objectives are to be achieved.

24.15  If the initial draft of the Technical Plan is prepared by a contractor, the proponent of the New Product or Subproduct may revise the Technical Plan as deemed necessary prior to transmittal of the draft to the other Organizations.

24.16  A draft Technical Plan which is prepared by a contractor shall not be deemed to be an admission by any Organization.

24.17  Work shall not commence under any Technical Plan for a New Product or Subproduct prior to the completion of the review and comment period and the period for invoking Dispute Resolution for such Technical Plan, or upon completion of Dispute Resolution if invoked, except that work may proceed pursuant to a disputed Technical Plan if such work is not materially and substantially related to that portion of the Technical plan that is in dispute.

(d)  Review and Comment on Draft Technical Plans

24.18  Draft Technical Plans for New Products or Subproducts shall be transmitted by the preparer of the Technical Plans to the other Organizations for a 30-day period of review and comment.

24.19  The recipients of a draft Technical Plan shall transmit their comments by overnight mail to the other Organizations.

- 48 -

24.20  Representatives of the Organization that prepared the draft Technical Plan shall make themselves readily available to the other Organizations during the comment period for purposes of informally answering questions and conferring with respect to the information and proposals provided in the draft Technical Plan.  Oral comments made at such meeting need not be the subject of a written response by the preparer of the draft Technical Plan.

24.21  The other Organizations may include in their comments on a draft Technical Plan a statement identifying any ARARs which they believe to be pertinent to the matters addressed in the Technical Plan.

### (e)  Draft Final Plans and Response to Comments

24.22  Following the close of the comment period, the Organization that prepared the draft Technical Plan shall give full consideration to all written comments submitted on the draft (and the Lead Agency shall give full consideration to all comments on potential ARARs) and each shall make appropriate modifications where warranted. While the contents of the resulting draft final Technical Plan shall be the determination of the preparer of the Technical Plan, the document shall be the product of unanimous agreement to the extent practicable.

24.23  Within 30 days of the close of the comment period, the Organization that prepared the draft Technical Plan shall transmit to the other Organizations a draft final Technical Plan.  At that time, the preparer shall also respond in writing to all written comments with a reasoned technical or legal response which addresses the commenters' concerns in appropriate detail.  This period may be jointly extended by the preparer and Lead Agency for an additional 15 days.  This period may be further extended in accordance with paragraph 26.18 if additional field work, pilot studies, computer modeling or other supporting technical work is necessary.

### (f)  Availability of Dispute Resolution

24.24  Within 15 days of receipt of the draft final Technical Plan for a New Product or Subproduct, any Organization may raise any aspect of it to Dispute Resolution.  Prior to raising a matter for Dispute Resolution, the Organizations shall endeavor to resolve it informally at the RMA Committee level.  Work which the disputing Organization does not identify as being in dispute or materially and substantially affected by the issue in dispute shall proceed irrespective of informal efforts to resolve the dispute or the invocation of Dispute Resolution.

### (g)  Finalization of New Technical Plans

24.25  To the extent that it is determined, either by the RMA Committee or as a result of Dispute Resolution, that a modification of the draft final Technical Plan is warranted, the preparer of the Technical Plan shall make such modification.

- 49 -

24.26 Either upon the close of the time for invoking Dispute Resolution, or upon the completion of Dispute Resolution if invoked and if the determination of the Organization that prepared the Technical Plan is sustained, the preparer of the Technical Plan shall advise the other Organizations in writing within seven days that the draft final Technical Plan shall serve as the final version. In the event that Dispute Resolution is invoked and the determination of the Organization that prepared the Technical Plan is not sustained, such Organization shall then prepare and submit to the other Organizations, within not more than 35 days, a revision of the draft final version of the Technical Plan which conforms to the result of Dispute Resolution. If any Organization believes that the revision does not conform to the result of Dispute Resolution, it may invoke Dispute Resolution to compel further revision. In such event, the preparer of the Technical Plan shall promptly advise the other Organizations in writing when the Technical Plan has been finalized as a result of Dispute Resolution and, with such notice, shall submit a copy of the finalized Technical Plan to each of them if it differs from the previously delivered draft.

24.27 The Final Technical Plan shall be the basis for all subsequent contractual or staff work by the Lead Agency or Lead Party for the New Product or Subproduct addressed in the Technical Plan. No field work addressed in the Technical Plan shall begin until the close of the time for invoking Dispute Resolution or upon the completion of Dispute Resolution, if invoked, unless such field work is not affected by the matter in dispute.

### (ix) On-Going Technical Plans

24.28 This paragraph governs the preparation of Technical Plans for all Products and Subproducts other than those designated as New Products or Subproducts in accordance with paragraphs 24.7-24.8. The Product Managers shall transmit the draft Technical Plans for which they have responsibility to the other Organizations for a 30-day period of review and comment. For any Technical Plan made available to the other Organizations prior to issuance of the draft Technical Program Plan by the Army in accordance with paragraph 20.6, the comment period shall be extended until the close of the comment period on the draft Technical Program Plan. Comments received on a draft Technical Plan shall be promptly addressed in a final Technical Plan, in a separate document, or, if appropriate, in the Army's response to comments on the Technical Program Plan.

### (x) Draft and Final Reports for Products and Subproducts

#### (a) Applicability

24.29 As of the effective day of this Agreement, all draft and final reports for any Product or Subproduct shall be prepared in accordance with paragraphs 24.30-24.60.

- 50 -

(b)   Product and Subproduct Reports for the On-Post Operable Unit

24.30   Products:  The Lead Agency shall make available for review and comment, in accordance with paragraphs 24.45 and 24.47, draft reports for the following Products for the On-Post Operable Unit:

RI Products

(i)     Air (results of Arsenal-wide air investigations);

(ii)    Buildings (results of Arsenal-wide buildings investigations);

(iii)   Biota (results of Arsenal-wide biota investigations);

(iv)    Water (results of Arsenal-wide surface water and groundwater investigations);

(v)     On-Post SARs (integration of the results of air, buildings, biota, water and soils investigations);

(vi)    RI (integration of all RI data presented in the RI Products).

EA Products

(vii)   Contaminant identification, with proposed EA-related ARAR Determination (site characterization, selection of target contaminants, and identification of environmental transport and fate mechanisms and ARARs for target contaminants)

(viii)  Exposure and Toxicity Assessment (identification and analysis of exposure pathways and extent of exposure of human and environmental populations at actual and potential risk; evaluation of the toxicological properties of target contaminants)

(ix)    EA, with revised proposed EA-related ARAR Determination (development of target cleanup level ranges based on risk characterization and revised EA-related ARAR identification)

FS Products

(x)     Development and Screening of Alternatives, with proposed ARAR Determination for Each Alternative (initial alternative screening process by which certain alternatives are selected for in-depth evaluation)

- 51 -

(xi)    Evaluation of Alternatives, with revised proposed ARAR Determination (in-depth evaluation of alternatives resulting from initial screening; refinement of proposed ARAR determination for each alternative evaluated)

(xii)    FS with revised proposed ARAR Determination (development of preferred alternative and final refinement of ARAR determination for that alternative)

24.31  For the On-Post Operable Unit, only the draft final Product Reports identified in the previous paragraph shall be subject to Dispute Resolution.  RI/FS Deadlines for issuance of draft Product Reports shall be established pursuant to paragraph 26.5.

24.32  Subproducts: The Lead Agency shall make available for review and comment, in accordance with the provisions of paragraphs 24.45-24.47, draft reports for the following Subproducts for the On-Post Operable Unit:

RI Subproducts

(i)    All Phase I CARs for the On-Post Operable Unit (to be used in developing the RI Products presented in paragraph 24.30);

EA Subproducts

(ii)    Risk Characterization (determination of the likelihood and extent of any harm);

FS Subproducts

(iii)    Technology Inventories (first step in Development and Screening of Alternatives);

(iv)    Treatment/Incineration Study (for incorporation into Evaluation of Alternatives);

(v)    Disposal Facility Study (for incorporation into Evaluation of Alternatives);

(vi)    Advanced Technologies and Pilot Treatment Studies (for incorporation in Evaluation of Alternatives).

24.33  The Organizations may comment on the draft reports for the Subproducts listed in the previous paragraphs and on any New Subproducts designated pursuant to paragraphs 24.7-24.8, as provided in paragraphs 24.7-24.48.  Such Subproducts shall not be subject to Dispute Resolution.  The Organizations shall not be deemed to waive their

- 52 -

right to comment subsequently on any issue which arose in connection with draft Subproduct reports. Schedules shall be established for the issuance of draft Subproduct reports pursuant to paragraphs 26.16 and 26.17.

(c)   Product and Subproduct Reports for the Off-Post Operable Unit

24.34  Products:  The Lead Agency shall make available for review and comment, in accordance with paragraphs 24.45 and 24.47, draft reports for the following Products for the Off-Post Operable Unit:

(i)   Proposed RI- and EA-related ARAR Determination

(ii)   EA and FS, with proposed FS-related ARAR Determination

24.35  For the Off-Post Operable Unit, only the draft final Product reports identified in the previous paragraph shall be subject to Dispute Resolution.  RI/FS Deadlines for the issuance of these draft Product reports shall be established pursuant to paragraph 26.7.

24.36  Subproducts:  The Technology Inventories Subproduct for the On-Post Operable Unit shall also be used in developing the FS for the Off-Post Operable Unit.

(d)   Meetings of the RMA Committee on the Development of Products and Subproducts

24.37  Each Product Manager for New or Ongoing Products shall meet with the RMA Committee approximately every 60 days, except as otherwise agreed by all Organizations, to review and discuss the progress of work being performed on the Products or Subproducts under that Product Manager's purview.  Prior to preparing a draft report for a Product or Subproduct, the RMA Committee shall meet with each appropriate Product Manager to discuss the Product and Subproduct results in an effort to reach a common understanding, to the maximum extent practicable, with respect to the results to be presented in the draft report.

(e)   Identification and Determination of Potential ARARs

24.38  For those Products or Subproducts that consist of or include proposed ARAR determinations, prior to the issuance of a draft Product or Subproduct report, the Army shall transmit a proposed ARAR determination to the other Organizations for review and comment and, if requested by any Organization, counsel for the United States (including counsel for EPA and for the Army), counsel for Shell and counsel for the State shall meet and confer with the RMA Committee and appropriate Product Mangers concerning such proposed ARAR determination.  The other Organizations, DOI and ATSDR at that time may also propose potential ARARs for consideration and may participate in any related meeting.  All potential proposed ARARs proposed by the

- 53 -

Organizations during the process shall be considered by the Lead Agency in its preparation of the draft Product report.

24.39  In accordance with CERCLA, the NCP and any pertinent guidance issued by EPA which is not inconsistent with CERCLA and the NCP, potential ARARs may include, but are not limited to, the following:

(a)    Ambient or chemical specific requirements which set health or risk-based concentration limits or ranges in various environmental media for specific hazardous substances, pollutants or contaminants;

(b)    Performance, design or other action-specific requirements which set controls or restrictions on particular kinds of activities related to management of hazardous substances, pollutants or contaminants; and

(c)    Locational requirements which set restrictions on activities depending on the characteristics of a site or its immediate environment.

24.40  In identifying potential ARARs, the Signatories recognize that actual ARARs can be identified only on a site-specific basis and that ARARs depend on the specific hazardous substances, pollutants and contaminants at a site, the particular actions proposed as a remedy and the characteristics of a site.  The Signatories recognize that ARAR identification is necessarily an iterative process and that potential ARARs must be re-examined throughout the RI/FS process until a ROD is issued.

24.41  At the meeting identified in paragraph 24.38, each Organization shall identify, to the best of its ability, all ARARs pertinent to the Product being addressed. At that meeting the State shall identify all State ARARs referenced in Section 121(d)(2)(A)(ii) of CERCLA, 42 U.S.C. § 9621(d)(2)(A)(ii), which are pertinent to the Product or Subproduct being addressed.  Draft ARAR determinations shall be prepared by the Lead Agency (in consultation with counsel) irrespective of whether another Organization is the Lead Party or the proponent of the Product or Subproduct for which the ARAR determination is required.  All ARAR determinations shall be prepared in accordance with Section 121(d) of CERCLA, 42 U.S.C. § 9621(d), the NCP and any pertinent guidance issued by EPA which is not inconsistent with CERCLA and the NCP.

24.42  The Lead Agency shall be responsible for all proposed ARAR determinations.  Such proposed determinations shall be made by the Lead Agency as early in the process of developing a Product or Subproduct as practicable.  Where an ARAR determination is part of a Product or Subproduct that is being developed by a Lead Party other than the Lead Agency, the Lead Agency shall be responsible for the ARAR portion of that Product.  In such cases, the Lead Party shall assure to the maximum extent possible that the technical portion of the draft Product report is

- 54 -

consistent with the ARAR determination of the Lead Agency prior to transmitting the draft report to the other Organizations for review and comment.

(f)    Review and Comment on Draft Product and Subproduct Reports

24.43  If the initial draft of any Product or Subproduct report is prepared by a contractor, the Product Manager may revise it as deemed necessary prior to transmittal of the draft to the other Organizations.  Draft Product or Subproduct reports which are prepared by a contractor shall not be deemed to be admissions of the Lead Party or Lead Agency.

24.44  When Dispute Resolution is invoked on a draft final Product report, work shall not continue on any later sequential Product, prior to the completion of Dispute Resolution except for work which is not in dispute and is not materially and substantially related to the work which is in dispute.

24.45  The Lead Party for a Product shall transmit the draft Product report to the other Organizations on or before the RI/FS Deadline for the issuance of such report established pursuant to paragraph 26.6-26.7.

24.46  The Lead Party for a Subproduct shall transmit the draft Subproduct report to the other Organizations on or before the Schedule for the issuance of such report established pursuant to paragraph 26.17.

24.47  All draft Product and Subproduct reports shall be subject to a 45-day review and comment period concerning all aspects of the Product or Subproduct (including completeness).  On or before the close of the 45-day comment period, the other Organizations (and ATSDR and DOI, as appropriate) shall transmit by overnight mail their written comments to the Lead Party and the other Organizations.

24.48  Representatives of the Lead Party shall make themselves readily available to the other Organizations (and DOI, as appropriate) during the comment period for purposes of informally responding to questions and comments on draft Product or Subproduct reports.  Oral comments made at such meetings need to be the subject of a written response by the Lead Party on the close of the comment period, and such comments may be raised during Dispute Resolution only if they were included in timely written comments or bear a material and substantial relationship to timely written comments or to other issues properly raised to Dispute Resolution.

24.49  In commenting on a draft Product or Subproduct report which consists of or includes a proposed ARAR determination, the Organizations (and ATSDR and DOI, as appropriate) shall include a reasoned statement of whether they object to any portion of the proposed ARAR determination.  To the extent that an Organization does object, it shall explain all bases for its objection in detail and shall identify any ARARs which it believes were not properly addressed in the proposed ARAR determination.

- 55 -

24.50   Following close of the comment period for a draft Product or Subproduct report, the Lead Party shall give full consideration to all written comments on the draft report submitted during the comment period (and the Lead Agency shall give full consideration to all such comments concerning a proposed ARAR determination). Within 30 days of the close of the comment period on a draft Subproduct report, the Lead Party shall transmit to the other Organizations its written response to comments received within the comment period and the Lead Agency shall transmit to the other Organizations its response to comments on ARARs received during the comment period. Within 30 days of the close of the comment period on a draft Product report, the Lead Party shall transmit to the other Organizations a draft final Product report, which shall include the Lead Party's response to all written comments, including the Lead Agency's response to comments on ARARs, received within the comment period. While the resulting draft final report shall be the responsibility of the Lead Party (except for ARAR determinations, which shall be the responsibility of the Lead Agency), it shall be the product of unanimous agreement to the maximum extent possible.

24.51   The 30-day period for responding to comments on a draft Product or Subproduct report may be jointly extended by the Lead Party and Lead Agency for an additional 20 days.  It may be further extended, in accordance with paragraphs 26.8-26.18, in the event that it is found necessary for the Lead Party or another Organization to perform additional field work, pilot studies, computer modeling or other supporting technical work.

(g)   Availability of Dispute Resolution for Draft Final Product Reports

24.52   With respect to Products, Subproducts and Other Deliverables, Dispute Resolution shall only be available for draft final Product reports.  Within 20 days of receipt of such a draft final report, any Organization may raise any aspect of it to Dispute Resolution.  The resolution of disputes with respect to any ARAR determination required for that Product shall be as provided in Section XXX of this Agreement.  Prior to raising a matter to Dispute Resolution, the Organizations shall attempt to resolve it informally at the RMA Committee level.  During Dispute Resolution on a draft final Product report, work may go forward pursuant to that report, or on any later sequential Product, Subproduct or RI/FS Report, where (a) the disputing Organization does not identify such work as being in dispute or materially and substantially related to work which is in dispute; or (b) it is determined through Dispute Resolution that such work may go forward pending the resolution of the dispute.

(h)   Finalization of Product Reports

24.53   Either upon the close of the time for invoking Dispute Resolution or upon the completion of Dispute Resolution if invoked and if the Lead Party's determination is sustained, the Lead Party shall advise the other Organizations in writing within seven days that the draft final Product report shall serve as the final Product report.  In the

- 56 -

event that Dispute Resolution is invoked and the Lead Party's determination is not sustained, the Lead Agency shall make any appropriate modifications of the ARAR determination and the Lead Party shall then prepare, within not more than 35 days, a revision of the draft final report that conforms to the results of the Dispute Resolution, including any revision necessary as a result of a modification of an ARAR determination. This revision period may be extended, in accordance with paragraph 26.18, if additional field work, pilot studies, computer modeling or other supporting technical work is necessary. If a draft final Product report is revised as a result of a dispute resolved by SAPC or FRC, the revision may be approved by the RMA Committee unless an Organization requests that it be approved by SAPC. If a draft final Product report is revised as a result of a dispute resolved by the RMA Council, the revision may be approved by the RMA Committee unless an Organization requests that it be approved by the RMA Council. The Lead Party shall promptly send to each of the other Organizations a copy of the finalized Product report.

24.54 Subproduct reports shall be the basis for the relevant portions of draft Product reports. Final Product reports and comments thereon shall be the basis for the relevant portions of RI/FS Reports.

(i) Subsequent Modifications of Product Reports

24.55 Following the finalization of a Product report pursuant to paragraphs 24.53-25.59, any Organization may seek to modify the Product addressed in that report, including seeking additional field work, pilot studies, computer modeling or other supporting technical work, only as provided in the following paragraphs 24.56 and 24.57.

24.56 An Organization may seek to modify a Product after finalization of the report for that Product, if it determines, based on new information that became available or conditions that became known after the Product report was finalized, that the requested modification would be of significant assistance in evaluating impacts on the human health or the environment or in evaluating the selection of remedial alternatives. The Organization may seek such a modification by submitting a concise written request to the RMA Committee. The request shall specify the nature of the requested modification and how the request is based on new information or previously unknown conditions.

24.57 In the event that unanimous agreement is not reached by the RMA Committee on the need for a Product modification, any Organization may invoke Dispute Resolution to determine if such modification shall be conducted. The RMA Council, SAPC or FRC shall require the modification of a Product report only upon a showing that: (1) the requested modification is based on new information that became available, or conditions that became known, after the Product report was finalized, and (2) the requested modification would be of significant assistance in evaluating impacts

- 57 -

on human health or the environment or in evaluating the selection of remedial alternatives.

24.58  In the event that a modification of a Product report is found to be warranted as a result of Dispute Resolution, the proponent of the modification shall prepare and have adopted a draft, draft final and final Technical Plan and new draft, draft final and final Product report as it would be required to do for a New Product pursuant to this Agreement.

### (j)  Other Deliverables

24.59  Any Organization may propose a new Other Deliverable that has not been proposed by the Army in the Technical Program Plan.  Any such proposal during the development of the Technical Program Plan may be subject to Dispute Resolution only in the context of Dispute Resolution on the Technical Program Plan.  After completion of the Technical Program Plan, such a proposal may be made at any time at the RMA Committee level.  Upon unanimous agreement of the RMA Committee members that the proposed Other Deliverable is necessary, that Other Deliverable shall be included in the applicable RI/FS.  If the RMA Committee members do not reach unanimous agreement that the Other Deliverable is necessary, any Organization may invoke Dispute Resolution with respect to a proposal.  If, as a result of Dispute Resolution, the proposed Other Deliverable is determined to be necessary, it shall be included in the applicable RI/FS.

24.60  Other Deliverables that have not been issued in draft as of the effective date of this Agreement shall be submitted in draft to the other Organizations for comment promptly upon their preparation by the Lead Party.  Any Organization may submit written comments on drafts of Other Deliverables.  Failure to submit such comments does not affect the right of an Organization to address such Other Deliverables when commenting on a related Product or Subproduct.

24.61  The Lead Party for an Other Deliverable shall respond to comments received on such Other Deliverable in a separate document or in a related Product or Subproduct Report.

### (k)  Remedial Investigation/Feasibility Study Reports

24.62  Following the finalization of all Product reports required for an Operable Unit, the Lead Agency shall prepare the RI/FS Report for that Operable Unit.  Each RI/FS Report shall identify the Lead Agency's preferred alternative, shall include the information and methodology used for site characterization, shall have an appendix that summarizes all proposed ARAR determinations applicable to the RI/FS and presents any necessary ARAR certification (including State standards compliance), and shall comply with any other CERCLA or NCP requirements or EPA guidance which is not inconsistent with CERCLA and the NCP.

- 58 -

24.63  On or before the applicable deadline established pursuant to paragraph 26.7(c), the Lead Agency shall have notice published in at least one major Denver newspaper of general circulation, in accordance with CERCLA Section 117(a) and (d), 42 U.S.C. § 9617(a) and (d), of the availability of the RI/FS Report and a brief analysis of the RI/FS Report, invite public comment for at least a 60-day period, and conduct one or more transcribed public meetings at a location near the Arsenal.

24.64  Any person, including an Organization or a member of the TRC, may offer comments on the RI/FS Report during the public comment period.

24.65  Upon the close of the public comment period, the Lead Agency shall prepare a response to all significant comments received.  A summary of such responses shall be included in the applicable ROD, in accordance with the following paragraph.

## XXV.  RECORDS OF DECISION ("RODs")

### (i)  Contents of Each ROD

25.1  Each ROD shall identify the remedial action selected for the Operable Unit addressed in the ROD, describe all bases for the selection, summarize and respond to significant public comments received on the RI/FS Report, provide Design Deadlines for Response Actions addressed in the ROD, provide an appendix of ARARs and an ARAR certification (including State standards compliance), and comply with any other CERCLA or NCP requirement or EPA guidance which is not inconsistent with CERCLA and the NCP.

### (ii)  Draft RODs

25.2  Not more than 75 days after the conclusion of the public comment period on a RI/FS Report, the Lead Agency shall transmit the draft ROD to the other Organizations for 30 days of review and comment.  This period for transmittal of the draft ROD may be extended, pursuant to paragraphs 26.8-26.15, because of the large volume or complexity of the comments received by the Lead Agency or on any other showing of good cause for such extension.  Each Organization shall transmit its written comments to the others.

### (iii)  Review and Comment on Draft RODs

25.3  Representatives of the Lead Agency shall make themselves readily available to the other Organizations during the comment period on the draft ROD to respond informally to comments and questions on the draft ROD.  Oral comments made at such meetings need not be the subject of a written response by the Lead Agency on the close of the comment period.

- 59 -

25.4    In each of their respective comments, the Organizations shall include a reasoned statement of whether they object to any of the proposed ARAR determinations in the draft ROD and, to the extent that they do, shall explain all bases for their objections.

(iv)    Draft Final RODs

25.5    Following the close of the comment period provided by paragraph 25.2, the Lead Agency shall give full consideration to all written comments submitted on the draft ROD (including comments on proposed ARAR determinations) and shall make appropriate modifications wherever warranted.

25.6    Within 30 days of the receipt of comments, the Lead Agency shall transmit to the other Organizations a draft final ROD (including proposed ARAR determinations). At that time, the Lead Agency shall also respond in writing to all written comments with a reasoned technical or legal response which addresses the commenters' concerns in appropriate detail. This period may be extended, in accordance with paragraph 26.8-26.15, in the event that it is found necessary for the Lead Agency or another Organization to perform additional field work, pilot studies, computer modeling or other supporting technical work.

(v)    Availability of Dispute Resolution

25.7    Within 15 days of the receipt of draft final ROD, any Organization may raise any aspect of the ROD (including proposed ARAR determinations) to Dispute Resolution. Otherwise, an Organization shall be deemed to have concurred in the draft final ROD.

(vi)    Finalization of RODs

25.8    Within seven days of the deadline for invoking Dispute Resolution, or within seven days of the completion of Dispute Resolution, if invoked and if the Lead Agency's determination is sustained, the Lead Agency shall transmit by overnight mail, on behalf of the United States, a copy of the final ROD to the other Organizations.

25.9    In the event that Dispute Resolution is invoked and the Lead Agency's determination is not sustained, the Lead Agency shall prepare, within not more than 45 days, a revision of the draft final ROD which conforms to the results of Dispute Resolution. This period may be extended in accordance with paragraph 26.8-26.15, on a showing of good cause by the Lead Agency. Prior to transmitting the revised ROD to the other Organizations, the Lead Agency shall submit it to SAPC for review, and approval. Within seven days of SAPC approval, the Lead Agency shall transmit a copy of the final ROD, on behalf of the United States, to the other Organizations.

- 60 -

(vii)   Publication and Judicial Review of RODs

25.10   Upon transmittal of a final ROD to the other Organizations pursuant to paragraph 25.8 or 25.9, the Lead Agency shall notify the State in writing of its intent to publicize, no sooner than 30 days from the date of such notice, the availability of the final ROD.  The notice to the State shall also request that the State, pursuant to Section 121(f)(3)(A) of CERCLA, 42 U.S.C. § 9621(f)(3)(A), concur in the selection of the Final Response Action reflected in the ROD.

25.11   If, at the time notice is sent to the State pursuant to the previous paragraph there is pending litigation concerning remediation of the Site pursuant to CERCLA, the Lead Agency shall submit the final ROD, and a summary of the final ROD, to the Court, together with the certified Administrative Record for the ROD, or, as appropriate, a suitable index to, or microfilm copy of, such certified Administrative Record, if the actual Administrative Record is to be maintained at a location other than the courthouse.

25.12   If the State does not concur in the final ROD, it may bring an action in the Court pursuant to Section 121(f)(3) of CERCLA, 42 U.S.C. § 9621(f)(3), within 30 days of the submittal of the ROD to the Court pursuant to the previous paragraph.

25.13   If Shell does not concur in the final ROD, it may bring an action in the Court within 30 days of the submittal of the ROD to the Court pursuant to paragraph 25.11 or may participate in an action brought by the State.  Shell's judicial challenge to a final ROD shall be subject to the provisions of paragraph 30.7.

25.14   If neither the State nor Shell brings a timely action pursuant to paragraphs 25.12 or 25.13, the Lead Agency shall publish notice of the availability of the ROD and Administrative Record in at least one major Denver newspaper of general circulation. After publication of such notice, the Lead Agency may proceed with the design and implementation of the response actions addressed in the ROD.  If the State or Shell brings an action pursuant to paragraph 25.12 or 25.13, the Lead Agency may nevertheless proceed with any design work that is unrelated to or not inconsistent with the relief sought in such action, and may proceed with any other work as may be determined by the Court.

25.15   Nothing in this Agreement shall be deemed to modify in any way the right of the State or Shell to seek judicial review, in accordance with CERCLA Section 113(a), 42 U.S.C. § 9613(a), in the United States Circuit Court of Appeals for the District of Columbia of any provision of the NCP or any other regulation promulgated under CERCLA.

- 61 -

(viii)   Modification of RODs

25.16   An Organization may seek to modify a ROD if it determines, based on information that was not available, or conditions that were not known at the time notice of the availability of the ROD was published, that good cause for such modification exists.  Such Organization may seek such a modification by submitting to the RMA Committee a detailed statement demonstrating good cause for such modification together with a supporting technical study and, if appropriate, a legal memorandum. Upon receipt of such detailed statement, any Organization may invoke Dispute Resolution if it believes the modification is unwarranted or if it believes the modification is significant enough to require a Supplemental Response Action, rather than a modification of the ROD, and the proposing Organization disagrees.  If all Organizations agree, or if Dispute Resolution resolves, that a modification of the ROD is appropriate, the ROD shall thereafter be modified in accordance with paragraphs 25.5-25.9 and CERCLA Section 117, 42 U.S.C. § 9617.

# XXVI.  DEADLINES AND SCHEDULES AND EXTENSIONS THEREOF

(i)   Prior Procedure

26.1   Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees governed the development, enforceability and extension of Deadlines and Schedules.  On the effective date of this Agreement, this Section shall control the development, enforceability and extension of Deadlines and Schedules.

(ii)   Development of Deadlines

26.2   RI/FS Deadlines shall be developed in accordance with paragraphs 20.2(g), 26.6 and 26.7.

26.3   IRA Deadlines shall be developed in accordance with paragraphs 22.13.

26.4   Supplemental Response Action Deadlines shall be developed in accordance with paragraph 33.4.

26.5   Design Deadlines and Implementation Deadlines shall be developed in accordance with paragraphs 25.1 and 34.2.

(iii)   RI/FS Deadlines for the On-Post Operable Unit

26.6   For the On-Post Operable Unit, RI/FS Deadlines that shall be enforceable pursuant to paragraphs 28.1-28.5, and subject to the stipulated civil penalty provisions in

- 62 -

paragraphs 29.1-29.5, are the dates established in the Technical Program Plan for the following milestones:

        (a)     Date for issuance of a draft Technical Plan for a New Product;

        (b)     Date for issuance of the draft reports for the RI, EA and FS Products listed in paragraph 24.30;

        (c)     Date for publication of the notice of availability of the RI/FS Report, pursuant to paragraph 24.63.

      (iv)    <u>RI/FS Deadlines for the Off-Post Operable Unit</u>

26.7    For the Off-Post Operable Unit, the RI/FS Deadlines that shall be enforceable pursuant to paragraphs 28.1-28.5, and subject to the stipulated civil penalty provisions in paragraphs 29.1-29.5, are the dates established in the Technical Program Plan for the following milestones:

        (a)     Date for issuance of a draft Technical Plan for a New Product;

        (b)     Date for issuance of the draft Product reports listed in paragraph 24.34;

        (c)     Date for publication of the notice of availability of the RI/FS Report pursuant to paragraph 24.63.

      (v)    <u>Extension of IRA, RI/FS, Supplemental Response Action, Design and Implementation Deadlines</u>

26.8    A Deadline shall be extended upon receipt of a timely request for extension pursuant to paragraph 26.9 and when good cause exists for such extension as provided in paragraphs 26.10 and 26.11..

26.9    A request for extension of a Deadline shall be submitted to each Organization in writing and shall specify:

        (a)     The Deadline which is sought to be extended;

        (b)     The length of the extension sought;

        (c)     The good cause(s) for the extension; and

        (d)     Any related Deadline which would be affected if the extension were granted.

Exhibit B
Page 70 of 128

26.10   Good cause exists for an extension of a Deadline where the extension is sought because of:

(a)   An event of Force Majeure;

(b)   A delay caused by any Organization other than the Organization seeking the extension to meet any Schedule or any other Deadline;

(c)   A delay caused by the invocation of Dispute Resolution or the initiation of judicial action;

(d)   A delay caused, or which is likely to be caused, by the grant of an extension of another Deadline or the extension of a Schedule.

26.11   Any other event or series of events shall constitute good cause if all the Organizations so agree or, absent such agreement, if the determination resulting from Dispute Resolution is that good cause exists.

26.12   Within seven days of receipt of a request for extension of a Deadline in accordance with paragraph 26.9, each Organization shall advise the others in writing of their respective positions on the request for extension. The failure of any Organization to respond within the seven-day period shall be deemed to constitute concurrence in the request for extension. If an Organization does not concur in the requested extension, it shall include in its statement of nonconcurrence a full explanation of all bases for its position.

26.13   If there is unanimous agreement among the Organizations that the requested extension is warranted, the Lead Agency shall extend the affected Deadline accordingly. Each such extension of a Deadline shall be appended to the Technical Program Plan.

26.14   If there is not unanimous agreement among the Organizations as to whether all or a portion of the requested extension is warranted, the Deadline at issue shall not be extended except in accordance with a determination resulting from Dispute Resolution. Any Organization may raise such a dispute to Dispute Resolution.

26.15   Within seven days of the receipt of one or more statements of nonconcurrence in the requested extension, an Organization which seeks the extension of the Deadline may invoke Dispute Resolution. Upon the conclusion of Dispute Resolution, the Lead Agency shall implement the decision resulting from Dispute Resolution. Each such extension of a deadline shall be appended by the Lead Agency to the Technical Program Plan.

26.16   A timely request for an extension of a Deadline shall toll any application for judicial enforcement of the affected Deadline until a decision on whether to allow

- 64 -

the extension is reached by unanimous agreement or through Dispute Resolution. Following extension of a Deadline, application for judicial enforcement may only be sought to compel compliance with the Deadline as most recently extended.

    (v)    <u>Schedules and Extensions Thereof</u>

    26.17   Schedules, including timetables and deadlines for issuance of Subproduct reports, shall be established in this Agreement and the Technical Program Plan.

    26.18   The RMA Committee, upon unanimous agreement of the Organizations-- and while endeavoring to avoid any extensions which may impact RI/FS Deadlines--may extend any Schedule at the request of an Organization.  In the event that such request is disputed by an Organization, the matter shall be resolved by Dispute Resolution.

## XXVII. <u>FORCE MAJEURE</u>

    27.1   If the Army or Shell is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement or the Settlement Agreement, then upon that Organization's giving written notice as provided in paragraph 27.3, the obligations of that Organization, so far as they are affected by the event of Force Majeure therein specified, shall be suspended during the continuance of such cause, but for no longer period, and such cause shall be remedied so far as possible with all reasonable dispatch.

    27.2   The settlement of a strike or other labor dispute shall be entirely within the discretion of the Organization involved with such strike or labor dispute and the requirement that any event of Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of a strike or labor dispute by acceding to the demands of the opposing party when such course is inadvisable in the discretion of the Organization involved with such strike or labor dispute.

    27.3   When circumstances are occurring or have occurred that delay the completion of any obligation, and the Army or Shell believes such circumstances constitute an event of Force Majeure, such Organization shall notify the other Organizations in writing within 15 days after the notifying Organization obtains information indicating that a delay will occur.  Such notice shall include a detailed explanation of the reason(s) for and anticipated duration of the delay, the measures taken and to be taken to prevent or minimize the delay, and a schedule for implementation of such measures.  Failure to provide such notice in accordance with this paragraph within the required 15-day period shall constitute a waiver of any claim of Force Majeure with respect to any event of Force Majeure for which notice was not timely given.

    27.4   If the Organizations cannot agree whether a delay is or was attributable to an event of Force Majeure, any Organization may invoke Dispute Resolution.

## XXVIII. ENFORCEABILITY

28.1   Upon the effective date of this Agreement:  (a) Deadlines, including Deadlines resulting from an extension granted in accordance with paragraphs 26.17-26.18, and any standard, regulation, condition, requirement or order which has become effective under CERCLA and is incorporated into this Agreement are enforceable by any person pursuant to Section 310 of CERCLA and any violation of such Deadline or standard, regulation, condition, requirement or order will be subject to civil penalties under 310(c) and 109 of CERCLA, 42 U.S.C. §§ 9659(c) and 9609; ~~Title~~ ~~Sect~~.

(b)   All terms and conditions of this Agreement which relate to remedial actions and all work associated with remedial actions shall be enforceable by any person to the extent permitted under Section 310 of CERCLA, and any violation of such terms and conditions will be subject to civil penalties under Sections 310(c) and 109 of CERCLA, 42 U.S.C. §§ 9659(c) and 9609;

(c)   Any final resolution of a dispute pursuant to Section XXX of this Agreement which establishes a term, condition or Deadline shall be enforceable by any person to the extent permitted by Section 310 of CERCLA, and any violation of such term, condition or Deadline will be subject to civil penalties under Sections 310(c) and 109 of CERCLA, 42 U.S.C. §§ 9659(c) and 9609.

28.2   Any such action shall be subject to the requirements of Section 310(d) and (e), 42 U.S.C. § 9659(d) and (e).  All provisions of this Agreement may be enforced by any Signatory without the need to comply with the notice requirements of Section 310 of CERCLA.  Deadlines are subject to stipulated civil penalties, in accordance with CERCLA Section 109, 42 U.S.C. § 9609, in the amounts specified in paragraph 29.2.

28.3   In any enforcement action brought against Shell pursuant to paragraph 28.1, Shell reserves the right to challenge the legality of such action consistent with the terms and conditions of this Agreement.  Shell further reserves all rights and defenses that it may have to the enforcement of this Agreement pursuant to paragraph 28.1.

28.4   To the extent that a Lead Party other than the Lead Agency or the proponent of a New Product or Subproduct, fails to meet a Deadline, that Lead Party or proponent of a New Product or Subproduct shall be subject to stipulated civil penalties as specified in Section XXIX.

28.5   EPA's request for payment of a stipulated civil penalty, as provided in paragraph 29.1, shall constitute commencement and diligent prosecution of an action within the meaning of CERCLA Section 310(d)(2), 42, U.S.C. § 9659(d)(2).

- 66 -

28.6   With the exception of EPA's right to request stipulated penalties from Shell or the Army pursuant to paragraph 29.1, the Organizations may only enforce the terms and conditions of this Agreement by bringing an appropriate action before the Court in accordance with Section XXXIX.

28.7   Nothing in this Agreement shall be construed to authorize any person to seek judicial review of any action of an Organization where such review is barred by any provision of CERCLA, including Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXIX.   STIPULATED CIVIL PENALTIES

29.1   Promptly upon determining that an Organization has failed to meet an Deadline, EPA shall so notify that Organization in writing.  If the Deadline in question is not already subject to Dispute Resolution at the time such notice is received, the Organization shall have 10 days after receipt of the notice to invoke Dispute Resolution. Failure of an Organization to invoke Dispute Resolution by the end of this 10-day period shall forfeit that Organization's right to object to the payment of stipulated civil penalties for failure to meet the Deadline in question.  Following completion of Dispute Resolution, Shell may seek judicial review of EPA's determination pursuant to paragraph 30.7.

29.2   An Organization that fails to meet a Deadline shall pay EPA upon request the following stipulated civil penalties for each failure:

(a)   For a delay of one week or part thereof, a total of $5,000; and

(b)   For a delay of more than one week, $10,000 for each additional week or part thereof.

29.3   EPA shall not request payment of stipulated penalties for failure to meet a Deadline until the later of:

(a)   The date of completion of the action that is subject to the Deadline; or

(b)   The date of completion of Dispute Resolution or judicial review concerning the Deadline.

29.4   Except as otherwise determined through Dispute Resolution or judicial review, the date on which stipulated civil penalties shall begin to accrue shall be the date specified in the notice sent by EPA pursuant to paragraph 29.1, but in no event earlier than the Deadline in question.

- 67 -

29.5    Stipulated civil penalties shall be payable to the "Hazardous Substance Response Trust Fund" and transmitted to:

> U.S. Environmental Protection Agency
> Superfund Accounting
> P.O. Box 317003M
> Pittsburgh, Pennsylvania  15251
> Attn:  Collection Officer for
>           Superfund Accounting

A copy of the transmittal shall be sent to EPA's designated RMA Committee representative.

29.6    Subject to paragraph 28.4, the payment of a stipulated civil penalty in accordance with this Agreement does not preclude invocation of any other remedy or sanction available pursuant to CERCLA for noncompliance with a provision of this Agreement.

29.7    The Lead Agency or Lead Party shall not be liable for any stipulated civil penalties, or be subject to any other penalty or sanction available pursuant to CERCLA if it can demonstrate that:

    (a)    It in fact met the Deadline in question;

    (b)    It in fact met the Deadline in question, as extended pursuant to paragraphs 26.8-26.18; or

    (c)    Good cause existed for an extension of the Deadline in question and application for such extension was timely made.

29.8    Nothing in this Agreement shall be construed to render any officer, agent, employee, or servant of any Signatory personally liable for the payment of any stipulated civil penalty hereunder.

## XXX.  DISPUTE RESOLUTION

30.1    For any dispute that is subject to Dispute Resolution pursuant to this Agreement, the Organizations shall make a good faith effort to resolve the dispute informally at the RMA Committee level.  If the dispute cannot be resolved informally at the RMA Committee level, the decision of the Lead Agency shall be implemented unless an Organization initiates Dispute Resolution pursuant to the following paragraph.

30.2    To initiate Dispute Resolution, an Organization (or DOI for matters addressed in paragraph 8.4 and matters, including without limitation, species designated as threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. § 1531

- 68 -

et seq., migratory birds or actions that will significantly affect biota at the Arsenal) shall advise the RMA Committee members of its intent to invoke Dispute Resolution and shall give written notice to the RMA Council members of the dispute. The notice shall include an identification of any activities that the Organization believes are affected by the dispute and therefore should not proceed during Dispute Resolution. If there is disagreement over which activities should or should not proceed during Dispute Resolution, that question shall also be subject to Dispute Resolution and shall be the first issue addressed during Dispute Resolution. Upon receipt of such notice, the RMA Council shall make best efforts to resolve the dispute within the following 14 days. Promptly upon the conclusion of any RMA Council meeting at which a dispute is resolved by unanimous agreement of the voting members, EPA shall prepare and submit to the Organizations for their concurrence a written decision memorandum setting forth the decision and briefly explaining the basis for the decision. The decision memorandum shall be included in the Administrative Record when all the Organizations have concurred that the decision memorandum accurately sets forth the decision and the basis for the decision.

30.3    If the RMA Council does not resolve the dispute by unanimous agreement, the dispute shall be elevated to SAPC for resolution at the close of the RMA Council's 14-day period.

30.4    Within 30 days of a request pursuant to the previous paragraph for SAPC to resolve a dispute, SAPC shall meet and attempt to resolve the dispute. A dispute or policy issue shall be considered resolved by the SAPC only if all the Organizations agree. If at the conclusion of the SAPC's 30-day resolution period the dispute has not been resolved, the position of the EPA Regional Administrator shall be implemented, unless the dispute is elevated to FRC pursuant to paragraph 30.5. Promptly upon the conclusion of any SAPC meeting at which a dispute is resolved (either by the EPA Regional Administrator or through unanimous agreement of the voting members), EPA shall prepare and submit to the Organizations for their concurrence a written decision memorandum setting forth the decision and briefly explaining the basis for the decision. The decision memorandum shall be included in the Administrative Record when all the Organizations have concurred that the decision memorandum accurately sets forth the decision and the basis for the decision.

30.5    A dispute that is not resolved by SAPC may be elevated to FRC upon the request of any Organization (or DOI for matters addressed in paragraph 8.4 and matters, including without limitation, species designated as threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. § 1531 et seq., migratory birds or actions that will significantly affect migratory birds at the Arsenal) by so notifying the other Organizations and the FRC members in writing within 5 days after the close of SAPC's 30-day resolution period.

30.6    Within 30 days of the elevation to FRC of a dispute, FRC shall meet and attempt to resolve the dispute. At the conclusion of the FRC's 30 day resolution period,

- 69 -

if the Army and EPA do not agree, then the position of the EPA Administrator shall be the position of the United States.  A matter shall be considered resolved by FRC only if all the Organizations concur in the resolution.  If the United States and all the Organizations do not concur, the decision of the United States shall be implemented. Promptly upon the conclusion of any FRC meeting at which a dispute is resolved (either by the Administrator of EPA or through unanimous agreement of the voting members), EPA shall prepare and submit to the Organizations for their concurrence a written decision memorandum setting forth the decision and briefly explaining the basis for the decision.  The decision memorandum shall be included in the Administrative Record when all the Organizations have concurred that the decision memorandum accurately sets forth the decision and the basis for the decision.  The duties of the Administrator of EPA in Dispute Resolution shall not be delegated.

30.7   In any judicial action brought pursuant to this Agreement, except for an action to enforce a provision of this Agreement, Shell and the State may only raise issues that had been previously addressed by FRC, or issues that bear a substantial and material relation to such issues.  In any such judicial proceeding, except for an action to enforce any provision of this Agreement, Shell and the State may only raise issues that had been previously addressed by the FRC, or issues that bear a material and substantial relation to such issues.  Shell and the State may only raise an issue referred to in the previous sentence in a judicial challenge to the relevant ROD or IRA Decision Document, with the following exceptions (the timing of which shall be governed by paragraph 39.2):  (a) a judicial proceeding that solely addresses Shell's obligations to pay penalties; (b) a judicial proceeding to enforce this Agreement or a proceeding in which other remedies or sanctions are sought against Shell for violating this Agreement; or (c) a dispute relating to the design or implementation of a Response Action which arises after the relevant ROD or IRA Decision Document has been finalized.  Shell may commence a judicial proceeding to challenge a determination by EPA pursuant to paragraph 29.1 that Shell failed to meet a Deadline, provided that Shell had invoked Dispute Resolution with respect to such determination.  Shell may commence such an action not later than 10 days after completion of Dispute Resolution.  Shell may seek judicial review of any other remedy or sanction sought by any person for noncompliance with this Agreement not later than 15 days after the date such remedy or sanction is sought.

30.8   The pendency of any dispute before the RMA Council, SAPC or FRC shall not affect the responsibility of any Organization to continue its involvement in the assessment and selection of Final Response Actions that are not subject to such dispute or are not materially and substantially related to such dispute.

30.9  Statements made in the course of Dispute Resolution or a meeting of the RMA Council, the SAPC or the FRC and documents prepared solely for use in Dispute Resolution, (excluding decision memoranda prepared by EPA, and concurred in by the Organizations, upon the conclusion of Dispute Resolution meetings), shall be considered statements made, and documents prepared, in furtherance of settlement and shall be

- 70 -

entitled to the protection afforded such statements and documents by the Federal Rules of Evidence and the Colorado Rules of Evidence. Persons who participate in Dispute Resolution meetings shall not be subject to deposition or to other discovery concerning statements made during, in preparation for, and in connection with such meetings.

30.10   The State's right to participate as an Organization in Dispute Resolution is subject to the following conditions:

(a)   The State may attend meetings of the RMA Council, the SAPC, and the FRC only after it has agreed in writing (i) to be bound by the provisions of Exhibit C to this Agreement; and (ii) to treat as highly confidential, and not to publish, divulge, disclose, or make known in any manner or to any extent not authorized or required by law, any Confidential Information received by or made available to it in connection with any activities performed pursuant to this Agreement; and

(b)   The State may invoke Dispute Resolution only after it has agreed to be bound by the Dispute Resolution process, as evidenced by its execution of the agreement attached hereto as Exhibit C. The form attached as Exhibit C shall be replaced by an executed copy of that agreement, once it has been executed by all parties thereto.

30.11   If, pursuant to paragraph 42.7, Dispute Resolution is invoked with respect to the draft Natural Resource Damage Assessment Plan, such dispute shall be resolved in accordance with the Dispute Resolution provisions in paragraphs 30.1-30.7, with the following exceptions:

(a)   The State shall not participate in Dispute Resolution on this issue at any level;

(b)   In addition to the Army, EPA and Shell RMA Council members, the Regional Director of the United States Fish and Wildlife Service, Region 6, shall participate as a full voting member of the RMA Council;

(c)   If the dispute is raised to the SAPC, the Director of the United States Fish and Wildlife Service (in addition to the Army, EPA and Shell members of the SAPC) shall participate as a full voting member of the SAPC;

(d)   If the dispute is raised to the FRC, the Assistant Secretary of the Interior for Fish, Wildlife and Parks shall participate as a full voting member of the FRC, and the Administrator of EPA and the Governor of Colorado shall not participate; and

(e)   If the dispute is not resolved by the FRC, it shall, within 45 days of the close of the FRC's Dispute Resolution period, be resolved by agreement of the Secretary of the Army and the Secretary of the Interior.

- 71 -

### XXXI.   CONTENTS OF ADMINISTRATIVE RECORD FOR EACH ROD, CUSTODIAN AND JARDFC

(i) Contents of the Administrative Record for the On-Post ROD

31.1     For the On-Post ROD, the Administrative Record shall consist at a minimum of complete copies of the following as well as any other relevant documents:

(a)     Pre-Plan RI/FS Activity

(i)     RI/FS documents from January 1983 until the issuance of the Technical Program Plan, including reports for On-Going Products or Subproducts which are designated in the Technical Program Plan as being substantially completed, drafts of Technical Plans, draft Product or Subproduct reports, publications listed in the bibliography of each Technical Plan or Product or Subproduct report which are not available to the general public (including damage assessment reports), written comments upon any drafts (including comments of DOI), minutes of meetings prepared by or furnished to the Army, Army's written responses to comments, final Product or Subproduct reports, final reports and any amendments of them, the December 6, 1982 Memorandum of Agreement with committee charters, summaries of any information in these documents which is subject to the attorney-client privilege or work product exemption, Other Deliverables, comments thereon, and other documents submitted pursuant to paragraph 31.3.

(b)     Other Documents Governing the RI/FS Process

(ii)     This Agreement;

(iii)     The Settlement Agreement;

(iv)     The proposed consent decree filed with the Court on February 1, 1988 (including the version of the RI/FS Process Document filed on that date);

(v)     The proposed modified consent decree filed with the Court on June 7, 1988 (including the version of the RI/FS Process Document filed on that date);

(c)     NPL Listings

(vi) Each proposed and final notice published in the Federal Register concerning NPL listings of the Arsenal, all written comments upon them with

- 72 -

EPA's responses and any other materials included by EPA in its record for NPL listings of the Arsenal;

    (d)   The RI/FS Plan

    (vii) The meeting agendas for the RI/FS Review Study Group, draft Technical Program Plan, comments on draft Technical Program Plan, Army's responses to comments, draft final Technical Program Plan submitted to SAPC, any approvals or other documents issued by SAPC or FRC on final Technical Program Plan;

    (viii) Directives issued with respect to the implementation of the Technical Program Plan;

    (e)   IRAs

    (ix) Relevant documents concerning IRAs, including the Basin F Memorandum of Understanding, IRA assessments, IRA Decision Documents, IRA Implementation Documents, any written requests invoking Dispute Resolution, any documents requested by or submitted to SAPC, and documents issued by SAPC or FRC on the IRAs.

    (f)   Products, Subproducts and Other Deliverables

    (x) Technical Plans for Products or Subproducts, including written communications concerning the development of each Technical Plan, draft Technical Plans, written comments on them (including comments of ATSDR and DOI), draft final Technical Plans for New Products or Subproducts, Army's written responses to the comments, any written requests invoking Dispute Resolution, any documents requested by or submitted to SAPC, any documents issued by SAPC or FRC on the Technical Plans, final Technical Plans for New Products or Subproducts;

    (xi) Publications or documents identified in the bibliography of each final Product or Subproduct report or Other Deliverable that are not available to the general public (i.e., guidance documents and technical sources)(documents identified in report bibliographies that are available to the general public shall be considered part of the Administrative Record, but need not be physically located in the JARDF);

    (xii) QA'd/QC'd sampling and test data or "raw" data, where provided in accordance with subparagraph 21.1(e)(ii)(related chain of custody forms shall be part of the Administrative Record and shall be made available upon request, but need not be physically located at the JARDF);

    (xiii) Quality Assurance Program Plan, with audit reports, written comments and written responses to comments;

- 73 -

(xiv) Reports for Products and Subproducts, including written submissions of the United States, Army, EPA, Shell and the State identifying potential ARARs for consideration; written comments on draft reports for Products or Subproducts (including comments of ATSDR and DOI); draft final reports for Products, Army's written responses to the comments; any written requests invoking Dispute Resolution; any documents requested by or submitted to SAPC; any documents issued by SAPC or FRC on the Products; final Product reports; any written request to modify any Products; any document reflecting action by the RMA Committee, SAPC or FRC on the request for modification; any document consisting of or addressing an Other Deliverable; and any document reflecting a modification of the Products:

(xv) Any documents transmitted by ATSDR or DOI to the RMA Committee;

(xvi) Other documents submitted by or relating to the involvement of ATSDR, DOI, EPA, Shell and State in the RI/FS process;

(g)   RI/FS Report for Each ROD

(xvii) Draft RI/FS Report, with preferred alternative;

(xviii) Public notice of availability of RI/FS Report with brief analysis (including all fact sheets and other documents made available to the public which summarize the various feasibility study alternatives and the preferred alternative);

(xix) Written public comments received on the RI/FS Report (including comments from EPA, Shell and the State);

(xx) Transcript of each public meeting held for the purpose of receiving comments on the RI/FS Report;

(xxi) Documentation of participation by the TRC, RMA Committee and RMA Council;

(h)   SAPC or FRC Activities

(xxii) Notices of SAPC and FRC meetings;

(xxiii) Written decisions issued by SAPC or FRC;

(xxiv) Other documents generated by or for SAPC or FRC;

- 74 -

(i)    RMA Committee Activities

(xxv) Notices of RMA Committee meetings, any written decision generated by or for the RMA Committee and any other documents generated by the RMA Committee or any subcommittee thereof;

(j)    RMA Council Activities

(xxvi) Notices of RMA Council meetings, any written decision issued by the RMA Council, and any other documents generated by or for the RMA Council;

(k)    JARDFC Activities

(xxvii) Notices of JARDFC meetings and any written document issued by JARDFC;

(l)    TRC Activities

(xxiii) Notices of TRC meetings and documents distributed to the TRC;

(m)    Local Governments' Involvement

(xxix) Record of all communications with and information provided to local government officials with respect to the RI/FS;

(n)    Interagency Agreements

(xxx) Any interagency agreements, including agreements with Corps of Engineers, DOI, etc.

(o)    Executive Orders

(xxxi) Executive Orders 12580 and 12316;

(p)    Deadlines

(xxxii) Deadlines, each request for extension of Deadlines, action on these requests by the RMA Committee, the RMA Council, SAPC or FRC, any notice of violation of a Deadline and any civil penalty assessment;

- 75 -

(q)    <u>ROD</u>

(xxxiii) Draft ROD (with appendix of proposed ARARs), written comments on draft ROD, Army's written response to comments, draft final ROD, any written requests invoking Dispute Resolution, any documents requested by or submitted to SAPC, any documents issued by SAPC or FRC on the draft final ROD, with any amendments of the ROD required by SAPC or FRC;

(xxxiv) Final ROD;

(xxxv) Notice of United States to State of opportunity to concur or not concur in the selected Final Response Action for the On-Post Operable Unit;

(xxxvi) The State's written concurrence or nonconcurrence in the selected Final Response Action for the On-Post Operable Unit;

(xxxvii) All public notices of the issuance of the ROD (including fact sheets and other documents made available to the public which describe the final Response Action selected);

(xxxviii) Any subsequent modifications of the ROD; and

(r)    <u>Other Documents</u>

(xxxix) Other documents transmitted to or from the Army or EPA concerning the RI/FS;

(s)    <u>Index</u>

(xl) Index of contents of the Administrative Record.

(ii)    <u>Contents of Administrative Records for RODs for Other Operable Units and IRAs</u>

31.2    For RODs for other Operable Units, the Administrative Record shall consist of complete copies of such documents as the JARDFC may designate, as provided in paragraphs 31.5 and 31.6, not inconsistent with CERCLA and the NCP and pertinent guidance issued by EPA that is not inconsistent with CERCLA and the NCP. Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees governed the contents of the Administrative Records for IRA proposed Decision Documents. This Section shall control the contents of the Administrative Records for IRA proposed Decision Documents issued after the effective date of this Agreement.

- 76 -

(iii)  Supplementation of Administrative Record for On-Post ROD

31.3      For a period of 90 days after the effective date of this Agreement, any Organization may submit a list identifying any documents prepared between January 1, 1983, and the effective date of this Agreement for inclusion in the Administrative Record for the On-Post ROD.  Promptly after receipt of notice from the Army identifying those listed documents that would not otherwise be included in the Administrative Record, the Organization that submitted the list shall promptly transmit to the Army copies of such documents for inclusion in the Administrative Record. During this period, the Army may decline to include in this Administrative Record documents proffered by an Organization only on the grounds that such documents were not previously received or generated by the Army, or are irrelevant to the Administrative Record for the ROD.  The Army may not refuse to include in the Administrative Record during the 90-day period any documents which are otherwise appropriate for inclusion in the Administrative Record on the grounds that they were improperly transmitted outside of official channels, except where the documents were not transmitted by or to individuals acting within the scope of their official employment.

(iv)  Custodian of Administrative Records

31.4      Within 30 days of the effective date of this Agreement, the Army shall designate a Custodian of the Administrative Records.  The Custodian shall be responsible for maintaining on a contemporaneous basis the Administrative Record for each ROD and each IRA Decision Document and for preserving in a separate area of the JARDF all documents designated in accordance with Paragraphs 21.1(f), 21.2 and 21.3.

(v)  Joint Administrative Record and Document Facility Committee

31.5      Promptly after signing this Agreement, the Organizations shall each designate a representative to serve on the JARDFC.  The JARDFC shall be chaired by the Custodian.  The JARDFC shall meet periodically in an effort to reach a consensus (to the maximum extent practicable) on the contents of the Administrative Record for each ROD and each IRA Decision Document.  The JARDFC shall take steps to ensure that documents preserved in accordance with paragraphs 21.1(f), 21.2 and 21.3 are kept to the minimum necessary in the opinion of the United States, and are preserved at the JARDF in a secure, cost-effective and space minimizing manner.

31.6      Disputes concerning the documents to be preserved pursuant to paragraphs 21.1(f), 21.2 and 21.3 which cannot be resolved with 30 days by the JARDFC shall be referred to the RMA Council for resolution.  In the event that the dispute cannot be resolved by the RMA Council in 45 days, the dispute shall be raised by any Organization to Dispute Resolution or shall be deemed to be waived.

(vi) Challenges to Administrative Record

31.7     Any Organization may support or oppose a proposal by another Organization to include any document in the Administrative Record. The only challenge which a Signatory may make in any judicial proceeding with respect to the contents of an Administrative Record is that one or more documents which was clearly submitted and identified in writing to the Army and which belongs in that Administrative Record, was improperly rejected for inclusion in that Administrative Record.

(vii) Joint Administrative Record and Document Facility ("JARDF")

31.8     The Administrative Records for the RODs and IRA Decision Documents, and all documents preserved in accordance with paragraphs 21.1(f), 21.2 and 21.3, shall be maintained at a records facility to be known as the JARDF, which shall be located at or near the Arsenal and shall be open for inspection and copying by representatives of the Organizations, the TRC and the public during reasonable office hours.

## XXXII.   COMMUNITY RELATIONS

32.1     The Signatories shall coordinate any statements to the press with respect to this Agreement or any aspect of the process set forth in this Agreement. Each Signatory shall inform the other Signatories of the terms of any such press release prior to issuance.

32.2     The Signatories agree to comply with all relevant EPA policy and guidance on community relations programs which are in accordance with CERCLA and consistent with the NCP.

## XXXIII.   ASSESSMENT AND SELECTION OF SUPPLEMENTAL RESPONSE ACTIONS

33.1     The Parties recognize that subsequent to Finalization of the RODs for the On-Post and Off-Post Operable Units, a need may arise for one or more Supplemental Response Actions to remedy continuing or additional releases or threats of releases of hazardous substances, pollutants or contaminants at or from the Arsenal. If such a release or threat of release presents an immediate threat to human health or the environment, it shall be addressed pursuant to Section XXIII.  If such release or threat of release does not present an immediate threat to human health or the environment, it shall be addressed pursuant to paragraphs 33.2-33.7, regardless of whether the determination of the need for such Supplemental Response Action is based on a Periodic Review conducted pursuant to Section XXXVI hereof or on some other source of information.

- 78 -

33.2     A Supplemental Response Action shall be undertaken only (a) if it is determined that as a result of the release or threat of release of a hazardous substance, pollutant or contaminant at or from the Arsenal an additional Response Action is necessary and appropriate to assure the protection of human health and the environment and (b) if either:

(i)     For Supplemental Response Actions proposed after Finalization of the RODs for the On-Post and Off-Post Operable Units, but prior to EPA Certification, the determination is based on conditions that were unknown at the time of Finalization of the ROD or based on information received in whole or in part by EPA following Finalization of the ROD; or

(ii)     For Supplemental Response Actions proposed after EPA Certification, the determination is based on conditions that were unknown at the time of EPA Certification or based on information received in whole or in part by EPA following EPA Certification.

33.3     If, after Finalization of the RODs for the On-Post and Off-Post Operable Units, any Organization or DOI concludes that a Supplemental Response Action is necessary, based on the criteria set forth in paragraph 33.2, such Organization or DOI may promptly notify the others of its conclusion in writing. The members of the RMA Committee shall confer and attempt to reach consensus on the need for such an action within 45 days of the receipt of such notice. If within that 45-day period the RMA Committee has failed to reach unanimous agreement, any Organization (or DOI, subject to paragraph 30.2) may notify the other Organizations in writing that it intends to invoke Dispute Resolution. If the RMA Committee is still unable to reach consensus within 14 days of the issuance of such notice, the question of the need for the Supplemental Response Action shall be resolved through Dispute Resolution.

33.4     If the RMA committee agrees or if it is determined through Dispute Resolution that a Supplemental Response Action is needed based on the criteria set forth in paragraph 33.2, the Lead Agency shall prepare a draft Supplemental Response Action Plan that shall include Supplemental Response Action Deadlines. Supplemental RI/FS Deadlines may be extended only pursuant to Section XXVI. The Lead Agency shall provide the draft Supplemental Response Action Plan to the other Organizations and DOI. The other Organizations and DOI shall have 30 days in which to comment. The Lead Agency shall respond to those comments within 30 days after close of the comment period. Any Organization (or DOI, subject to paragraph 30.2) may then invoke Dispute Resolution to resolve a dispute with respect to the Supplemental Response Action Plan. After any disagreements with respect to the Supplemental Response Action Plan have been resolved, the Lead Agency shall submit the Supplemental RI/FS Deadlines as an exhibit to the Technical Program Plan.

33.5     After any disputes with respect to a Supplemental Response Action Plan have been resolved, the Lead Agency shall conduct a Supplemental RI/FS and

- 79 -

issue a Supplemental ROD in accordance with the Supplemental Response Action Plan. The provisions in the RI/FS Process Document shall govern the planning and selection of Supplemental Response Actions to the same extent they govern the planning and selection of Final Response Actions, unless it is the unanimous agreement of the Organizations that a particular provision does not apply. The Supplemental ROD shall include Design Deadlines that shall govern completion of the design work for the Supplemental Response Action.

33.6     Following issuance of the Supplemental Response Action ROD, the Supplemental Response Action shall be implemented pursuant to that ROD and Section XXXIV.

33.7     Shell shall have the opportunity to participate in the assessment, selection, design and implementation of a Supplemental Response Action as provided in Section XXXVI.

XXXIV.   DESIGN AND IMPLEMENTATION OF FINAL AND SUPPLEMENTAL RESPONSE ACTIONS

(i)   Response Actions Covered By This Section

34.1     Paragraphs 34.2-34.24 shall govern design and implementation of the following Response Actions:  the Final Response Action for the On-Post Operable Unit, the Final Response Action for the Off-Post Operable Unit, the Final Response Action for any other Operable Unit that may be designated for the Site, and any Supplemental Response Actions selected pursuant to Section XXXIII.

(ii)   Design and Implementation Deadlines

34.2     (a)     Promptly upon Finalization of any ROD that was not the subject of judicial review, the United States shall append as an exhibit to the ROD and transmit to the other Organizations the Design Deadlines for that ROD.  If a ROD is subject to judicial review, 45 days after submittal of the ROD to the Court in accordance with paragraph 25.11, the United States shall submit to the Court as an exhibit those Design Deadlines applicable to portions of the ROD, if any, that are not subject to judicial review.  At the conclusion of the judicial review of any ROD, the United States shall submit to the Court as an exhibit to the ROD those Design Deadlines applicable to any portion of the ROD that was the subject of judicial review.  Once Design Deadlines have been properly appended to the ROD or submitted to the Court pursuant to this paragraph, they shall be subject to stipulated civil penalties pursuant to Section XXIX, and may be extended only pursuant to paragraph 34.22.

(b)     Promptly upon issuance of a Final Design Document, the United States shall append as an exhibit to the ROD and transmit to the other Organizations a list of the Implementation Deadlines that are set forth in the Final Design Document.

- 80 -

Implementation Deadlines shall be subject to stipulated penalties pursuant to Section
XXIX and may be extended only pursuant to paragraph 34.22.

      (iii)  Role of the RMA Committee and the RMA Council

    34.3    The RMA Committee shall oversee the day-to-day progress of the
design and implementation of Final and Supplemental Response Actions. Promptly
upon issuance of a ROD that addresses such a Response Action, the Lead Agency for
the Response Action shall designate an employee who shall serve as the Coordinator for
the design and implementation of that Response Action. The Coordinator may be the
same person who served as the Coordinator for the development of the ROD. The
Coordinator shall be responsible on a daily basis for ensuring that the Lead Agency's
design and implementation of the Response Action is in accordance with the ROD and
the terms of this Agreement.

    34.4    Promptly upon issuance of a ROD, the Organizations shall each
designate an employee to serve as its representative on the RMA Committee. Each
such representative shall be responsible on a daily basis for ensuring his or her
respective entity's fulfillment of its responsibilities regarding the design and
implementation of the Response Action in accordance with the terms of the ROD and
this Agreement. This representative may be the same person who served as the
representative on the RMA Committee during development of the ROD. DOI may
attend and participate in RMA Committee meetings.

    34.5    Except for communications between counsel, the Organizations shall
transmit all written communications between each other with respect to the design and
implementation of a Final or Supplemental Response Action as provided in Section
XXXVII.

    34.6    The RMA Committee shall meet approximately once each month.
Although the Lead Party for a Response Action shall have primary responsibility for
meeting applicable Design Deadlines and Implementation Deadlines, the RMA
Committee shall endeavor to assist in this effort by setting completion dates for design
and implementation tasks, reviewing the progress of these tasks, attempting to resolve
disputes informally, making necessary and appropriate adjustments to schedules, advising
the SAPC whenever a Deadline cannot be attained, and recommending, if warranted,
that a Deadline be extended, as provided in paragraph 34.22.

    34.7    The RMA Council shall oversee the design and implementation of
Response Actions and review the work of the RMA Committee. Promptly upon
issuance of a ROD that addresses a Final or Supplemental Response Action, the
Organizations shall each designate an employee to serve on the RMA Council for the
purpose of overseeing the design and implementation of the Response Action addressed
in that ROD. Such employee may be the same person who served on the RMA Council
during development of the ROD. The designee of the Lead Agency for the Response

- 81 -

Action shall serve as the chairman of the RMA Council for the purpose of overseeing the design and implementation of that Response Action. DOI may attend and participate in RMA Council meetings at which matters concerning biota at the Arsenal are addressed.

34.8    The chairman shall schedule regular meetings of the RMA Council approximately every 3 months, shall transmit to the other members and DOI a proposed agenda at least 20 days in advance of each meeting and shall transmit a final agenda at least 10 days in advance of the meeting which shall incorporate any additional matter that an RMA Council member requests be included. Regular meetings shall be for the purpose of reviewing and commenting on the progress being made in the design and implementation of the Response Action.

34.9    Special meetings of the RMA Council shall be held at the request of the chairman or any RMA Council member. As much notice for special meetings as is feasible under the circumstances shall be provided by the chairman.

(iv)  Shell's Right to Participate as Lead Party

34.10    Shell shall have the opportunity to participate as Lead Party in the design or implementation, or both, of all or portions of Final or Supplemental Response Actions pursuant to the terms of the Settlement Agreement, the terms of this Section and the terms of any subsequent Consent Decree. When Shell assumes responsibility for any portion of the design or implementation of a Response Action, Shell shall keep the Lead Agency apprised of its progress so that the Lead Agency may monitor Shell's progress. Shell shall consult with the Lead Agency prior to taking any significant action over which Shell has assumed Lead Party responsibility.

34.11    When Shell has assumed Lead Party responsibility for design or implementation, or both, of all or portions of a Response Action, it shall be subject to the stipulated penalty provisions set forth in Section XXIX with respect to any Design and Implementation Deadlines that apply to the portions of such Response Action for which Shell is responsible as Lead Party. The Lead Agency shall remain responsible for assuring that such Response Action otherwise comports with the ROD and this Agreement.

(v)  Design of Response Actions

34.12    The Lead Party responsible for design of a Response Action identified in a ROD shall designate a Project Manager who shall be responsible for development of the Design Scope of Work, the Conceptual Design Document, and the Final Design Document for the Response Action.

34.13    The Project Manager shall submit a draft Design Scope of Work to the RMA Committee and DOI for review and comment. The RMA Committee members

- 82 -

shall meet to discuss the draft and attempt to reach unanimous agreement on its adequacy. At the request of any Organization (or DOI, subject to paragraph 30.2), a dispute with respect to a draft Design Scope of Work shall be subject to Dispute Resolution. The failure of an Organization to request Dispute Resolution with respect to such draft within 30 days of the RMA Committee's receipt of the draft scope of work shall constitute that Organization's concurrence in the Design Scope of Work.

34.14    Upon unanimous agreement of the RMA Committee members, or completion of Dispute Resolution if invoked, with respect to a draft Design Scope of Work, the Project Manager shall issue the document in final form and shall promptly begin the process of developing, or having developed under contract, the Conceptual Design Document. The Lead Party shall submit the Conceptual Design Document to the RMA Committee for review and comment. The Project Manager shall be available to discuss with the other RMA Committee members the adequacy of the Conceptual Design Document. The Conceptual Design Document shall not be subject to Dispute Resolution.

34.15    The Final Design Document shall include Implementation Deadlines pursuant to which the Response Action addressed in the Final Design Document shall be conducted. The Project Manager shall submit the Final Design Document to the RMA Committee and DOI in draft form for review and comment. The RMA Committee members shall meet and discuss the draft and attempt to reach unanimous agreement on the adequacy of the draft, including the Implementation Deadlines proposed in the draft. At the request of any Organization (or DOI, subject to paragraph 30.2), any dispute with respect to a draft Final Design Document may be resolved pursuant to Dispute Resolution. The failure of an Organization to request Dispute Resolution with respect to such draft within 30 days of the RMA Committee's receipt of the Final Design Document shall constitute that Organization's concurrence in the Final Design Document.

34.16    If, following RMA Committee review, the Organizations are unable to reach unanimous agreement with respect to a draft Design Scope of Work or a draft Final Design Document, and either document is the subject of Dispute Resolution, the Project Manager shall promptly modify the draft document as necessary to reflect the outcome of Dispute Resolution and submit the modified document to the other Organizations. If the Organizations fail to agree unanimously that the modified document accurately reflects the outcome of the Dispute Resolution, any Organization may submit the issue to Dispute Resolution within ten days after receipt of the modified document. After the Organizations reach unanimous agreement, or, absent such agreement, after the time for invoking Dispute Resolution has passed, the Project Manager shall issue the document in final form.

34.17    After the Final Design Document is issued in final form, the Project Manager shall promptly begin implementation of the Response Action addressed in the Final Design Document.

- 83 -

(vi)   Implementation of Response Actions

34.18     At the monthly meetings of the RMA Committee, Project Managers shall report on their progress in implementing Response Actions.  During such meetings, it shall be the responsibility of each RMA Committee member to raise any objections he or she may have with respect to the manner in which a Response Action is being implemented.  In raising such an objection, an RMA Committee member shall indicate whether, and to what extent, he or she believes the activity is not being implemented in accordance with the applicable ROD, the Final Design Document, or this Agreement. The Project Manager shall be available to respond to such objections.

34.19     The RMA Committee shall attempt to resolve informally any dispute with respect to the manner in which a Response Action is being implemented or whether extension of an Implementation Deadline should be granted.  Any Organization (or DOI, subject to paragraph 30.2) may invoke Dispute Resolution to resolve a disagreement with respect to the implementation of a Response Action that cannot be resolved at the RMA Committee level.  The only issues relating to implementation of a Response Action that may be raised to Dispute Resolution are:  (a) whether the Response Action is being implemented in accordance with the ROD, (b) whether the Response Action is being implemented in accordance with the applicable Final Design Document, (c) whether the Response Action is being implemented in accordance with the terms of this Agreement and (d) whether good cause exists for extending an Implementation Deadline.  The failure of an Organization to invoke Dispute Resolution with respect to implementation of a Response Action shall constitute such Organization's acknowledgement that the Response Action is being properly implemented.

34.20     Subject to the following paragraph, if Dispute Resolution is invoked with respect to implementation of a Response Action, the implementation of the Response Action shall not continue until Dispute Resolution has been concluded.

(vii)   Right to Judicial Review

34.21     Following completion of Dispute Resolution regarding either design or implementation of a Response Action, Shell and the State shall have the right to judicial review of such issue in accordance with Section XXXIX.  Whether the design work or implementation activity that is subject to judicial review may go forward pending such review over the objection of Shell and the State shall be determined by the Court in accordance with traditional principles governing injunctive actions.

(viii)   Extensions of Deadlines

34.22     Design Deadlines and Implementation Deadlines may be extended for good cause in accordance with the provisions of paragraphs 26.8-26.18.

- 84 -

(ix) EPA Certification

34.23    When the Army determines that any Final or Supplemental Response Action for which it is the Lead Agency has been completed in accordance with the requirements of this Agreement, it shall so advise Shell, EPA and the State in writing, and shall request from EPA certification that the Response Action has been completed in accordance with the requirements of this Agreement. Shell or the State may request in writing that the Army make such a determination and, unless the Army notifies Shell or the State in writing within 30 days after receipt of any such notice that the Army has made such a determination, Shell or the State may submit the matter to Dispute Resolution within 14 days after the end of the 30-day period. If it is determined by Dispute Resolution that the Final or Supplemental Response Action has been completed in accordance with this Agreement, EPA shall promptly make such certification with respect to such Response Action. If the Army's determination has not been subject to Dispute Resolution, within 90 days of the receipt of a request from the Army for EPA Certification, EPA shall advise the Army, Shell and the State in writing that:

(a)    EPA certifies that the Response Action has been completed in accordance with this Agreement; or

(b)    EPA denies the Army's request for certification, stating in full the basis of its denial.

34.24    If EPA denies the Army's request for certification pursuant to paragraph 34.23(b), any Organization may invoke Dispute Resolution to review EPA's determination. If EPA's denial of certification is upheld in Dispute Resolution, EPA shall describe the additional work needed to bring the Response Action into compliance with the requirements of this Agreement. After performing such additional work, the Army shall resubmit a request for certification to EPA. EPA shall then grant or deny certification pursuant to the process set forth in this paragraph and the previous paragraph.

## XXXV.  OPERATION AND MAINTENANCE OF RESPONSE ACTION STRUCTURES AND MONITORING OF RESPONSE ACTIONS

35.1    Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees (and related exhibits) governed the operation and maintenance of Response Action Structures and the monitoring of Response Actions. On the effective date of this Agreement, this section shall control the operation and maintenance of Response Action Structures and the monitoring of Response Actions. The Organizations recognize that operation and maintenance of Response Action Structures, and monitoring the effectiveness of Response Actions, may be necessary for a period of 30 years or more. Shell may participate in such operation, maintenance and monitoring in accordance with the provisions this Section. Shell's

- 85 -

obligation to pay its share of the cost of such activities shall be as set forth in the Settlement Agreement.

35.2    Any Organization shall have the right to inspect any Response Action Structure operated by another Organization for the purpose of determining if such Response Action Structure is being properly operated and maintained or if such Response Action Structure is performing as specified in the Final Design Document. Such right of inspection shall include the right of free access to such Response Action Structure at times convenient to the Organization operating and maintaining the Response Action Structure. An Organization that intends to inspect a Response Action Structure operated and maintained by another Organization shall provide the other Organization with at least one-week prior written notice of such intent.

35.3    The Organizations recognize that eventually the operation and maintenance of Response Action Structures at the Arsenal may no longer be necessary for the protection of human health and environment. When an Organization believes that operation and maintenance of a Response Action Structure may properly be discontinued or substantially curtailed, that Organization may propose such cessation or curtailment in a written notice to the other Organizations at least 45 days before the date of proposed cessation or curtailment. The notice shall describe the proposed cessation or curtailment and explain why continued operation or maintenance without substantial curtailment is no longer necessary to protect human health and the environment.

35.4    Operation and maintenance of the Response Action Structure may be discontinued or substantially curtailed if all the Organizations so agree. If the Organizations are unable to reach unanimous agreement on the proposed discontinuance or curtailment within 45 days after receipt of the notice proposing discontinuance or curtailment, any Organization may elevate the proposal to Dispute Resolution. When there is a dispute with respect to a proposal to discontinue or substantially curtail the operation and maintenance of a Response Action Structure, the operation and maintenance of such Response Action Structure shall continue until the dispute is resolved.

35.5    Notwithstanding any other provision of this Agreement, Shell's obligation to operate or maintain a Response Action Structure, and its obligation to monitor the effectiveness of Response Action Structures, shall be in accordance with this Agreement and contingent on the Army's annual certification that funds will be available to reimburse Shell for the cost of such activities to the extent that Shell will be entitled to such reimbursement pursuant to the Settlement Agreement. However, nothing in this paragraph shall be construed to relieve Shell of any of Shell's obligations under this Agreement or the Settlement Agreement for the designated Shell-Only Response Actions in Exhibit D to the Settlement Agreement.

- 86 -

35.6     It is the United States' long-term goal eventually to discontinue the use of all groundwater pump-and-treat systems pursuant to paragraph 35.4 that further operation of such Response Action Structures is no longer necessary to protect human health and the environment.

## XXXVI. PERIODIC REVIEW

36.1     Subject to the paragraph 36.2, the United States shall conduct a Periodic Review of any Final and Supplemental Response Action taken at the Site to determine whether and to what extent any additional remedial action is necessary. The Periodic Review shall be conducted in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), any pertinent regulation or guidance issued by EPA that is not inconsistent with CERCLA and the NCP.

36.2     The Periodic Review for each Operable Unit shall be conducted not less often than every five years after initiation of the Final Response Action for that Operable Unit, as long as hazardous substances, pollutants or contaminants remain within the area covered by that Operable Unit.

36.3     The Periodic Review for the On-Post Operable Unit and the Off-Post Operable Unit shall be conducted by the Army. The Periodic Review for any other Operable Unit included within the boundaries of the Site shall be conducted by the Lead Agency with responsibility for the Operable Unit. Prior to and during each Periodic Review, the Organization conducting the Periodic Review shall consult with the other Organizations concerning the proper scope and design of the review.

36.4     The assessment and selection of any additional Response Action determined necessary in the course of a Periodic Review shall be in accordance with Section XXXIII. Except for Emergency Actions, which shall be governed by Section XXII, such Response Action shall be implemented as a Supplemental Response Action in accordance with Section XXIII.

## XXXVII. NOTIFICATION

37.1     Except for communications between counsel, all written notices or other written communications contemplated in this Agreement shall be deemed to have been duly given when personally delivered to the appropriate individuals indicated below or when actually received if sent by telefax, express delivery service with charges prepaid, or the United States Postal Service with postage prepaid to the address and individual indicated below for the Organization intended:

- 87 -

If to the Army:

> Program Manager
> Office of the Program Manager,
>   RMA Contamination Cleanup
> Aberdeen Proving Ground,
>   Maryland  21010-5401
> Attention:  AMXRM-PM

with copies to:

> Deputy Program Manager
> RMA Contamination Cleanup
> Rocky Mountain Arsenal
> Building 111
> Commerce City, Colorado  80022-0116

> Department of the Army
> Office of the Judge Advocate General
> Environmental Law Division
> Attention:  DAJA-EL
> Washington, D.C. 20310

If to ATSDR:

> Agency for Toxic Substances and Disease Registry
> c/o Environmental Protection Agency, Region VIII
> One Denver Place
> 999 18th Street
> Denver, Colorado  80202-2413
> Attention:  Michael McGeehan

with a copy to:

> Director, Office of Health Assessments
> ATSDR
> 1600 Clifton Road
> Atlanta, Georgia  30333
> Attention:  Mark Bashor

- 88 -

If to DOI:

    Regional Director
    U.S. Fish and Wildlife Center
    Region 6
    P.O. Box 25486
    Denver, Colorado  80225

If to DOI concerning Natural Resource Damage Assessment, a copy should also go to:

    United States Department of the Interior
    Office of Environmental Project Review
    Denver Federal Center, Building 56, Room 1018
    Denver, Colorado 80225
    Attention:  Regional Environmental Officer

If to EPA:

    EPA's Coordinator for RMA
    (8HWM-SR)
    U.S. Environmental Protection Agency
    Region VIII
    One Denver Place
    999 18th Street, Suite 1300
    Denver, Colorado  80202-2413

If to Shell:

    Shell Denver Site Project
    c/o Holme Roberts & Owen
    1700 Lincoln, Suite 4100
    Denver, Colorado  80203
    Attention:  Manager of Denver Site Project

with a copy to:

    Shell Oil Company
    Legal Department
    P.O. Box 2463
    Houston, Texas  77252
    Attention:  General Attorney Environmental

- 89 -

If to the State:

> Colorado Department of Health
> 4210 East 11th Avenue
> Denver, Colorado  80220
> Attention:  CDH Coordinator for RMA

with a copy to:

> CERCLA Litigation Section
> Colorado Department of Law
> One Civic Center Plaza
> 1560 Broadway, Suite 250
> Denver, Colorado  80202
> Attention:  First Assistant Attorney General

37.2     All written notices or communications directed to the Coordinator or representative of the RMA Committee or to the Chairman or members of the RMA Council shall be sent in care of the addresses set forth in paragraph 37.1 for the appropriate Organization, and it shall be the responsibility of the recipient to forward the notice or communication to the appropriate individuals within the Organization.

37.3     By written notice pursuant to paragraph 37.1, any Organization may change the address, telefax number, or individual to which written notices or communications shall thereafter be directed.

## XXXVIII.  SPECIAL EXEMPTIONS

38.1     Notwithstanding any other provisions of this Agreement, the United States reserves the right to take action affecting the Arsenal that is not consistent with this Agreement, including use of the Arsenal for any purpose upon the occurrence of either of the following events:  (a) a determination by the President that such action is of paramount importance, or (b) a determination by the United States Secretary of Defense or by the United States Secretary of the Army that such action is necessary and in the interest of national defense.  The costs of any action, including any Response Action, taken by the United States pursuant to or as a result of a determination made in accordance with the previous sentence, shall be borne entirely by the United States.

## XXXIX.  JUDICIAL REVIEW

39.1     Except for issues concerning disputes involving compliance with this Agreement, an Organization may obtain judicial review only of issues which an

Organization previously sought to resolve through Dispute Resolution or issues that bear a substantial and material relationship to such issues.

39.2     Judicial review may be obtained by any Organization that is accorded the right to do so pursuant to this Agreement by motion filed in the Court within the following time periods:  (a) for issues concerning assessment and selection of a Response Action (i.e., IRA, Final Response Action or Supplemental Response Action), not later than 30 days after issuance of the final ROD or IRA Decision Document for that Response Action; (b) for issues concerning Shell's obligation to pay penalties or any other remedy or sanction sought against Shell, within the appropriate period set forth in paragraph 30.7; (c) for all other issues that may be submitted to Dispute Resolution, and are otherwise subject to judicial review, not later than 15 days after the end of the FRC's 30-day resolution period; (d) for all disputes arising under the Financial Manual, within the time period specified in the Financial Manual; (e) to enforce compliance with any provision of this Agreement, not later than 15 days after the end of the period of informal dispute resolution provided for in paragraph 30.1.

39.3     The standard and scope of review of any issue concerning the assessment and selection of Response Actions shall be the standard and scope of review applicable to actions brought pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, at the time that such judicial review is sought.  The scope of review shall be de novo, and the standard of review shall be the preponderance of the evidence for a question of whether and to what extent stipulated civil penalties are due.  Whether the United States may permit the use of any portion of the Arsenal pursuant to Section XLIV over Shell's objection pending judicial review shall be determined by the Court in accordance with traditional principles governing injunctive actions.  For all other issues, including issues concerning compliance with this Agreement and the design and implementation of Response Actions and Natural Resource Damages, the standard and scope of judicial review shall be as the Court determines to be appropriate.

39.4     Nothing in this Agreement shall be construed to authorize any person to seek judicial review of any action of the Army, EPA, Shell or the State where such review is barred by any provision of CERCLA, including Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

XL.   FUNDING

40.1     Any requirement for the payment or obligation of funds by the United States or any agency thereof, established by the terms of this Agreement shall be subject to availability of appropriated funds, and no provision herein shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341.  It is the expectation of the Organizations that all obligations of the United States under this Agreement will be fully funded.  The United States, or any agency thereof, shall take all necessary steps and make every effort within its authority to assure

- 91 -

that timely funding is available to meet all obligations of the United States under this
Agreement. In cases where payment or obligation of funds would constitute a violation
of the Anti-Deficiency Act, the dates established for payment or obligation shall be
appropriately adjusted. Notwithstanding any such adjustment of the date established for
payment, interest shall continue to accrue from and after the original due date in
accordance with the terms of the Settlement Agreement.

40.2    The Army shall submit an annual report to Congress which shall
include, at a minimum:  (a) a description of the Army's progress in planning, selecting,
and implementing Response Actions at the Arsenal; and (b) the specific cost estimates
and budgetary proposals anticipated by the Army over the following three-year period.

40.3    Notwithstanding any other provisions of this Agreement, Shell's
obligation to incur costs pursuant to an agreement with the head Agency shall be
contingent on the Army's certification that funds will be available to reimburse Shell for
the cost of such Response Actions to the extent that Shell will be entitled to
reimbursement pursuant to Section VI of the Settlement Agreement; except that nothing
in this Section shall be construed to relieve Shell of any Shell obligations under this
Agreement or the Settlement Agreement for the designated Shell-Only Response
Actions in Exhibit D to the Settlement Agreement.

## XLI.  ATSDR HEALTH ASSESSMENT OR HEALTH EFFECTS STUDY

41.1    Prior to the effective date of this Agreement, the February 1, 1988, and
June 7, 1988, proposed consent decrees governed the performance by ATSDR of its
preliminary Health Assessment. On the effective date of this Agreement, this Section
shall control ATSDR's performance of any further Health Assessments or Health Effects
Studies. ATSDR shall perform one or more Health Assessments for the Site pursuant
to Section 104(i) of CERCLA, 42 U.S.C. § 9604(i), and any applicable final Federal
regulations that are not inconsistent with CERCLA. The results of any Health
Assessment performed by ATSDR shall be set forth in a proposed report, which shall be
submitted to EPA for review and comment. EPA shall make copies of the proposed
report available upon request to the other Federal agencies and shall consult with other
Organizations with respect to the proposed report. After considering any comments
received from EPA, ATSDR shall prepare a draft final report, which shall be made
available for public comment. ATSDR shall publish notice of the availability of the
draft final report in at least one major daily newspaper in the Denver, Colorado
metropolitan area. The public shall have 30 days to comment on the draft final report,
or such longer period as determined appropriate by ATSDR. After considering all
comments received on the draft final report, ATSDR shall issue a final report, a copy of
which shall be sent to each Organization.

41.2    Upon reasonable prior written request, any Organization shall be given
access to ATSDR's administrative record of a Health Assessment.

- 92 -

41.3     ATSDR may perform one or more Health Effects Studies for the Site pursuant to Section 104(i) of CERCLA, 42 U.S.C. § 9604(i). Prior to initiating a Health Effects Study, ATSDR shall advise EPA that it has determined there to be a need for such study. EPA, after consultation with the other Organizations, may provide recommendations to ATSDR concerning the proper scope of the proposed Health Effects Study and may provide, or advise ATSDR of the availability of any data or other information which EPA believes would be pertinent to such study.

41.4     The results of a Health Effects Study shall be set forth in a draft final report, which shall be made available for public comment. ATSDR shall publish notice of the availability of the draft final report in at least one major daily newspaper in the Denver, Colorado metropolitan area. The public shall have 30 days to comment on the draft final report, or such longer period as determined appropriate by ATSDR. After considering all comments received on the draft final report, ATSDR shall issue a final report, a copy of which shall be sent to each Organization.

41.5     Upon reasonable prior written request, any Organization shall be given access to ATSDR's administrative record for a Health Effects Study.

41.6     At the request of ATSDR, the Organizations shall promptly make appropriate representatives available to respond to questions from ATSDR, and shall provide pertinent written information to ATSDR, for use in a Health Assessment or a Health Effects Study. At the request of ATSDR, the Organizations shall meet with ATSDR, either individually or in full Committee, for the purpose of providing such information. Copies of any written communication from an Organization to ATSDR shall be sent to the other Organizations at the time it is sent to ATSDR.

41.7     Whenever, during the course of, or as a result of a Health Assessment or a Health Effects Study, ATSDR determines there to be an imminent danger to human health as the result of the release or threatened release of a hazardous substance at or from the Arsenal, ATSDR shall promptly advise the Organizations of such determination.

## XLII. NATURAL RESOURCE DAMAGE ASSESSMENT

42.1     The DOI Natural Resource Damage Assessment regulations and this Section shall govern the Natural Resource Damage Assessment within the trusteeship authority of the Federal government, unless the Organizations and DOI agree otherwise. The Army (or Shell, when it is acting as Lead Party), in planning and assessing, selecting and implementing Response Actions shall, to the extent required by the NCP and in consultation with DOI, undertake appropriate actions necessary to protect and to restore natural resources under the United States' trusteeship that have been damaged by the release of hazardous substances at or from the Arsenal.

- 93 -

42.2     Upon execution of this Agreement, the Army, in consultation with the State, Shell and appropriate Federal agencies, shall designate the Chairman of the RMA Council to be the lead authorized official, to act on behalf of all Federal government agencies, which, pursuant to CERCLA, are trustees for public natural resources on or off the Arsenal and within the Federal government's trusteeship authority that have been injured, destroyed or lost as a result of the release of hazardous substances at or from the Arsenal.

42.3     After Finalization of the ROD for the On-Post Operable Unit or Finalization of the ROD for the Off-Post Operable Unit, whichever is later, and pursuant to CERCLA and applicable regulations promulgated under Section 301(c) of CERCLA, 42 U.S.C. § 9659(c), the lead authorized official shall conduct a preassessment screening for the purpose of determining whether and to what extent there is any residual injury to the natural resources arising from the release of hazardous substances at or from the Arsenal.  If the lead authorized official in consultation with DOI determines that there is sufficient residual injury to proceed, then the lead authorized official shall develop a Natural Resource Damage Assessment Plan, conduct a damage assessment, and conduct the activities required for the post-assessment phase.

42.4     In the determination of baseline conditions and baseline services and of the reduction in services that may have resulted from the release of hazardous substances at or from the Arsenal, the United States shall take into account, among other things, the uses of natural resources at the Arsenal by the United States and members of the public at large.

42.5     The lead authorized official shall consult and coordinate with Shell, the State, and appropriate Federal agencies in the preparation of the preassessment screens, Natural Resource Damage Assessment Plan, Natural Resource Damage Assessment, the post-assessment phase, particularly with respect to the sharing of the data and the development of the Natural Resource Damage Assessment Plan.

42.6     If the lead authorized official in consultation with DOI decides to develop a Natural Resource Damage Assessment Plan, he or she shall notify Shell, the State and appropriate Federal agencies in writing of that decision at least 30 days before proceeding with development of the Natural Resource Damage Assessment Plan.  Such notice shall include a copy of the preassessment screens and shall provide Shell, the State, and appropriate Federal agencies an opportunity to participate in the development of the Natural Resource Damage Assessment Plan.  Shell and the Army may participate in the development of any aspect of the Natural Resource Damage Assessment Plan.

42.7     The lead authorized official shall provide the draft Natural Resources Damage Assessment Plan, including the methodologies to be used, to Shell, the State, appropriate Federal agencies and interested members of the public for comment.  Shell, the State, appropriate Federal agencies, and interested members of the public shall have

- 94 -

30 days in which to comment. The lead authorized official shall have 30 days in which to respond in writing to those comments. After the lead authorized official's response, Shell or DOI may invoke Dispute Resolution over any aspect of the draft Natural Resource Damage Assessment Plan.

42.8    After the end of the comment and response periods and consistent with the results of Dispute Resolution, if invoked, the lead authorized official shall issue the final Natural Resource Damage Assessment Plan. If, in the opinion of the lead authorized official, a change in the applicable statute or regulations requires modifications of the final Natural Resources Damage Assessment Plan, such modifications shall be subject to the notice, comment and Dispute Resolution procedures set forth in paragraph 42.7.

42.9    At the option of the lead authorized official, Shell, the Army, or another Federal natural resource trustee, under the direction, guidance and monitoring of the lead authorized official, may conduct any part of the natural resource damage assessment. The Natural Resource Damage Assessment shall be conducted as set out in the Natural Resource Damage Assessment Plan and any modifications thereto.

42.10    Prior to issuance of a Report of Assessment, the lead authorized official shall issue its draft Report of Assessment to Shell, the State, and appropriate Federal agencies. If Shell disagrees with the draft Report of Assessment, Shell may invoke Dispute Resolution.

## XLIII.  SHELL PARTICIPATION IN RESPONSE ACTIONS

43.1    Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees governed Shell's participation in Response Actions. On the effective date of this Agreement, this Section shall control Shell's participation in Response Actions. Shell's right to participate as Lead Party for Response Actions for the On-Post and Off-Post Operable Units shall be as follows:

(a)    RI/FS for the On-Post Operable Unit--Shell may participate as Lead Party as provided in Section XXIV;

(b)    IRAs for the On-Post and Off-Post Operable Units--Shell may participate as Lead Party as provided in Section XXII;

(c)    Operation and Maintenance of Response Action Structures-- Shell may participate as Lead Party as provided in Section XXXV;

(d)    Emergency Actions--Shell may participate as Lead Party as provided in Section XXIII; and

- 95 -

(e)     Final and Supplemental Response Actions--Shell may participate as Lead Party for Final or Supplemental Response Actions as provided in paragraphs 34.10-34.11 hereof.

43.2     Shell may participate as Lead Party for Response Actions for the On-Post and Off-Post Operable Units other than those identified in paragraph 43.1, in accordance with the terms and conditions of paragraphs 43.3-43.8.

43.3     Prior to initiating any other Response Action work in which Shell has the right to participate hereunder as Lead Party other than the work identified in paragraph 43.1, the Lead Agency shall provide Shell with reasonable periods of time within which Shell may propose to conduct such work in accordance with this Agreement.

43.4     Within the time periods provided pursuant to paragraph 43.3, Shell shall identify in writing any Response Action work subject to this Section, including the design, implementation, operation, and maintenance of a Response Action Structure constructed by Shell or the Lead Agency, that Shell wishes to conduct as Lead Party. Within 30 days after receipt of such identification, the Lead Agency shall determine whether it is more appropriate for Shell rather than the Lead Agency to conduct the identified Response Action work, and shall notify Shell in writing of its determination. If the Lead Agency determines that it is not more appropriate for Shell to conduct any identified Response Action work, Shell may invoke Dispute Resolution. Only the Army, EPA, and Shell shall participate in Dispute Resolution on this issue. The issue to be addressed during Dispute Resolution is whether, considering all relevant circumstances, it is more appropriate for Shell to conduct the Response Action work than the Lead Agency. The result of Dispute Resolution of that issue shall not be subject to judicial review.

43.5     Once it has been determined, either by the Lead Agency or through Dispute Resolution, that it is more appropriate for Shell to conduct any Response Action work, Shell and the Lead Agency shall, pursuant to the Memorandum of Understanding attached as Exhibit G to the Settlement Agreement, develop and sign a Scope of Work by which the Response Action work shall be conducted. If Shell or the Lead Agency are unable to agree upon a Scope of Work, either may invoke Dispute Resolution. Only the Army, EPA and Shell shall participate in Dispute Resolution on this issue.

43.6     Payment of the costs incurred by Shell in conducting Response Actions shall be governed by Sections VI and VII of the Settlement Agreement. Notwith-standing any other provisions of this Agreement, or the Settlement Agreement, Shell's obligation to incur costs pursuant to an agreement with the Lead Agency shall be contingent on the Army's certification that funds will be available to reimburse Shell for the cost of such Response Actions to the extent that Shell will be entitled to such reimbursement pursuant to Section VI of the Settlement Agreement.

- 96 -

43.7     Unless the United States and Shell otherwise agree in writing: (a) each Response Action Structure constructed or placed on the Arsenal by Shell pursuant to this Section shall become the property of the United States upon acceptance of Shell's work of construction or placement of that Response Action Structure; and (b) the Irondale System shall become the property of the United States upon Finalization of the ROD for the On-Post Operable Unit.

43.8     Notwithstanding any other provision of this Section, the Lead Agency shall, subject to the Dispute Resolution and judicial review provisions of this Agreement, make all ARAR determinations, issue all IRA Decision Documents and all RODs for Final or Supplemental Response Actions, conduct all public meetings, and respond to public comments on all IRA Decision Documents and all RODs.

## XLIV. RESTRICTIONS ON OWNERSHIP, USE, AND TRANSFER

44.1     The United States shall retain title to the Arsenal, subject to the provisions of this Section.

44.2     Prior to the effective date of this Agreement, the February 1, 1988, and June 7, 1988, proposed consent decrees governed the implementation and application of certain existing restrictions on ownership, use and transfer of the Arsenal.  On the effective date of this Agreement, this Section shall control the implementation and application of restrictions on ownership, use and transfer of the Arsenal.  The Parties have agreed that certain existing restrictions on the use of resources on and under the Arsenal should continue after the execution of this Agreement to assure continued protection of human health and the environment and shall amend the Technical Program Plan to include such restrictions.  The United States intends that significant portions of the Arsenal shall eventually be available for beneficial public uses that are consistent with the following restrictions, which shall be maintained and enforced for all property within the boundary of the Arsenal, subject only to the provisions of paragraph 44.6 and Section XLV.

(a)  Residential development on the Arsenal shall be prohibited.

(b)  The use of groundwater located under, or surface water located on, the Arsenal as a source of potable water shall be prohibited.

(c)  Consumption of all fish and game taken on the Arsenal shall be prohibited, although hunting and fishing on the Arsenal for non-consumptive use may occur if subject to appropriate restrictions.

(d)  Agricultural, including all farming activities such as the raising of livestock, crops, or vegetables, shall be prohibited.  Agricultural practices used in Response Action or used for erosion control, however, shall be permitted.

- 97 -

(e)     Wildlife habitat(s) shall be preserved and managed as necessary to protect endangered species of wildlife to the extent required by the Endangered Species Act, 16 U.S.C. §§ 1531 et seq, migratory birds to the extent required by the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 et seq., and bald eagles to the extent required by the Bald Eagle Protection Act, 16 U.S.C. §§ 668 et seq.

(f)     Other than as may be necessary in connection with a Response Action or as necessary to construct or operate a Response Action Structure, no major alteration shall be permitted in the geophysical characteristics of the Arsenal if such alteration may likely have an adverse effect on the natural drainage of the Arsenal for floodplain management, recharge of groundwater, operation and maintenance of Response Action Structures, or protection of wildlife habitat(s).

44.3     The United States shall maintain security at the Arsenal adequate to assure the proper construction, operation, and maintenance of Response Action Structures, the proper implementation and monitoring of Response Actions and compliance with the restrictions listed in paragraph 44.2 and the Technical Program Plan. The United States shall take reasonable precautions to assure that only Federally authorized access to the Arsenal shall occur.

44.4     The United States shall impose and enforce, either on a temporary or permanent basis, additional restrictions on the use of resources on and under the Arsenal not enumerated in paragraphs 44.2 and 44.3 if, at any time, the United States determines that such restrictions are: (a) required by CERCLA or regulations promulgated thereunder; (b) necessary to assure protection of human health or the environment; or (c) necessary to assure the proper construction, operation, and maintenance of Response Action Structures or to assure the proper implementation and monitoring of Response Actions at the Arsenal or; (d) required by the Endangered Species Act, the Migratory Bird Treaty Act and the Bald Eagle Protection Act. The additional restrictions shall be appended to the Technical Program Plan.

44.5     The United States shall assure that the assessment, selection, design, construction and implementation of Response Actions for the Site, including the identification and application of ARARs and the development and application of any other standard, requirement, criterion or limitation for a Response Action, shall be based upon and consistent with the terms and conditions of this Agreement, including without limitation the restrictions and requirements set forth in paragraphs 44.2 and 44.3, or developed pursuant to paragraph 44.4 and appended to the Technical Program Plan. Each ARAR identified, or other standard, requirement, criterion or limitation developed, for a Response Action conducted on or off the Arsenal and its application to Response Actions for the Site (including the location on or off the Arsenal where the ARAR or other standard, requirement, criterion or limitation must be met, and a target date for meeting such ARAR or other standard) shall be specified in the applicable decision document for such Response Action (i.e., ROD, Supplemental ROD or IRA

- 98 -

Decision Document) and shall be fully enforceable by any Party in accordance with Section XXVIII.

44.6    It is understood that because the Response Actions for the Site are to be based on and consistent with the terms and conditions of this Agreement, including without limitation the restrictions and requirements set forth in paragraphs 44.2 and 44.3 or developed pursuant to paragraph 44.4, such Response Actions are conditional in nature; that is, if any such restriction or requirement is removed for any reason, the United States shall promptly evaluate the need for, and as necessary implement, any additional Response Action as may be necessary to assure protection of human health and the environment. The assessment, selection, design and implementation of any such Response Action shall be conducted in accordance with the terms of Sections XXIV and XXV. When conducting a Periodic Review pursuant to Section XXXVI, the United States shall assess the effectiveness of the restrictions in paragraphs 44.2 and 44.3 or developed pursuant to paragraph 44.4 in protecting human health and the environment. The United States shall also evaluate the continuing need for such restrictions or requirements to determine if any restriction or requirements may be removed or modified. If the Army believes that, as a result of Response Actions previously taken, any of the restrictions on ownership, use and transfer listed in paragraph 44.2 and 44.3 or developed pursuant to paragraph 44.4 are no longer necessary to assure protection of human health and the environment, the Army may seek to modify this Agreement pursuant to Section XLV and the Technical Program Plan to remove or modify such restriction.

44.7    The United States shall assure that the future use of resources on and under the Arsenal by the United States or by persons entering on the Arsenal with the consent of the United States, including licensees and lessees of the United States, shall be in compliance with the restrictions and requirements set forth in paragraphs 44.2 and 44.3 or determined necessary by the United States pursuant to paragraph 44.4. Any lease, license, or other instrument by which the United States provides for the use of any portion of the Arsenal by non-Federal parties shall require such parties to comply with all such restrictions and requirements.

44.8    If, after the effective date of this Agreement, the United States decides to lease, grant a license, or otherwise provide for the use by any non-Federal party of the Arsenal, or any portion thereof, it shall first issue and deliver to Shell a proposed Report of Availability, which shall include, at a minimum, the following information: (a) a legal description of the land involved (together with a plat depicting such land); (b) a description of the nature, scope, and extent of any hazardous substance, pollutant, or contaminant located in, on, or under the land involved, as reflected by the On-post RI/FS (as affected by the implementation of Response Actions) or as otherwise known to the United States; (c) the specific use(s) of the property to be allowed by the lease, license, or other instrument and the means by which the non-Federal party will implement those specific uses (including the extent of any excavation or other subsurface disturbance); (d) the restrictions and requirements identified in paragraphs 44.2-44.4 and

- 99 -

the Technical Program Plan as applied to the specific use(s) reflected in the Report of Availability; and (e) any additional restrictions and requirements to be included in the lease, license, or other instrument. The United States shall issue and deliver to Shell and the State the proposed lease, license, or other instrument by which the United States intends to provide for use by any non-Federal party of the Arsenal, or any portion thereof.

44.9    Shell and the State shall have 30 days after receipt of any proposed Report of Availability in which to provide written comments to the United States. This period shall be extended by the United States for an additional 30 days at the request of Shell or the State. The United States shall respond to the comments within 30 days after receipt of those comments. After receipt of the United States' response, if any Organization disagrees about the proposed Report of Availability, then any Organization may invoke Dispute Resolution by notifying the RMA Council of the dispute within 14 days after receipt of the United States' response. The United States shall not take any action with respect to the lease, license, or other instrument until the period for invoking Dispute Resolution has expired. If Shell or the State invokes Dispute Resolution, the United States shall not take any action with respect to the lease, license, or other instrument until completion of Dispute Resolution. The only issue to be addressed during Dispute Resolution or judicial review concerning the United States' proposed lease, license or other instrument shall be whether the action proposed by such instrument would be consistent with the protection of human health and the environment. If the proposed action is determined to be consistent with the protection of human health and the environment, it may proceed. If Dispute Resolution is invoked pursuant to this paragraph, and at that time a Federal agency other than the Army has management authority over the property involved in the dispute, appropriate officials of that Federal agency shall participate in Dispute Resolution in lieu of Army officials. Following Dispute Resolution, Shell shall have the right to seek judicial review of the FRC's decision by filing a motion with the Court within 30 days of that decision. The Report of Availability shall be revised to reflect the outcome of Dispute Resolution or judicial review.

44.10    The United States shall incorporate into the lease, license, or other instrument all restrictions and requirements identified in the Report of Availability and any restrictions and requirements resulting from Dispute Resolution or judicial review. A copy of the lease, license, or other agreement shall be provided to Shell at least 30 days prior to its effective date. The United States shall attach to the lease, license, or other instrument the following documents: (a) the Report of Availability issued pursuant to paragraph 44.8, (b) the comments of Shell and the State on the Report of Availability, (c) the United States' response, and (d) a statement of whether Dispute Resolution was invoked and the results of that process. The United States shall then record the lease, license, or other instrument and the attachments listed in the previous sentence in the real property records of Adams County, Colorado.

- 100 -

44.11    The United States shall follow all the procedures set forth in paragraphs 44.8-44.10 for any lease, license, or instrument that provides for use by a non-Federal party of the Arsenal, or of any portion thereof, or for any amendment, modification, or other change to any such lease, license, or other instrument.

44.12    Any person having actual or constructive notice of any filing made pursuant to paragraph 44.10 shall be bound by such filing.

## XLV.  AMENDMENT

45.1    Unless and until this Agreement is incorporated into a Consent Decree that has been entered by the Court, this Agreement may be amended at the request of a Signatory upon unanimous agreement of the Signatories.

45.2    Upon incorporation of this Agreement into a Consent Decree that has been entered by the Court, the terms of this Agreement may be amended only by modifying the Consent Decree pursuant to the terms and conditions of that Decree.

45.3    Notwithstanding the preceding paragraph, if the United States Supreme Court declares any provision(s) in CERCLA unconstitutional, or if the United States elects not to appeal such a declaration by a lower Federal court, any Party without the approval of the other, may petition the Court to modify such Consent Decree in light of any such declaration.  Any modification to such Consent Decree shall be subject to public comment pursuant to paragraph 3.5-3.7.

**EFFECTIVE:**  February 17, 1989

FOR THE UNITED STATES OF AMERICA

By the Department of the Army:


1/23/89
Date

LEWIS D. WALKER
Deputy for Environment
Safety & Occupational Health

- 102 -

By the United States Environmental Protection Agency:

1/23/89                    _J. Winston Porter_
Date                       J. WINSTON PORTER
                           Assistant Administrator for Solid
                           Waste and Emergency Response

- 103 -

By the United States Environmental Protection Agency, Region VIII:

_2 -15 -95_
Date

JAMES J. SCHERER
Regional Administrator
Region VIII

- 104 -

By the United States Department of Interior

1-24-89
Date

_Galen Buterbaugh_
GALEN BUTERBAUGH
Regional Director
Region 6
U.S. Fish and Wildlife Service

- 105 -

By the United States Department of Interior:

Feb 9, 1989
Date

BECKY NORTON DUNLOP
Assistant Secretary for Fish,
 Wildlife and Parks
U.S. Department of Interior

- 106 -

By the Agency for Toxic Substances and Disease Registry,
United States Department of Health and Human Services:


_1/2c/99_
Date

_William D. Adam_
BARRY JOHNSON
Associate Administrator
Agency for Toxic Substances
  and Disease Registry
Department of Health and
  Human Services


_1/2c/89_
Date

_Paula L. Kocher_
PAULA L. KOCHER
Senior Attorney
Office of the General Counsel
Agency for Toxic Substances
  and Disease Registry
Department of Health and
  Human Services


- 107 -

By the United States Department of Justice:


Apr. 1, 1999                    _____
Date                            MYLES E. FLINT
                                Deputy Assistant
                                Attorney General


- 108 -

FOR SHELL OIL COMPANY:

Date _2/15/89_     R. G. DILLARD
Vice President

Date _2/15/89_     HOLME ROBERTS & OWEN
A. EDGAR BENTON
DANIEL S. HOFFMAN
EDWARD J. McGRATH
Attorneys for Shell Oil Company
1700 Lincoln, Suite 4100
Denver, Colorado  80203

- 109 -

# EXHIBIT A

## TO FEDERAL FACILITY AGREEMENT

## THE ARSENAL

## THE ARSENAL

The Rocky Mountain Arsenal consists of the following described land in Adams County, Colorado:

1.   In Township 2 South, Range 66 West of the Sixth Principal Meridian:

All of Sections 19, 20, 29, 30, 31 and 32;

2.   In Township 2 South, Range 67 West of the Sixth Principal Meridian:

a.   All of Sections 24, 25, 26, 34, 35 and 36; and

b.   That portion of Sections 22, 23, 27, 28 and 33 lying Southeasterly of the Southeasterly Right-of-Way line of U.S. Highway No. 6;

3.   In Township 3 South, Range 66 West of the Sixth Principal Meridian:

All of Sections 5, 6, 7 and 8;

4.   In Township 3 South, Range 67 West of the Sixth Principal Meridian:

a.   All of Sections 1, 2, 3, 4 and 11;

b.   All of Section 9, excepting therefrom the East 660.00 feet of the West 1260.00 feet of the South 660.00 feet of the SW/4 of Section 9;

c.   The East 50 feet, the North 50 feet, and the West 50 feet of Section 10; and

d.   All of Section 12.*

---

*   The following described tract of land in Section 12, T. 3 S., R. 67 W., 6th P.M. is owned by the United States and operated by the United States Army but was removed from the area officially designated as the Rocky Mountain Arsenal for other purposes in 1982:  beginning at a point on the West line of said Section 12 which bears North 00°06'07" West, 155.00 feet from the Southwest corner thereof; thence North 00°06'07" East, 480.00 feet; thence South 89°49'34" East, 900.00 feet; thence South 00°06'07"
Footnote continued on next page.

A-1

The above described land contains 17,073.70 acres, more or less.

---

Footnote continued from previous page.
    West, 480.00 feet; thence North 89°49'34" West, 900.00
    feet to the Point of Beginning.

A-2

**EXHIBIT B**

**TO FEDERAL FACILITY AGREEMENT**

**THE SITE**

EXHIBIT B

# THE SITE



EXHIBIT C

TO

FEDERAL FACILLITY AGREEMENT

SUPPLEMENTAL AGREEMENT BY THE STATE TO
BE BOUND BY THE DISPUTE RESOLUTION PROCESS

ESTABLISHED PURSUANT TO THE PROVISIONS OF THE
FEDERAL FACILITY AGREEMENT

## EXHIBIT C

## SUPPLEMENTAL AGREEMENT BY THE STATE OF COLORADO TO BE BOUND BY THE DISPUTE RESOLUTION PROCESS

## ESTABLISHING PURSUANT TO THE PROVISIONS OF THE FEDERAL FACILITY AGREEMENT

### Recitals

A.       The United States Army ("Army"), the United States Environmental Protection Agency ("EPA") the United States Department of the Interior ("DOI") and Shell Oil Company ("Shell") have established a process for resolving disputes ("Dispute Resolution") that arise concerning the planning, selection and implementation of response actions resulting from the release or threatened release of hazardous substances, pollutants or contaminants at or from Rocky Mountain Arsenal.

B.       The Dispute Resolution Process is set forth in the accompanying Federal Facility Agreement ("Agreement").

C.       The State of Colorado (the "State") has not yet signed the Agreement.

D.       The State, the Army, EPA and Shell believe that it is desirable for the State to participate in Dispute Resolution, even though the State is not yet a signatory to the Agreement.

E.       Paragraph 30.2 of the Agreement requires that before the State may participate in Dispute Resolution, the State must agree to comply with the procedures for that process.

F.       The State, the Army, EPA and Shell desire to enter into this Supplemental Agreement to satisfy the requirements of paragraph 30.1 of the Agreement that the State agree to comply with the procedures for the Dispute Resolution process.

- C1 -

## Supplemental Agreement

In consideration of the foregoing, the State, the Army, EPA and Shell (collectively, the "parties") hereby agree as follows:

1.      This Supplemental Agreement shall be attached to and become a part of the Agreement.

2.      After execution of this Supplemental Agreement by all the parties, the Army, EPA, DOI and Shell shall not modify any provision of the Agreement that relates directly to the State's right to participate in the Dispute Resolution process under the Agreement, without the consent of the State.

3.      The State agrees to comply with all applicable provisions of the Agreement concerning the Dispute Resolution process, including without limitation the following:

(a)      The State must commence Dispute Resolution within the applicable time period specified by the Agreement or, if no time is specified, within a reasonable time after the State concludes that a dispute exists.

(b)      The State shall comply with all other applicable time periods specified for the Dispute Resolution process.

(c)      The State shall make a good-faith effort to resolve any dispute at each Dispute Resolution level before requesting that it be elevated to the next higher level for resolution.

(d)      The State shall prepare a concise statement of the issue in dispute and identify the activities, if any, that it believes are affected by the dispute in such a way that they should not proceed during Dispute Resolution.

(e)      The State shall not seek judicial review of an issue in dispute while the Dispute Resolution process is under way.

(f)      The State may only seek judicial review of an issue if the issue is subject to judicial review under the Agreement and the State first attempted to resolve the matter through Dispute Resolution.

(g)      The State shall comply with applicable provisions of paragraph 39.2 of the Agreement concerning timing of judicial review.

(h)      The applicable provisions of the Agreement setting forth how, and by whom, a dispute is to be resolved at any given level in the Dispute Resolution process

- C2 -

shall be binding upon the State subject to judicial review as set forth in of the Supplemental Agreement.

(i)    Only those issues identified in the Agreement as subject to Dispute Resolution by the State or all the Organizations may be raised to Dispute Resolution by the State.

(j)    The State shall treat as highly confidential and not publish, divulge, disclose or make known in any manner or to any extent not authorized by law, any Confidential Information (as defined in the Agreement) received by, or made available to the State, in connection with any activities performed pursuant to the Consent Decree.

(k)    Oral statements made in the course of Dispute Resolution, and documents prepared solely for use in Dispute Resolution, shall be kept confidential and shall not be disclosed to any non-party, and shall be considered statements made in furtherance of settlement and entitled to the protection afforded such statements and documents by the Federal Rules of Evidence and the Colorado Rules of Evidence. Persons who participate in the Dispute Resolution process shall not be subject to deposition or other discovery concerning statements made during, in preparation for, or in connection with Dispute Resolution.

- C3 -

FOR THE UNITED STATES OF AMERICA

By the Department of the Army


_____          _____
Date                                         LEWIS D. WALKER
                                                 Deputy for Environment,
                                                 Safety & Occupational Health


By the United States Environmental Protection Agency


_____          _____
Date                                         JAMES J. SCHERER
                                                 Regional Administrator
                                                 Region VIII


By the Department of Justice


_____          _____
Date                                         MYLES E. FLINT
                                                 Deputy Assistant
                                                 Attorney General


- C4 -

FOR SHELL OIL COMPANY

_____   _____
Date       R. G. DILLARD
         Vice President

_____   _____
Date       HOLME ROBERTS & OWEN
         A. EDGAR BENTON
         DANIEL S. HOFFMAN
         EDWARD J. McGRATH
         Attorneys for Shell Oil Company
         1700 Lincoln, Suite 4100
         Denver, Colorado  80203

- C5 -

FOR THE STATE OF COLORADO

<u>By the Department of Health</u>

_____        _____
Date                                                    THOMAS M. VERNON
                                                             Executive Director

<u>By the Department of Law</u>

_____        _____
Date                                                    DUANE WOODARD
                                                             Attorney General

1419nh.doc

- C6 -